FILED

MAR 17   3 10 PM '89

CLERK, U.S. DISTRICT COURT
DISTRICT OF OREGON

BY _____

TIM WEAVER of
Cockrill, Weaver & Bjur, P.S.
316 North Third Street
Post Office Box 487
Yakima, Washington    98907
(509)  575-1500
Attorneys for Yakima Indian Nation

IN THE UNITED STATES DISTRICT
FOR THE DISTRICT OF OREGON

UNITED STATES, et al.,            )
                                  )
          Plaintiff,              )    Civil No. 68-513
                                  )
vs.                               )    YAKIMA INDIAN NATION'S
                                  )    MEMORANDUM IN OPPOSITION
STATE OF OREGON, et al.,          )    TO THE COLVILLE TRIBE'S
                                  )    MOTION TO INTERVENE
          Defendant.              )
_____)

I

## INTRODUCTION

The Colville Confederated Tribes (hereafter Colville), with a reservation located around Nespelem, Washington, on the upper Columbia and Okanogan Rivers, has moved for intervention as a matter of right in this twenty-one year old Indian fishing rights case.  The Yakima Nation opposes this motion on several bases.

It is untimely, highly prejudicial to the interests of the existing parties and fails to supply a sufficient showing interest in the subject matter of this action.

Contrary to their allegations, Colville interevention at this stage of the proceedings will not simply dove-tail into the

MEMORANDUM IN OPPOSITION - 1 -

1623

LAW OFFICES OF
COCKRILL, WEAVER & BJUR, P.S.
316 NORTH THIRD STREET
P.O. BOX 487
YAKIMA, WASHINGTON 98907
TEL: 575-1500

comprehensive Management Plan (Edwards and George affidavits filed herewith). Instead, granting of intervention has the potential of plunging the parties back into extensive litigation and uncertainty. The Yakima Indian Nation approved the Management Plan on the basis that it would resolve, during its term, the vast majority of litigation. Had the Yakima Nation been aware of the claims and assertions of the Colville Nation, either throughout the twenty-one year course of this litigation or at any time prior to finalization of the Management Plan, it would have altered its stance in that Management Plan (George affidavit). Further, the granting of the petition may significantly alter the position of the Yakima Indian Nation vis-a-vis the terms and provisions of the Management Plan.

Granting of the petition will, as was the case with last year's petitioners, the Makahs, present the Court with novel, unique and complex issues of law with which it has never dealt, many of which are not subjects of the original proceeding herein. The most novel and complex is the Colville's request for a declaration that the entire Colville Confederated Tribes be entitled to exercise treaty rights of another distinct, federally recognized and functioning tribal government (Yakima).

As argued _infra_, this is a question of first impression before any court and will require significant litigation. The Confederated Tribes and Bands of the Yakima Indian Nation possess, control and are exercising the interests of all parties named in the Yakima Treaty and, accordingly, dispute the tardy assertions of the Colvilles.

Overlaid on the alleged Colville treaty right issue is the additional issue of how fish harvested by Colville fishermen should be allocated in the treaty- non-treaty sharing formula. As noted _infra_, even assuming some portion of the Colville Tribe holds an undefined treaty right, the vast majority of Colville tribal members have no treaty secured right to fish on Columbia River stocks. They, accordingly, hold no rights to demand a share of

MEMORANDUM IN OPPOSITION - 2 -

LAW OFFICES OF
COCKRILL, WEAVER & BJUR, P.S.
316 NORTH THIRD STREET
P.O. BOX 487
YAKIMA, WASHINGTON 98907
TEL: 575-1500

fish from treaty tribes. Yakima submits that any fish harvested by non-treaty Colvilles must be counted against the non-treaty share and that Yakima harvest cannot be restrained to supply such fish to Colville. Yakima assumes this will be unacceptable to Washington, Oregon and Colville, thereby assuring litigation among all parties.

It also will require the resolution of Colville fishing claims to which **no** treaty right applies, an issue requiring expansion of the subect matter of this case. The Colvilles wish to thrust the obligation to reach such a determination upon all the parties to this case, who until the Colville filings were received, perceived that they had at the very least resolved the allocation issues involved in this case. Colville may have a claim against the United States and Washington over this issue, but all of the other parties should not be forced to litigate along with them.

As was argued in opposition to the Makah intervention, this action will significantly expand the physical boundaries of this litigation. While it is unclear from the Colville filings as to the exact nature of their claim, it is clear that they are asking that the court determine their rights to fish **above the area of the Columbia managed jointly by Oregon and Washington**. The area in which they apparently claim the majority of their rights is totally within the boundaries of the State of Washington and solely subject to its jurisdiction. It appears that Colville can seek resolution of its rights against the State of Washington in a forum other than United State v. Oregon.

Colville prays for a declaration that **all parties be required to recognize Colville treaty rights in all future management action and that its members receive an "equitable share" of fish**. These allegations, while couched in general terms, seek declaratory and injunctive relief not only against Oregon and Washington, but also against the Yakima Indian Nation. The Yakima Nation, as a sovereign, has not consented to such action nor has it in any way waived its sovereign immunity from suit by Colville.

MEMORANDUM IN OPPOSITION - 3 -

LAW OFFICES OF
COCKRILL, WEAVER & BJUR, P.S.
316 NORTH THIRD STREET
P.O. BOX 487
YAKIMA, WASHINGTON 98907
TEL: 575-1500

The remedy requested by Colville, as a new intervenor in this case, cannot be asserted against Yakima.

The petition is grossly out of time. The Colvilles, unlike the Shoshone-Bannock and Makah tribes (both of whom alleged rights separate and distinct from tribal parties already in the case and perhaps can arguably be said to have some excuse for wasting 16 to 18 years to move for intervention) allege rights in this case identical to those of at least two other parties (Yakima and Nez Perce). Colville claims the right to share in the harvest by those tribes and to fish the same usual and accustomed places. Colville claims that its rights derive from the Yakima Treaty of 1855 and have theoretically been in existence since that time. As argued _infra_, the Colvilles have never before asserted the rights they now claim. They instead have chosen to let the Yakima Nation, whose resources have been at least as limited as those possessed by Colville (George affidavit), adjudicate every aspect of these rights without one iota of assistance. During the period that Yakima has been actively protecting its rights, it has received no notice that Yakima was, under the Colville theory, without authority to pursue and protect their rights. Colville now blithely asserts that it owns these rights and it is now time to exercise them as a full party to this proceeding. Yakima requests that the court refuse to allow Colville to intervene in this case at this stage.

II

### INTERVENTION AS OF RIGHT UNDER RULE 24(a)(2)

A motion for intervention as of right must satisfy four requirements: (1) the motion must be timely; (2) the applicant must assert an interest relating in the subject matter of the litigation; (3) the applicant's interest must be impaired by disposition of the action without the applicant's involvement; and (4) the applicant's interest must be inadequately represented by the other parties. United States v. $129,374 in U.S. Currency, 769

MEMORANDUM IN OPPOSITION - 4 -

LAW OFFICES OF
COCKRILL, WEAVER & BJUR, P.S.
316 NORTH THIRD STREET
P.O. BOX 487
YAKIMA, WASHINGTON 98907
TEL: 575-1500

F.2d 583, 585 (9th Cir. 1985).  The applicant has the burden of proving each of the four elements of intervention as of right; the lack of one element requires that the motion to intervene be denied.  Keith v. Daley, 764 F.2d 1265, 1268 (7th Cir. 1985).

## A.    THE COLVILLE MOTION IS UNTIMELY.

The threshold question in determining whether intervention should be allowed, either as a matter of right or permission, is whether the application is timely.  Arkansas Electric Energy Consumers v. Middle South Energy, Inc., 772 F.2d 401, 403 (8th Cir. 1985).  Although the issue of timeliness "is determined from all the circumstances," NAACP v. New York, 413 U.S. 345, 366 (1973), three factors receive particular attention:  (1) the stage of the proceedings at which the movant seeks to intervene; (2) the prejudice to other parties that would result from intervention; and (3) the reason for and length of the delay.  United States v. Oregon, 745 F.2d 550, 552 (9th Cir. 1984).

### 1.    Stage of the Proceedings.

a. Colville intervention will disrupt the Management Plan.

The parties hereto have finalized five years of negotiation with the approval of the comprehensive Management Plan presently before the court.  Colville now requests intervention as a full party and asks that the court declare that it should simply be inserted in the Management Plan as an additional party. Colville asks this court to allow it full party status with the clearly implied purpose of altering portions of the plan which constitutes a major portion of the consideration afforded the Yakima Nation under the Plan.

The Colville tribe, instead of joining in the litigation at a phase where its concerns and claims of full treaty rights could have been made known to all parties prior to finalization of

MEMORANDUM IN OPPOSITION - 5 -

LAW OFFICES OF
COCKRILL, WEAVER & BJUR, P.S.
316 NORTH THIRD STREET
P.O. BOX 487
YAKIMA, WASHINGTON 98907
TEL: 575-1500

the plan, instead wishes to enter the case after the matter has been concluded. See, Aleut Corporation v. Tyonek Native Corporation, 725 F.2d 527, 530 (9th Cir. 1984) ("intervention on the eve of settlement following several years of litigation was not timely"). Obviously, Colville's motion to intervene at this late stage of the proceedings is untimely under Fed.R.Civ.P. 24(a)(2).

Colville claims their intervention in this proceeding is timely because they are willing to accept the case as it stands. Colville asserts that its intervention can be fully accommodated under the existing plan with no disruption. In fact, the Colvilles present issues that will substantially alter the provisions of the current Plan (Edwards affidavit). As reflected in the George affidavit, the Colvilles have been aware of the U.S. v. Oregon proceeding for years and have chosen to ignore the process until it is apparent that many of the major issues have been resolved by other parties' efforts.

While it is obviously the strategy of the Colvilles in their position to intervene is to appear to agree to all prior orders and allege that they will do nothing to disrupt the present Plan, in practical terms that cannot be accomplished. Colville has approximately 7,000 tribal members, all of whom would theoretically be entitled to exercise a fishing right under Colville's complaint. These rights as alleged by Colville would extend at least as far down stream as the Hanford Reach area and would therefore entitle Colville to fish on nearly every run of consequence to the Yakima Nation and the other intervenor tribes. As reflected in the affidavits, the Plan makes no provision for such a fishery in this area, nor does it make any provision for the sharing claimed by Colville. Colville fails to demonstrate how it can conduct such a fishery without major disruption of the current sharing escapement and management formulas under the Plan, or without major litigation over the nature and extent of their rights. Such litigation clearly is a "disruption" of the present Plan which the parties worked so hard to finalize. Clearly Colville cannot

MEMORANDUM IN OPPOSITION - 6 -

LAW OFFICES OF
COCKRILL, WEAVER & BJUR, P.S.
316 NORTH THIRD STREET
P.O. BOX 487
YAKIMA, WASHINGTON 98907
TEL: 575-1500

justify its intervention on the bald assertion that it will not disrupt the Plan.

b.    The court must consider the timeliness of Colville's filing under all the circumstances surrounding the case.

The Yakima Nation, under whose treaty Colville now makes its claim, has been involved in litigation over Yakima Treaty rights on the Columbia since the turn of the Century. These efforts and lawsuits have always been brought on behalf of the 14 Confederated Tribes and Bands of the Yakima Indian Nation and have been for the benefit of all of them. Beginning with U. S. v. Winans in 1905, through Seufert Brothers v. U.S., _____ U.S. _____; Tulee v. Washington, _____ U.S. _____; twenty-one years of U.S. v. Oregon, fifteen years of U.S. v. Washington; three different cases against the Secretary of Commerce to reduce ocean interceptions of fish bound for the Yakimas' usual and accustomed fishing areas (and the areas Colville claims), innumerable appeals to the Ninth Circuit and the United States Supreme Court; twenty years of United States/Canada salmon interception treaty negotiation; passage of the Northwest Power Act and the Columbia River Gorge Protection Bill; and concluding with six years of extensive negotiation (covering both the present Management Plan and the February 28, 1977 "Five Year Plan"), the Yakimas and other intervenor tribes have established their place in this fishery. They have, by assertion of their treaty rights, forced the states and the United States to revitalize these up river runs and bring them back to their present status. Throughout that long process, the present intervenor tribes have established precedents on treaty issues throughout the United States and have expended their meager resources to protect and enhance these rights. None of these proceedings have been a secret, nor has the Yakimas' assertion of these rights on behalf of all fourteen tribes found in its treaty.

Under the equitable principles upon which this case is based, it is only fair that Colville, who alleges a right identical

MEMORANDUM IN OPPOSITION - 7 -

LAW OFFICES OF
COCKRILL, WEAVER & BJUR, P.S.
316 NORTH THIRD STREET
P.O. BOX 487
YAKIMA, WASHINGTON 98907
TEL: 575-1500

to those litigated in this case for the last twenty-one years should bear a heavy burden in explaining its absence. For Colville to claim inadequacy of resources simply begs the question as the other tribes involved in this case find themselves in similar or worse consequences. Their claim of no fish being available falls into the same category. The whole history of their case has been based on the assertion of treaty rights to a small or non-existent share of the resource. This did not detour the other tribes. As noted infra, Colville received $3,250,000 in the Court of Claims in 1978 as a result of damages to its reservation based fishery, yet it did not seek intervention in this case at this point.

Only now, after the Yakimas and others completed the tasks above set forth, have the Colvilles chosen to come forward and claim the spoils of others' victories. As the issue of timeliness must be determined from all the circumstances, NAACP v. New York, supra, the court should consider the actions of the Colvilles in light of the above scenario. Fundamental fairness dictates that Colville not now be allowed to step into this case at this stage, claiming rights founded in equity, and move in to reap the benefits of others' toils.

c. Finalization of the Management Plan is not a "new stage" in this litigation.

Finalization of the Management Plan does not represent a new stage in these proceedings. Instead it represents the culmination of a quasi settlement process by the parties which was initiated by court order in 1983 (Judge Craig's Order of 1983). It represents the finalization of that process, rather than a beginning where new interests may be asserted. As this court noted with regard to intervention by the Makah Tribe in 1988:

> I find that the present motion is not timely. The circumstances before me are different than those before the court when Idaho sought intervention. Here, the parties have been negotiating since the original Plan expired in 1982. The contention by the Makah Tribe that

MEMORANDUM IN OPPOSITION - 8 -

LAW OFFICES OF
COCKRILL, WEAVER & BJUR, P.S.
316 NORTH THIRD STREET
P.O. BOX 487
YAKIMA, WASHINGTON 98907
TEL: 575-1500

<u>this is a new stage is incorrect</u>. This court ordered the parties to negotiate a new plan in 1983. <u>United States v. Oregon</u>, Civ. 68-513 (August 24, 1983). The Makah Tribe's active participation in the companion cases in the United States District Court for the District of Washington and the order by this court on August 24, 1983 are conclusive evidence of the Makah Tribe's awareness of the status of this action. I feel that the Makah Tribe, if in other respects a proper party, should have sought intervention at that time. However, in light of subsequent rulings in this case, the appropriate time for a motion to intervene by the Makah Tribe would have been within a reasonable time after October 16, 1984, the date that the Ninth Circuit entered its opinion granting Idaho status as an intervenor, or certainly by the time the Shoshone-Bannock Tribes petitioned for intervention in 1986. The Makah Tribe has not offered any reason for its delay in moving to intervene. On the other hand, during that time, the parties have made significant strides in reaching agreement and the moving parties have presented a new 1988 Plan to the Court. <u>Each portion of the complex Plan reflects concessions made and relates to other portions of the Plan. To allow participation by the Makah Tribe now would require the parties to start negotiating all over again. I find this would significantly prejudice the existing parties</u>.

There is no difference between the effects of the Makah and this request for intervention, except the passage of an additional six months in the case of the Colvilles. The court should adhere to its ruling regarding Makah and deny Colville intervention.

2. Prejudice to the existing parties if intervention is permitted.

Prejudice to the existing parties is "the most important factor in determining the timeliness of a motion to intervene as of right." <u>Petrol Stops Northwest v. Continental Oil Company</u>, 647 F.2d 1005, 1010 (9th Cir. 1987); <u>U.S. v. Oregon</u>, 745 F.2d 550 (9th

MEMORANDUM IN OPPOSITION - 9 -

LAW OFFICES OF
COCKRILL, WEAVER & BJUR, P.S.
316 NORTH THIRD STREET
P.O. BOX 487
YAKIMA, WASHINGTON 98907
TEL: 575-1500

Cir. 1984). Colville's intervention would prejudice the Yakima Indian Nation in the following regard:

a. **Colville intervention prejudices Yakima by requiring that they either agree to a smaller share of the Finite resource of the Zone 6 Fishery, or face litigation to seek other fishing areas, all after the fact in this case.**

Granting of the untimely Colville petition for intervention will severely prejudice the Yakima Indian Nation in the exercise of its treaty secured fishing rights. Colville's success on its claims will ultimately result in Yakima being required to share some portion of fish to which it is now entitled and harvesting in the Zone 6 area. Yakima already engages in such sharing with the other three intervenor tribes and limits its fishery to the area above Bonneville Dam, solely because such an arrangement was suitable under the circumstances of the case at that point in time. During the negotiation process, the Yakima Nation considered asserting its claims to fisheries at its usual and accustomed places in the lower Columbia River (George affidavit), in order to provide its fishermen a greater harvest opportunity. However, based upon the guarantees of Indian harvest made in the Plan, the contemplation that these fish would only be shared with the present three other intervenor tribes, and the other consideration offered by the States and the United States, the Yakima Indian Nation agreed to the terms of the present Management Plan.

As reflected in the George affidavit, had the Yakima Nation been aware that it would suddenly be faced with an additional 7,000 member tribe asserting an equal sharing right to the Finite Zone 6 resource, Yakima would have reacted differently on the lower Columbia River issue. Colville intervention and potential sharing of the fish presently available in Zone 6 area results in Yakima being forced, after the fact, to accept a sharing pattern which it most likely would have rejected had the situation arisen prior to the finalization of the Management Plan.

MEMORANDUM IN OPPOSITION - 10 -

LAW OFFICES OF
COCKRILL, WEAVER & BJUR, P.S.
316 NORTH THIRD STREET
P.O. BOX 487
YAKIMA, WASHINGTON 98907
TEL: 575-1500

Colville's intervention further forces Yakima to make a choice to either accept Colville intervention, litigate with Colville and/or litigate the lower river issue, all results not contemplated by Yakima when it agreed to the Management Plan. In a case based upon equity it is both unjust and inequitable to place Yakima in such a dilemma after the fact.

        b.   **Allowing Colville intervention now places undue and unjust litigation burden on the Yakima Indian Nation.**

A significant element of the consideration for Yakima approval of the Plan was the cessation of a good deal of litigation. Now Colville asserts a right which is neither recognized by nor acceptable to the Yakima Nation, and which presents an issue of first impression to the courts, mandating additional litigation. As the George affidavit indicates, had these issues been presented in a timely fashion, the Yakima Nation could have decided to expend its resources on litigating them prior to the exhaustive five year negotiations leading to this Plan, in order to determine whether and how such a plan could be formulated with these issues resolved. Colville's tardy conduct has deprived the Yakima Indian Nation of that opportunity, and instead presents Yakima with no choice but to litigate those issues and then attempt to fit them within the framework of the Plan. Assuming Colville was in some respects successful Yakima would insist that Plan would no longer be workable. Such a result is inequitable and prejudiced to existing parties.

Additionally, if Colville were successful in all or a portion of its claims, Yakima will most likely be forced to seek fisheries in the lower Columbia River to compensate for any fish it may have to share with Colville. Obviously this will result in either further negotiations or litigation, both of which Yakima was seeking to avoid in the finalization of this Plan. It is just such a situation that the rules surrounding timeliness of intervention

MEMORANDUM IN OPPOSITION - 11 -

LAW OFFICES OF
COCKRILL, WEAVER & BJUR, P.S.
316 NORTH THIRD STREET
P.O. BOX 487
YAKIMA, WASHINGTON 98907
TEL: 575-1500

were designed to prevent.  Clearly Colville's action at this time presents real and serious prejudice to the existing parties.

c.  Colville intervention and assertion of the right claimed in its petition will disrupt the Management Plan.

As noted in the Timeliness Section above and the affidavits of Levi George and Jean Edwards, the Colville claim will not simply meld into the Plan.  Such disruption clearly prejudices the rights of the existing parties and is grounds for denial of the petition on the same bases that this court rejected the Makah petition.

d.  The Colville action requests waiver of the Yakima Indian Nation's sovereign immunity.

Colville requests declaratory relief against Yakima regarding Colville's treaty right, usual and accustomed places and sharing formulas.  Yakima has briefed and argued this issue in the Idaho, Sho-Ban and Makah intervention issues.  That briefing and argument is applicable to this case as well and Yakima adopts herein its arguments in those cases by this reference.

Yakima did not waive its sovereign immunity to the world by intervening in this case.  It chose to intervene and litigate with the parties to the case at the time of intervention.  Colville was not such a party and Yakima refuses to waive its immunity from suit by Colville.  Under the circumstances, this court cannot grant the declaratory relief requested by Colville as Yakima is immune from those claims.

Allowing Colville intervention, however, could be interpreted as a defacto waiver of Yakima immunity.  U.S. v. Oregon, _____ F.2d _____ 1981.  In that case the Ninth Circuit held that Washington could sue Yakima over an issue involving the fish res in this case, over Yakima's claim of immunity, on the basis that Yakima Indian Nation intervention in this case waived its immunity.  Yakima Nation believes that the decision of the Circuit

MEMORANDUM IN OPPOSITION - 12 -

LAW OFFICES OF
COCKRILL, WEAVER & BJUR, P.S.
316 NORTH THIRD STREET
P.O. BOX 487
YAKIMA, WASHINGTON 98907
TEL: 575-1500

in that case did not constitute a ruling that Yakima had waived its immunity to subsequent intervenors in the case, but it is obvious that Colville intends to interpret that decision in the regard that such a waiver did occur. Colville's actions at this point in time forces the Yakima Nation to once again appear and defend itself in costly and extensive litigation on this issue. By subjecting Yakima to such claims on an untimely filing contributes prejudice.

**e. Colville intervention at this late date violates the equitable nature of these proceedings.**

This action is based upon equitable principals and the Colvilles come before the court seeking equity. The old maxim "one who seeks equity must do equity" is pertinent to their request. The relative equities of the parties weigh heavily in favor of denial of the petition and the court should exercise its equitable jurisdiction in making such a denial.

**3.    Colville shows no valid basis for its failure to intervene at an earlier stage of these proceedings.**

Unlike the other recent intervenors (Idaho, Sho-Ban and the Makah) Colville here alleges that it holds rights identical to those held by Yakima and apparently has held those rights since the signing of the Yakima Treaty on June 9, 1855. If that is in fact the case (which Yakima adamantly opposes), what basis does Colville advance for its failure to assert those rights prior to its filing on February 22, 1989? As argued, supra, Colville should have a heavy burden on this issue. Its stated reasons appear insufficient to justify its delay. Colville does not assert that these proceedings were kept a secret, that they were unaware of the proceedings in this case since it was filed in 1968, nor that it was aware of the negotiations of the Management Plan (George affidavit). Colville makes no explanation why it has failed to assert these alleged rights since the court's initial ruling in this case in 1969. Judge Belloni decreed the nature and extent of

MEMORANDUM IN OPPOSITION - 13 -

LAW OFFICES OF
COCKRILL, WEAVER & BJUR, P.S.
316 NORTH THIRD STREET
P.O. BOX 487
YAKIMA, WASHINGTON 98907
TEL: 575-1500

Yakima Treaty right in that case, pursuant to which Yakima, as a federally recognized tribal government, has allowed its members to exercise their rights. Fish have been available for harvest at Yakima usual and accustomed places since that time, yet Colville has never asserted these rights. Had they done so and given Yakima timely notice of their claims, the entire face of this litigation may well have been altered in its formative years in order to deal with these claims.

It is equally disingenuous of Colville to insist that it did not intervene because there were no fish available. It is a matter of record that all of the other tribes have expended considerable resources and efforts to protect stocks upon which there was no harvest. This is particularly true of the summer chinook, which was one of the major stocks for which the Yakimas have fought in the United States Canada process, yet there have been virtually no fisheries in this stock since 1964.

Colville's claim of a lack of resources and participation in other matters involving upper River stocks as an excuse for failure to intervene is disingenuous at best. Every other tribe involved in this case has both participated fully in this case and in numerous other proceedings of importance to this resource, while having no greater, and, in the case of intervenors Umatilla and Nez Perce, significantly less resources than the Colville. In light of Colville's claim of no resources, it is interesting to note that on September 28, 1978, the Court of Claims in the above-mentioned Docket No. 181-C awarded the Colville Tribe $3,257,083.00 in damages from the United States for damage to Colville on reservation interests. It appears that the Colville Tribe had a substantial amount of money available to it to provide assistance for dealing with this issue. Apparently Colville made a conscious choice to sit on its claimed rights while others resolved them, even though substantial resources were available to Colville. The excuses Colville raises, when weighed against the prejudice to existing parties, cannot justify their tardy application.

MEMORANDUM IN OPPOSITION - 14 -

LAW OFFICES OF
COCKRILL, WEAVER & BJUR, P.S.
316 NORTH THIRD STREET
P.O. BOX 487
YAKIMA, WASHINGTON 98907
TEL: 575-1500

This court should further consider that Judge Belloni, in 1968 declared that the Yakima Nation held the federally secured _fishing_ rights of the tribes confederated at Yakima. That ruling has stood without contest or appeal for twenty-one years. If Colville holds the rights it claims, can it explain why it has not challenged Yakimas exercise of these rights all these years? It has certainly failed to do so in its pleadings.

    4.  **Colville's interest in this case is unclear at best.**

        a.  **Colville's claim of the right to assert treaty rights of another federally recognized Indian tribe has never been adjudicated.**

    It is not the intention of the Yakima Indian Nation to debate, on this motion, the merits of Colville's claim of Yakima Treaty right. However, it is necessary that the court be aware that this is an issue of first impression that has not been resolved in any forum. Colville's pleadings have the impression that this issue has been resolved in their favor. It is contemplated that Colville's response will mention and analogize to other tribes in the Puget Sound region of the State of Washington. It is important for the court to recognize, however, that in those circumstances those tribes are in fact the tribe mentioned and discussed in the treaties in question, but simply are located at other areas pursuant to agreement with the United States Government. In this situation, the Colville Tribe, as a Confederation without a treaty recognized by the United States, claims the treaty rights of the Yakima Indian Nation, a presently existing, federally recognized Indian government whose treaty, after naming the fourteen tribes and bands confederated in the Yakima Nation, including those claimed by Colvilles, as follows:

> . . . who for purposes of this treaty are to be considered _as one nation_, under the name of Yakima . . . ,

MEMORANDUM IN OPPOSITION - 15 -

LAW OFFICES OF
COCKRILL, WEAVER & BJUR, P.S.
316 NORTH THIRD STREET
P.O. BOX 487
YAKIMA, WASHINGTON 98907
TEL: 575-1500

and whose rights to fish pursuant to that treaty or the representations of the named bands has been decreed without appeal by Judge Belloni in his original ruling in 1968.

Yakima continues to exist as the one nation referred to in its treaty, has acted to protect those rights for the fourteen tribes and bands incorporated in that nation without protest or assistance from Colville. Colville has never asserted those rights nor attempted to exercise them until this action. There is no determination in this issue and litigation to resolve it is assumed.

        b.    **There are serious questions as to what, if any, rights, the Moses Bands retained.**

Colville asserts, citing the decision in the Court of Claims Docket 161, that it holds treaty secured fishing rights to four bands named in the Yakima Treaty. First and foremost, Docket 161 dealt solely with a claim for money damages for lands which were taken by the United States Government. The Docket 161 action simply determined who, at aboriginal times, had rights to those particular lands and allocated damage funds accordingly. The case is silent as to what other rights, if any, descendants of the aboriginal bands may have retained after leaving those lands. Docket 161 does not stand for the proposition that Colville claims, nor does it create any estoppel or res judicata barriers to either the Yakima Indian Nation or the United States in contesting Colville's claim of off-reservation treaty reserved fishing rights. This court, in 1968, found without challenge that the Yakima Nation held the treaty fishing rights now asserted by Colville. That ruling casts serious doubts on any subsequent claim by Colville.

Second, the Claims Court, in a Colville fishery damage claim, held that the Colville Tribe had no treaty fishing rights. In response to a summary judgment motion by Colville claiming

MEMORANDUM IN OPPOSITION - 16 -

LAW OFFICES OF
COCKRILL, WEAVER & BJUR, P.S.
316 NORTH THIRD STREET
P.O. BOX 487
YAKIMA, WASHINGTON 98907
TEL: 575-1500

treaty fishing rights and citing Judge Belloni's decision in this case as authority, the Claims Court held:

> Plaintiff cites <u>Sohappy v. Smith</u>, 302 F. Supp. 699 (D. Or. 1969) in support of the first proposition, but <u>Sohappy</u> deals with Indian's treaty rights to fish. **In the absence of a treaty as in the instant case,** the existence of special fishing rights is a question of fact.

<u>Colville v. United States</u>, Court of Claims Docket 181-C, 36 Indian Claims Commission 183 at 194 (1975). In the same proceeding, Colville attempted to assert Yakima Treaty rights, claiming that since the Moses Band moved to Colville, that Colville possessed Moses Band Yakima Treaty rights. The Court of Claims specifically rejected this allegation, rejecting Colville's claim of representation of these tribes on the basis of alleged Yakima Treaty reserved rights:

> With regard to claimant's response, it is simply not true that the fishing rights in this case were not the property of any of the aboriginal tribes on the Colville Reservation, but were, and are now, the property of the Confederated Tribes of the Colville Reservation. The Confederated Tribes appear in this case in a representative capacity just as we stated in our amended Docket 181 findings. Moreover, the reverse is true as to claimant's next argument that the named claimants are not suing for themselves but as representatives of all of the tribes on the reservation. The named claimants did sue, and have sued, for themselves but in doing so they are represented by the Confederated Tribes in a representative capacity, not vice versa.
>
> **Claimants do not impress us with their other arguments wherein they attempt to include the lower Salish in this case (Columbia, Chelan, Wenatchee and entiat bands).** The fact that the defendant added other Indians to the reservation population, the fact that those added Indians shared the fishing with the named

MEMORANDUM IN OPPOSITION - 17 -

LAW OFFICES OF
COCKRILL, WEAVER & BJUR, P.S.
316 NORTH THIRD STREET
P.O. BOX 487
YAKIMA, WASHINGTON 98907
TEL: 575-1500

claimants, and the fact that they may have depended on fish for subsistence do not make the added Indian parties in interest in this case. Nor does it matter that the Yakima Treaty **may have secured** to the lower Salish fishing rights or that they may have been on the Colville Reservation at the time of the 1891 agreement. **That treaty and the 1891 agreement are not the subject of this litigation.**

The essence of the Docket 181-C rulings were that:

(1) That "Colville Tribes" - exclusive of the Moses Bands or lower Salish Tribes - held <u>no treaty secured rights</u> of the type dealt with in this proceeding; and

(2) That those non-treaty "Colville Tribes" could not assert another group or tribe's alleged treaty rights simply by claiming that that tribe or band resided on the reservation.

The argument made here, that "Colville" represents the alleged "treaty bands" in their reservation, was specifically rejected by the Court of Claims. This ruling seriously clouds the Colville's claim of a protectable interest in this case.

c. **The history of the alleged "Yakima Bands" at Colville is highly confused as to what, if any rights those bands retain.**

Without citing this history at length, the court should be aware some members of those tribes, who now claim an unbroken history with the Yakimas, refused to recognize the authority of the Yakima Treaty signatories and did not remove to the Yakima Reservation. The Docket 161 record is replete with references that the Moses band did not recognize the Yakima Treaty signers and were not bound by the treaty. It is unusual that now they claim their rights from the same transaction. Numerous other members of these bands recognized the treaty and moved to Yakima. They refused to

MEMORANDUM IN OPPOSITION - 18 -

LAW OFFICES OF
COCKRILL, WEAVER & BJUR, P.S.
316 NORTH THIRD STREET
P.O. BOX 487
YAKIMA, WASHINGTON 98907
TEL: 575-1500

accept either the benefits or liabilities of the Yakima Treaty and instead, under the leadership of Chief Moses, entered into separate agreements with the United States which are totally silent as to the Yakima Treaty and as to any off-reservation reserved rights. Those agreements relinquished rights to all lands situated other than on the Columbia Reservation. When these bands moved to the Colville Reservation, they further relinquished claim to all other areas without reference to treaty secured fishing rights. There is a serious doubt as to whether such rights ever existed in the Moses Band. Attached hereto as Exhibit "A" "B", "C" and, "D" are a series of Executive Orders, Agreements and statutes dealing with the Columbia Reservation and the Moses Bands relinquishment of that reservation at the time they moved to Colville. As the court can note, the orders are silent as to any rights retained by Moses and his bands outside of interests on those reservations.[1]

While the courts have usually treated the "interest test" as a liberally applied guideline in intervention cases, under the facts and circumstances in this case the court should look carefully at the Colville's claimed rights before allowing intervention. The effect of allowing that intervention will most assuredly result in significant litigation as to the nature and extent of that right vis-a-vis the other party.

d. The Colville Tribe, as defined in Court of Claims Docket 181-C, holds no treaty secured fishing rights and any assertion of rights by those tribes is beyond the subject matter of this action.

---

[1] The Yakima Indian Nation does not concede that all of the bands claimed by Colville in fact moved there in total. Many descedants of those bands reside at and are members of the Yakima Indian Nation and form a functioning part of the Yakima Tribal Government. The statements made about these bands are made for purposes of argument only, with no admissions as to the validity of the Colville claims being intended.

MEMORANDUM IN OPPOSITION - 19 -

LAW OFFICES OF
COCKRILL, WEAVER & BJUR, P.S.
316 NORTH THIRD STREET
P.O. BOX 487
YAKIMA, WASHINGTON 98907
TEL: 575-1500

As noted above, the Court of Claims has specifically ruled that at least a significant portion of the population of the Colville reservation has no rights secured by any treaty. The only rights held by those tribes by those individuals arise from a "special relationship" that the Colville Tribe had with the United States Government at the time of the formation of its reservation. As the subject matter of this case deals solely with the regulation by Oregon and Washington of treaty Indian fishermen, much of the Colville claim is beyond the scope of this case. This court should not allow Colville to subject all other parties to the burden of litigating this issue, which is really a dispute between them and the United States and possibly the State of Washington. Further, the issue of allocation of any non-treaty harvest by Colville is beyond the scope of this case. Colville should resolve these issues elsewhere.

e. **Based upon the ruling in Docket 181-C, Colville cannot assert the interest it claims.**

Colville claims a full treaty right for all its members. Even assuming it is 100% correct on its treaty claim, that right cannot be conferred on all Colville members. Clearly the vast majority of Colville members have no treaty right and cannot simply have one bestowed on them by the coincidence of the residence of some members of the Moses Band on their reservation.

This situation presents a complex and nearly impossible burden in establishing who, if anyone, at Colville can assert a treaty right. The existing parties should not be forced to try to lift, let alone shoulder their obligation.

## CONCLUSION

Based upon the foregoing, the Yakima Nation requests that the court deny Colville's Motion for Intervention on the basis that

MEMORANDUM IN OPPOSITION - 20 -

LAW OFFICES OF
COCKRILL, WEAVER & BJUR, P.S.
316 NORTH THIRD STREET
P.O. BOX 487
YAKIMA, WASHINGTON 98907
TEL: 575-1500

it is untimely and will create severe prejudice to the existing parties in this case.

Respectfully submitted this ⟨17⟩ day of March, 1989.

Tim Weaver of
COCKRILL, WEAVER & BJUR, P.S.
Attorney for Yakima Indian Nation

MEMORANDUM IN OPPOSITION - 21 -

LAW OFFICES OF
COCKRILL, WEAVER & BJUR, P.S.
316 NORTH THIRD STREET
P.O. BOX 487
YAKIMA, WASHINGTON 98907
TEL: 575-1500

224

# PART II. LAWS GOVERNING VARIOUS TRIBES.

July 4, 1884.
23 Stat., 76.

CHAP. 180.—An act making appropriations for the current and contingent expenses of the Indian Department, and for fulfilling treaty stipulations with various Indian tribes, for the year ending June thirtieth, eighteen hundred and eighty-five, and for other purposes.

Fulfilling treaties, etc., for 1885.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the following sums be, and they are hereby, appropriated,

\#　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

## COLUMBIAS AND COLVILLES.

[23 Stat., 79.]
Columbia and Colville.
Agreement of July 7, 1883, ratified.

For the purpose of carrying into effect the agreement[a] entered into at the city of Washington on the seventh day of July, eighteen hundred and eighty-three, between the Secretary of the Interior and the Commissioner of Indian Affairs and Chief Moses and other Indians of the Columbia and Colville reservations, in Washington Territory, which agreement is hereby accepted, ratified, and confirmed, including all expenses incident thereto, eighty-five thousand dollars, or so much thereof as may be required therefor, to be immediately available: *Provided,* That Sarsopkin and the Indians now residing on said Columbia reservation shall elect within one year from the passage of this act whether they will remain upon said reservation on the terms therein stipulated or remove to the Colville reservation: *And provided further,* That in case said Indians so elect to remain on said Columbia reservation the Secretary of the Interior shall cause the quantity of land therein stipulated to be allowed them to be selected in as compact form as possible, the same when so selected to be held for the exclusive use and occupation of said Indians, and the remainder of said reservation to be thereupon restored to the public domain, and shall be disposed of to actual settlers under the homestead laws only, except such portion thereof as may properly be subject to sale under the laws relating to the entry of timber lands and of mineral lands, the entry of which shall be governed by the laws now in force concerning the entry of such lands.

\*　　　\*　　　\#　　　\*　　　\*　　　\*　　　\*

Approved, July 4, 1884.

---

## ACTS OF FORTY-EIGHTH CONGRESS—SECOND SESSION, 1885.

Mar. 3, 1885.
23 Stat., 340.

CHAP. 319.—An act providing for allotment of lands in severalty to the Indians residing upon the Umatilla Reservation, in the State of Oregon, and granting patents therefor, and for other purposes.

Allotments of lands to certain Indians.
Preamble.
See note to 1882, c. 392, ante, p. 209.
Amendment, post, p. 299.

Whereas the confederated bands of Cayuse, Walla-Walla, and Umatilla Indians, residing upon the Umatilla Reservation, in the State of Oregon, have expressed a willingness to settle upon lands in severalty on their said reservation, and to have the residue of their lands not needed for such allotment sold for their benefit: Therefore,

President to allot agricultural lands to the confederated bands of Cayuse, Walla-Walla, and Umatilla Indians in Oregon.
Persons entitled to allotment.
1885, c. 503, s. 12, post, p. 286.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the President of the United States cause lands to be allotted to the confederated bands of Cayuse, Walla-Walla, and Umatilla Indians, residing upon the Umatilla Reservation, in the State of Oregon, as follows, of agricultural lands: To each head of a family, one hundred and sixty acres; to each single person over the age of eighteen years, eighty acres; to each orphan child being under eighteen years of age, eighty acres; and to

---

[a] This agreement, which is not set forth in the statute, is to be found in the Annual Report of the Commissioner of Indian Affairs for 1883 at page LXX. Also in "Treaties," vol. 2, p. 1072.

EXHIBIT "A" 1 of 1

03/14/89   16:17   350   2153   647   SCH   003

904                     PART III. EXECUTIVE ORDERS RELATING TO RESERVES.

1 and 2; thence north on the line between sections 1 and 2, 73.94 chains to the place of beginning.

It is further ordered that the south half of section 3 and the northwest quarter of section 10, township No. 15 north, of range 4 west of the Willamette meridian, Washington Territory, be, and the same is hereby, withdrawn from sale or other disposition, and set apart for the use and occupation of the Chehalis Indians.

<div align="right">GROVER CLEVELAND.</div>

---

### *Columbia or Moses Reserve.*

[In Colville Agency; occupied by Chief Moses and his people; area, 38 square miles; act of July 4, 1884 (23 Stat., 79).]

<div align="right">EXECUTIVE MANSION, *April 19, 1879.*</div>

It is hereby ordered that the tract of country in Washington Territory lying within the following-described boundaries, viz: Commencing at the intersection of the forty-mile limits of the branch line of the Northern Pacific Railroad with the Okinakane River; thence up said river to the boundary line between the United States and British Columbia; thence west on said boundary line to the forty-fourth degree of longitude west from Washington; thence south on said degree of longitude to its intersection with the forty-mile limits of the branch line of the Northern Pacific Railroad; and thence with the line of said forty-mile limits to the place of beginning, be, and the same is hereby, withdrawn from sale and set apart as a reservation for the permanent use and occupancy of Chief Moses and his people, and such other friendly Indians as may elect to settle thereon with his consent and that of the Secretary of the Interior.

<div align="right">R. B. HAYES.</div>

---

<div align="right">EXECUTIVE MANSION, *March 6, 1880.*</div>

It is hereby ordered that the tract of country in Washington Territory lying within the following-described boundaries, viz: Commencing at a point where the south boundary line of the reservation created for Chief Moses and his people by Executive order dated April 19, 1879, intersects the Okinakane River; thence down said river to its confluence with the Columbia River; thence across and down the east bank of said Columbia River to a point opposite the river forming the outlet to Lake Chelan; thence across said Columbia River and along the south shore of said outlet to Lake Chelan; thence following the meanderings of the south bank of said lake to the mouth of Shehekin Creek; thence up and along the south bank of said creek to its source; thence due west to the forty-fourth degree of longitude west from Washington; thence north along said degree to the south boundary of the reservation created by Executive order of April 19, 1879; thence along the south boundary of said reservation to the place of beginning, be, and the same is hereby, withdrawn from sale and settlement and set apart for the permanent use and occupancy of Chief Moses and his people and such other friendly Indians as may elect to settle thereon with his consent and that of the Secretary of the Interior, as an addition to the reservation set apart for said Chief Moses and his people by Executive order dated April 19, 1879.

<div align="right">R. B. HAYES.</div>

---

<div align="right">EXECUTIVE MANSION, *February 23, 1883.*</div>

It is hereby ordered that the tract of country in Washington Territory lying within the following-described boundaries, viz: Commencing at the intersection of the forty-fourth degree of longitude west

from Washington with the boundary line between the United States and British Columbia; thence due south 15 miles; thence due east to the Okinakane River; thence up said river to the boundary line between the United States and British Columbia; thence west along said boundary line to the place of beginning, being a portion of the country set apart for the use of Chief Moses and his people by Executive orders of April 19, 1879, and March 6, 1880, be, and the same is hereby, restored to the public domain.

CHESTER A. ARTHUR.

———

EXECUTIVE MANSION, *May 1, 1886.*

It is hereby ordered that all that portion of country in Washington Territory withdrawn from sale and settlement, and set apart for the permanent use and occupation of Chief Moses and his people and such other friendly Indians as might elect to settle thereon with his consent and that of the Secretary of the Interior, by the Executive orders dated April 19, 1879, and March 6, 1880, respectively, and not restored to the public domain by the Executive order dated February 23, 1883, be, and the same is hereby, restored to the public domain, subject to the limitations as to disposition imposed by the act of Congress approved July 4, 1884 (23 Stats., pp. 79–80), ratifying and confirming the agreement entered into July 7, 1883, between the Secretary of the Interior and the Commissioner of Indian Affairs and Chief Moses and other Indians of the Columbia and Colville Reservations in Washington Territory.

And it is hereby further ordered that the tracts of land in Washington Territory surveyed for and allotted to Sar-sarp-kin and other Indians in accordance with the provisions of said act of July 4, 1884, which allotments were approved by the Acting Secretary of the Interior April 12, 1886, be, and the same are hereby, set apart for the exclusive use and occupation of said Indians, the field-notes of the survey of said allotments being as follows: *

[Allotments Nos. 1, 2, 3, and 4, in favor of Sar-sarp-kin, Cum-sloet-poose, Showder, and Jack respectively.]

Set stone on north bank of Sar-sarp-kin Lake for center of south line of claim No. 1. Run line north 78 degrees west and south 78 degrees east, and blazed trees to show course of south line of claim. Then run north 12 degrees east (var. 22 degrees east) in center of claim. At 80 chains set temporary stake and continued course. At 20 chains came to brush on right bank of Waring Creek and offset to the right 9.25 chains. Thence continued course to 65 chains and offset to right 13.25 chains to avoid creek bottom and continued course. At 80 chains set temporary stake and continued course. At 37.50 offset 4.50 chains to right to avoid creek bottom and continued course. At 55.50 chains offset to right 4.77 chains to avoid creek bottom and continued course. At 80 chains set temporary stake and continued course to 32.60 chains. Thence run south 78 degrees east 8.23 chains and set stone 10 by 10 by 24 inches for northeast corner of claim. Then retraced line north 78 degrees west 12 chains and set stone 6 by 6 by 18 inches to course of north line of claim No. 1, and south line of claim No. 2, and for center point in south line of claim No. 2 (claim No. 1, Sar-sarp-kin's contains 2,180.8 acres). Thence run north 12 degrees east 80 chains. Blazed pine 20 inches diameter on 3 sides on right bank of Waring Creek for center of north line of claim No. 2, and center of south line of claim No. 3. Set small stones north 78 degrees west and south 78 degrees east to show course of said line. Thence run north 12 degrees east in center of claim No. 3. At 10.50 chains offset to right 3 chains to avoid creek bottom and continued course. At 71 chains offset to left 4.23 chains to avoid creek bottom and continued course. At 76.25

———
* See Appendix II, post page, 1048.

EXHIBIT "C"    1 of 1

west of the 6th principal meridian, in the Territory of Dakota, lying on the north bank of the White river, together with the tract of land bounded and described as follows, to wit:

Beginning at a point at low-water mark on the east bank of the Missouri River opposite the mouth of the said White River; thence down said east bank of the Missouri River along said low-water mark to a point opposite the mouth of Pratt Creek; thence due south to the forty-third parallel of latitude; thence west along said parallel to a point in longitude ninety-nine degrees and thirty minutes west; thence due north along the eastern boundary of Rosebud Reservation to the White River, and thence down said White River to the Missouri River, at the place of beginning. It is also agreed that said Indians shall receive all necessary aid from the government in their removal to said reservation, and when so removed each of said Indians shall be entitled to receive from the government the full value of all improvements, in buildings or on lands, owned by him at the time of such removal and lost to him thereby. Said compensation shall be made in such manner and on such appraisement as shall be ordered by the Secretary of the Interior.

Witness our hands and seals this 23rd day of January, 1880.

<div style="text-align:center">

NEWTON EDMUNDS. [SEAL.]
PETER C. SHANNON. [SEAL.]
JAMES H. TELLER. [SEAL.]

</div>

---

## AGREEMENT WITH THE COLUMBIA AND COLVILLE, 1883.

In the conference with chief Moses and Sar-sarp-kin, of the Columbia reservation, and Tonaskat and Lot, of the Colville reservation, had this day, the following was substantially what was asked for by the Indians:

<div style="float:right">

July 7, 1883.

Ratified July 4, 1884,
23 Stat., 79. Vol. 1. p. 224.

See report of Commissioner of Indian Affairs for 1882, p. lxx.

</div>

Tonasket asked for a saw and grist mill, a boarding school to be established at Bonaparte Creek to accommodate one hundred pupils (100), and a physician to reside with them, and $100. (one hundred) to himself each year.

Sar-sarp-kin asked to be allowed to remain on the Columbia reservation with his people, where they now live, and to be protected in their rights as settlers, and in addition to the ground they now have under cultivation within the limit of the fifteen mile strip cut off from the northern portion of the Columbia Reservation, to be allowed to select enough more unoccupied land in Severalty to make a total to Sar-sarp-kin of four square miles, being 2,560 acres of land, and each head of a family or male adult one square mile; or to move on to the Colville Reservation, if they so desire, and in case they so remove, and relinquish all their claims to the Columbia Reservation, he is to receive one hundred (100) head of cows for himself and people, and such farming implements as may be necessary.

All of which the Secretary agrees they should have, and that he will ask Congress to make an appropriation to enable him to perform.

The Secretary also agrees to ask Congress to make an appropriation to enable him to purchase for Chief Moses a sufficient number of cows to furnish each one of his band with two cows; also to give Moses one thousand dollars ($1,000) for the purpose of erecting a dwelling-house for himself; also to construct a saw mill and grist-mill as soon as the same shall be required for use; also that each head of a family or each male adult person shall be furnished with one wagon, one double set of harness, one grain cradle, one plow, one harrow, one scythe, one hoe, and such other agricultural implements as may be necessary.

1074        AGREEMENT WITH THE COLUMBIA AND COLVILLE, 1883.

And on condition that Chief Moses and his people keep this agreement faithfully, he is to be paid in cash, in addition to all of the above, one thousand dollars ($1,000) per annum during his life.

All this on condition that Chief Moses shall remove to the Colville Reservation and relinquish all claim upon the Government for any land situate elsewhere.

Further, that the Government will secure to Chief Moses and his people, as well as to all other Indians who may go on to the Colville Reservation, and engage in farming, equal rights and protection alike with all other Indians now on the Colville Reservation, and will afford him any assistance necessary to enable him to carry out the terms of this agreement on the part of himself and his people. That until he and his people are located permanently on the Colville Reservation, his status shall remain as now, and the police over his people shall be vested in the military, and all money or articles to be furnished him and his people shall be sent to some point in the locality of his people, there to be distributed as provided. All other Indians now living on the Columbia Reservation shall be entitled to 640 acres, or one square mile of land, to each head of family or male adult, in the possession and ownership of which they shall be guaranteed and protected. Or should they move on to the Colville Reservation within two years, they will be provided with such farming implements as may be required, provided they surrender all rights to the Columbia Reservation.

All of the foregoing is upon the condition that Congress will make an appropriation of funds necessary to accomplish the foregoing, and confirm this agreement; and also, with the understanding that Chief Moses or any of the Indians heretofore mentioned shall not be required to remove to the Colville Reservation until Congress does make such appropriation, etc.

H. M. TELLER,
Secretary of Interior.
H. PRICE,
Commissioner of Indian Affairs.
MOSES (his x mark),
TONASKET (his x mark),
SAR-SARP-KIN (his x mark).