FILED

Oct 7  1 40 PH '88

CLERK, U.S. DISTRICT COURT
DISTRICT OF OREGON

BY _____

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA, )
                  Plaintiff, )
and )
THE CONFEDERATED TRIBES AND BANDS OF )
THE YAKIMA INDIAN NATION; THE )
CONFEDERATED TRIBES OF THE WARM SPRINGS )
RESERVATION OF OREGON; CONFEDERATED )
TRIBES OF THE UMATILLA INDIAN RESERVA- )
TION; AND NEZ PERCE TRIBE OF IDAHO, )
                  Intervenors, )   Civil No. 68-513-MA
     v. )   A M E N D E D
                      )   O P I N I O N
STATE OF OREGON, STATE OF WASHINGTON, )   (Plan)
              Defendants. )
and )
STATE OF IDAHO and SHOSHONE-BANNOCK )
TRIBE, )
                  Intervenors. )

GEORGE D. DYSART
Special Asst. U.S. Attorney
312 U.S. Courthouse
620 S.W. Main St.
Portland, OR 97205
      Of Attorneys for Plaintiff.

Page   1 - AMENDED OPINION

HOWARD G. ARNETT
Johnson, Marceau, Karnop, Petersen,
835 N.W. Bond Street
Bend OR 97701

    Attorneys for Warm Springs Tribe.

TIMOTHY WEAVER
Hovis, Cockrill, Weaver & Bjur
P.O. Box 487
Yakima WA 98907

    Attorneys for Yakima Tribe.

GEORGE K. MEIER III
Stoel, Rives, Boley, Fraser & Wyse
900 S.W. Fifth Avenue
Portland OR 97204

WILLIAM S. WHELAN
STEPHEN V. GODDARD
Deputy Attorney General
Statehouse, Room 210
Boise ID 83720

    Attorneys for State of Idaho.

CATHERINE E. WILSON
Confederated Tribes of the
    Umatilla Indian Reservation
P.O. Box 638
Pendleton OR 97801

    Attorneys for Umatilla Tribe.

CHERYL F. COODLEY
Asst. Attorney General
State of Oregon
500 Pacific Building
Portland OR 97204

    Attorneys for State of Oregon.

ROBERT C. STROM
Strom, Longeteig & Johnson
P.O. Box 155
Craigmont ID 83523

    Attorneys for Nez Perce Tribe.

Page

  2 - AMENDED OPINION

NARDA PIERCE
Assistant Attorney General
State of Washington
7th Floor, Hwy-Licenses Bldg.
Olympia WA 98504-8071

        Attorneys for State of Washington.

HOWARD FUNKE
Attorney at Law
P.O. Box 36
Fort Hall ID 83203

        Attorney for Shoshone-Bannock Tribes.

THANE W. TIENSON
MITCHELL, LANG & SMITH
2000 One Main Place
101 S.W. Main
Portland OR 97204

        Attorney for NW Gillnetters Association

DONALD D. STUART
c/o Washington Trollers Assn.
P.O. Box 7431
Bellevue WA 98008

        Attorney for Washington State Trollers Association.

ROBERT S. BANKS, JR.
BANKS & NEWCOMB
209 S.W. Oak Street, 5th Floor
Portland OR 97204-2740

ALVIN J. ZIONTZ
MARC D. SLONIM
ZIONTZ, CHESTNUT, VARNELL,
    BERLEY & SLONIM
1230 Fourth & Blanchard Bldg.
2121 Fourth Avenue
Seattle WA 98121

        Attorneys for Makah Indian Tribe.

MARSH, Judge.

    The State of Oregon, the State of Washington, the United States, the Confederated Tribes of Warm Springs Reservation of Oregon, the Confederated Tribes and Bands of the Yakima Indian Nation, the

Page
    3 - AMENDED OPINION

Confederated Tribes of the Umatilla Indian Reservation and the Nez Perce Tribe move for an order approving a Columbia River Fish Management Plan (hereinafter "1988 Plan" or "the Plan). The State of Idaho and the Shoshone-Bannock Tribes object to its adoption. Amicus curiae briefs are submitted from the Northwest Gillnetters Association and Columbia River Fishermen's Protective Union and the Washington State Trollers. Further, a brief is submitted on behalf of the Makah Indian Tribe. For the reasons discussed below, I commend the parties on their efforts to derive the proposed 1988 Plan which, with a few restrictions, I adopt.

BACKGROUND

The pending case is the outgrowth of the consolidation of two cases filed in 1968. The first case was designated Sohappy v. Smith, Civil No. 68-409, while the second was designated by the heading in this case. Each suit was brought against the State of Oregon to define the Indians' treaty right to take fish "at all usual and accustomed places" on the Columbia River and its tributaries. Sohappy v. Smith, 302 F. Supp. 899 (D. Or. 1969).[1] They sought determination of the extent to which the State of Oregon could regulate fishing after Puyallup Tribe v. Department of Game, 391 U.S. 392 (1968). Four Indian Tribes, including the Yakima Indian Nation, the Confederated Tribes and Bands of the Warm Springs Reservation of Oregon, the Confederated Tribes of the Umatilla Indian Reservation and the Nez Perce Tribe of Idaho, intervened as plaintiffs in the suit brought by

[1]. The opinion filed today on the motion to intervene by the Makah Indian Tribe provides a further synopsis of the background of this case. For continuity, I restate many of the same facts here.

Page
    4 - AMENDED OPINION

the United States. Sohappy, 302 F. Supp. at 899. The two actions were consolidated.

An initial opinion was entered on July 8, 1969 wherein the Hon. Robert C. Belloni construed the Indians' treaty fishing right and considered the manner and extent to which the State of Oregon could regulate Indian fishing. Sohappy, 302 F. Supp. at 911-12. He retained jurisdiction to grant further or amended relief. Id. Referring to the retention of jurisdiction, the Ninth Circuit quoted this court as permitting "[a]ny party at any time [t]o apply to the court for a subsequent modification of any provision of this decree where the continued application of the decree has become inequitable or impracticable, but this right shall not affect the finality of the decree with respect to times prior to any such modification." United States v. Oregon, 529 F.2d 570, 572 (9th Cir. 1976).

Between 1969 and 1976 the parties appeared before this court several times with Judge Belloni urging the parties to adopt a comprehensive plan for allocation and management of Columbia River anadromous fish. In 1974, the State of Washington was allowed to intervene.

In 1977, the parties presented a five year plan to the court entitled "A Plan for Managing Fisheries on Stocks Originating from the Columbia River and its Tributaries above Bonneville Dam" (hereinafter "original Plan"). The original Plan set conservation goals for each fish species, established fishing regulations and provided for the establishment of future management techniques.

However, the original Plan did not establish fishing locations, times or quotas. United States v. Oregon, 718 F.2d 299, 302 (9th Cir.

Page

5 - AMENDED OPINION

1983). These details are regulated through the Columbia River Compact (hereinafter the "Compact"), an interstate agency created by Oregon and Washington and ratified by Congress. Id.; Act of April 8, 1918, Pub. L. No. 64-123, 40 Stat. 515 (1918). Under the Compact, the Columbia River is divided into six commercial fishery zones and annually it estimates the size of the runs and determines the length of fishing seasons that the runs can support.

In 1976, Congress passed legislation providing for exclusive fishery management over all fish in a zone extending 200 miles seaward from a state's boundary. Fishery Conservation and Management Act of 1976, 16 U.S.C. § 1801 et seq., (Supp. V 1985) (also known as "the Magnuson Act"). The Pacific Fishery Management Council (hereinafter "PFMC") was created by the Magnuson Act for the areas seaward of the bounaries of Washington, Oregon and California. 16 U.S.C. § 1852(a)(6); 16 U.S.C. § 1853(a)-(c). The PFMC is composed of representatives from Washington, Oregon, California, Idaho, eight members appointed by the Secretary of Commerce and the regional director of the National Marine Fisheries Service. Id.

In 1982 two of the tribes gave notice of their intent to withdraw from the original Plan or to renegotiate it. United States v. Oregon, 745 F.2d 550, 552 (9th Cir. 1984). On August 24, 1983 and again on September 6, 1983 this court found that changed circumstances of law and fact made the original Plan subject to revision or modification and ordered the parties to attempt to agree upon a revised or modified agreement. United States v. Oregon, Civ. 68-513 (August 24, 1983; September 6, 1983). If the parties were unable to reach agreement, the parties were to independently submit proposed orders for allocation and

6 - AMENDED OPINION

management of Columbia River anadromous fish. Id.

In 1983, the Ninth Circuit reversed this court and allowed the State of Idaho to intervene by right. United States v. Oregon, 745 F.2d at 553. And, in 1986 this court allowed the Shoshone-Bannock Tribes to intervene.

Pursuant to the August, 1983 order, the parties have continued negotiations to reach a comprehensive plan. Since the expiration of the original Plan in 1982 and the subsequent negotiations, the parties have entered into several one year management plans in order to maintain responsible management of Columbia River anadromous fish.

Despite the years of negotiations, the 1988 Plan submitted for my consideration does not have the unanimous approval of the parties to the case. On the other hand, all but two parties have agreed and no other proposed plan has been submitted. Thus, first it is important to examine the 1988 Plan in the light of the existing law. Second, it must be determined if it is fair to the parties thus justifying its adoption until some further interim or final disposition is made in the case. To do this, I will consider separately the objections of Idaho and the Shoshone-Bannock. The comments of the amicus curiae and the Makah Indian Tribe are considered for background and general overall effect of the 1988 Plan.

SYNOPSIS OF 1988 PLAN

The first step in the process requires a thorough review and understanding of the 1988 Plan itself. Even though Idaho is not a signator to the Plan, it is considered a party by its terms. On the other hand, the Shoshone-Bannock Tribes "although not a party . . . .

Page 7 - AMENDED OPINION

are accorded the right to participate in certain aspects of the plan." Part I, Section G. Both the Shoshone-Bannock Tribes and the signatory parties acknowledge that the Shoshone-Bannock's rights and the signatory parties' defenses are reserved irrespective of the Shoshone-Bannock's limited participation in the Plan.

Part I of the 1988 Plan includes other administrative provisions including its purpose, considerations of the controlling law and treaties, judicial review, internal resolution of disputes, term of the Plan, withdrawal, modification, review of success or failure of its anticipated results and definitions.

In Part II, the 1988 Plan addresses harvest management wherein the Indian fisheries are identified and the separate fishing seasons defined for both Indian and non-Indian fisheries. In addition, management goals are established with corresponding provisions for harvest sharing and stock rebuilding. The provisions relate individually to each species covered by the Plan with particular consideration to the time, harvest rate(s), size of run, and timing of fisheries in relation to each species as well as the effect the planning for one species may have upon the planning for another species.[2] Provisions for imbalance and further review and adjustment in management are also included.

Part III of the 1988 Plan concerns artificial and natural production and management of the conservation, rebuilding and enhancement of the fish of the upper Columbia River Basin. Reports and data exchange

---

[2.] I recognize the walleye species, a relatively recent introduction, is a non-anadromous fish and yet allocation of it is now included in the 1988 Plan.

Page
     8 - AMENDED OPINION

are required.  The entire Columbia system is divided into subbasins with a harvest and production management plan for each.  The separate management teams are made up of the parties to the agreement most in proximity to a given subbasin.  Each individual subbasin plan is required to be consistent with the agreement in general.

Part IV establishes the Technical Advisory Committee (hereinafter "TAC") which is concerned with tracking and estimating fish runs, in-river migration and harvest management.  Also created is the Production Advisory Committee (hereinafter "PAC") concerned with pro-duction for maintenance and enhancement of stocks and for placement and production of hatcheries.  The Plan further establishes a Policy Committee to facilitate cooperation and set general policy.  Part IV also deals with dispute resolution, mainstream treaty Indian fisheries and their relationship to state and tribal regulations and enforcement.

STANDARD OF REVIEW

My next consideration concerns the standard of review I should apply to the proposed 1988 Plan.  Seven of the parties have presented the Plan and objections have been received by two parties, amicus curiae and the Makah Indian Tribe.  First, I note that this is not a settlement proposal committed to the court for discretionary review by the trial judge as all the parties are not in accord.  Thus, the stan-dard set forth by the Ninth Circuit in S.E.C. v. Randolph, 736 F.2d 525, 259 (9th Cir. 1984) is not applicable.  Second, I note that this is not a consent decree as it is not a final judgment but rather is limited to a ten year period and subject to modification in the

Page
   9 - AMENDED OPINION

interim. Thus, the standards urged by Idaho and set forth in United States v. City of Miami Florida, 664 F.2d 435 (5th Cir. 1981) are not applicable. Rather, I find an absence of a single appropriate standard to apply.

However, I have considered the nature of this litigation and the scope of the relief sought by the parties objecting to the Plan. I am convinced this year, as I was last year, that the relief sought by the objectors is that most similar to injunctive relief. United States v. Oregon, Civ. 68-513 slip op. at 6 (D. Or. July 24, 1987).

To obtain a preliminary injunction, the plaintiff must show either (1) a likelihood of success on the merits and the possibility of irreparable harm or (2) the existence of serious questions going to the merits and the balance of hardship tipping in its favor. First Brand Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1381 (9th Cir. 1987); Oakland Tribune, Inc. v. Chronicle Publishing Co., 762 F.2d 1374, 1376 (9th Cir. 1985); Inglis & Sons Baking v. ITT Continental Banking Co., Inc., 526 F.2d 86, 88 (9th Cir. 1975). Although often discussed in the alternative, these tests represent the extremes of a single continuum. "The critical element is the relative hardship to the parties. If the balance of hardships tips decidedly toward the plaintiff, less likelihood of success on the merits is required." Wilson v. Watt, 703 F.2d 395, 399 (9th Cir. 1983).

In considering the hardship to the parties, I am influenced by the analysis of the Fifth Circuit even though I am not presented with a consent decree. United States v. City of Miami, Fla., 664 F.2d at 441. When considering a consent decree that affects only the parties, the

Page    10 – AMENDED OPINION

court should examine it carefully to ascertain not only that it is a fair settlement but also that it does not put the court's sanction on and power behind a decree that violates the Constitution, a statute or jurisprudence. Id. at 441. "This requires a determination that the proposal represents a reasonable factual and legal determination based on the facts of record, whether established by evidence, affidavit or stipulation." Id. When considering a consent decree that also affects third parties, the court must be satisfied that the effect on them is neither unreasonable nor proscribed. Id. The court must also consider the nature of the litigation and the purposes to be served by the decree. Id. Finally, if the suit seeks to enforce a statute, the decree must be consistent with the public objectives sought to be attained by Congress. Id.

IDAHO'S OBJECTIONS

Generally, Idaho argues that the Plan is inequitable, discrimina-tory, vague and ambiguous and should not be adopted and asks that the court modify the Plan to give Idaho a voice. Idaho contends that the spring chinook harvest management provision must specify overall mainstem and tributary harvest management and not just mainstem manage-ment.

Idaho's first objection is that the 1988 Plan is not fair in its treatment of wild B-run steelhead. In years of underescapement, Idaho contends that the harvest rate allowed the commercial fishermen frustrates the goals of Idaho regarding conservation and rebuilding of wild B-run steelhead. Idaho specifically requests that the court incorporate a "safey net" into the Plan.

Page 11 - AMENDED OPINION

I have considered the 1988 Plan and find that Section II.J. specifically provides for only three years of steelhead allocation and management and has a built in review of the steelhead provisions after the 1988 season.  See also, Section I.F.2.b.  Thus, the Plan itself allows Idaho the opportunity to continue its negotiations and assert its recommendations with the moving parties for further consideration of steelhead conservation.  Idaho's request for a "safety net" can be incorporated into the Plan, if reasonable under the applicable provisions, after further information has been gathered following this season.

Further, I note that of all the species of fish allocated under the 1988 Plan, the steelhead run alone is allocated through goals set for four separate stocks.  Section II.J.1.  This section provides a range of management strategies for wild B-run steelhead based upon escapement at Bonneville Dam.  Other runs are managed by a single escapement goal. This special treatment indicates concern of all the parties towards the unique consideration of the steelhead runs. Finally, Sections I.F.2.C. and I.F.4  provide emergency modification procedures which could be implemented if the wild B-run steelhead returns show a significant decline.

As to the effects on steelhead management this season, I have further considered the structure of the 1988 Plan and find that Idaho is a member of TAC.  Section IV.A.  As a member of TAC, Idaho should first bring its concerns to TAC within the existing structure and not as an objection to adoption of the 1988 Plan itself.

Next, Idaho contends that a joint study of wild B-run steelhead is

Page

12 - AMENDED OPINION

needed. Idaho argues that there is inadequate steelhead data and requests that Section II.J be amended to allow for study and implementation of the study. In light of my analysis above, this objection is not persuasive.

Third, Idaho contends that it needs an equal voice and that the Plan, in its operation, excludes Idaho. Idaho is essentially arguing that management decisions by the Compact exclude them and request that this Court require modification of the structure of the Compact to include them. This request is different from the issue appealed by Washington and Idaho in 1985 whereby the regulations promulgated by the Compact were reviewed. United State v. Oregon, 769 F.2d 1410 (9th Cir. 1985). Here, Idaho's contention of exclusion may, or may not be true. However, the Compact is an interstate compact that was created by Oregon and Washington to manage the Columbia River. In 1918, Congress ratified the Compact. Act of April 8, 1918, Pub. L. No. 64-123, 40 Stat. 515 (1918). However, whether or not Idaho would like to have and seeks full participation in the Compact was determined by an act of Congress and is not a matter properly before the district court. The same analysis applies to the extent that Idaho objects to the Plan in that "management entities" control, rather than "parties."

Fourth, Idaho contends that the 1988 Plan must provide that all spring chinook and steelhead taken by the parties count towards their fifty per cent harvest share. The contention specifically is that the Plan does not combine mainstem and tributary harvest allocation schemes. The moving parties reply that the allocation scheme is not inconsistent with case law and is not harmful to Idaho's protec-

Page
13 - AMENDED OPINION

table interest. With regard to the latter, the moving parties note that Idaho's protectable interest is only in an equitable apportionment of the non-treaty share of Idaho-origin runs. Although I agree with the moving parties that Idaho does not have a protectable interest in the non-Idaho origin fish at issue in this contention, I consider the contention in keeping with my ruling today on the motion to intervene by the Makah Indian Tribe.

First, I note that Idaho is not objecting that the allocation is inequitable when considering the 1988 Plan as a whole but is making specific objections for particular sections. There is a variance in the methodology used to allocate ceremonial and subsistence fish (hereinafter "C&S") taken from the mainstem as opposed to the tributaries of the Columbia River. However, this variance has been accounted for in other provisions of the Plan. The 10,000 fish entitlement for C&S fishing is balanced by permitting the non-Indian fishermen to conduct a winter commercial and sport fishery in the Columbia River for lower river salmon and steelhead, particulary those salmon destined to migrate up the Willamette River. The concession allowed the lower river fishery so long as the combined harvest rate on spring chinook destined for upriver does not exceed the 1985-86 average and in no event exceeds 5% of the total in-river run size of upriver spring chinook adults. Section II.B.2.

For example, on runs of 50,000 to 128,000 (112% of the management goal of 115,000 fish) the C&S harvest shall not exceed 7% of the in-river run size (or 3,300 to 9,016 fish) with a mean of 6,258. Section II.A.3. The maximum incidental harvest by non-Indian fishermen would

Page
    14 - AMENDED OPINION

be 5% of 126,600 or 6,400 fish.  Thus, the C&S catch is proportionate to the non-Indian catch.

For runs in excess of 112% of the management goal of 115,000 fish, the harvestable surplus will be divided fifty-fifty between the Indian and non-Indian fishermen.  The non-Indian share of the surplus on runs between 112% & 125% cannot be harvested in the Columbia River below the confluence of the Columbia and Snake Rivers.  This surplus is then passed on to Idaho for all intent and purposes.  Next I consider these provisions in the light of existing law as to allocation of the fish.

The law of this case requires that any regulation of an Indian tribe's treaty fishing rights must meet three standards. United States v. Oregon, 666 F.  Supp. 1461, 1464 (D. Or. 1987). First, the state must show that the regulation is both reasonable and necessary for the conservation of the fish; the regulation must be "the least restrictive which can be imposed consistent with assuring the necessary escapement of fish for conservation purposes." Id.; Sohappy v. Smith, 302 F.  Supp. at 907-08.  Second, the states must consider the protection of the treaty right to take fish at the Indians' usual and accustomed places as an objective co-equal with the conservation of the fish runs for other uses. Id. at 911.  Third, the regulations must accord the Tribes an opportunity to take, by reasonable means, a fair and equitable share of all fish from any given run. Id. at 907-08.

In Washington v. Washington State Commercial Passenger Fishing Vessel Association, 443 U.S. 658, 687 (1979), the Supreme Court held that an equitable measure of the common right to take fish should ini-

Page
    15 - AMENDED OPINION

tially divide the harvestable portion of each run that passes through a "usual and accustomed" place into approximately equal treaty and non-treaty shares.  This opinion is abbreviated as holding that "all fish count."  Thus, under Washington State Commercial Fishing Vessel Association, treaty and nontreaty allocation must be made on the basis of the total catch.

In Hoh v. Baldrige, 522 F. Supp. 683, 689 (D. Wash. 1981), the court considered Washington State Commercial Fishing Vessel Association and concluded that "(t)he rule of law which governs application of the allocation provisions with respect to treaty Indian fisheries requires that such allocations are generally determined separately for each run of fish on a river-system by river-system basis, but this is not an inflexible rule."  The court went on to state that, if special circumstances warrant, it may be modified by agreement among the affected parties or by specific prior judicial determination.  Id.

In accord with all these principles, the parties have proposed a 1988 Plan which allocates fish over the entire Columbia River system. I find that pursuant to these standards, it is the operation of the Plan considering each run separately and as part of the river-system that must comply, not each individual section of the Plan.  Idaho has not demonstrated that the overall allocation under the Plan violates the applicable legal principles.  Idaho urges the court to modify a single section of the Plan.  However, each part of the 1988 Plan was negotiated by all the various parties for concessions in other sections of the Plan.  To modify a single allocation section would

Page

16 - AMENDED OPINION

distort the entire allocation system of the Plan. Accordingly, I do not consider Idaho's request to modify the language in a section appropriate.

Idaho makes further objections in its supplemental response in opposition to the motion for an order approving the 1988 Plan. The moving parties urge the court to strike these objections as new theories and technical conclusions beyond the scope of Idaho's opposition brief. Against this contention, I weigh Idaho's argument that the moving parties did not appropriately supply a memorandum in support of their motion for an order approving the Plan. I find merit in both arguments but feel I must further consider Idaho's supplemental response.

Idaho's further argument is with regard to the necessity for conservation practices and procedures for preservation of a reasonable margin of safety for wild B-run steelhead. Idaho specifically points to a meeting in May, 1986, between a representative of the Columbia River Intertribal Fish Commission and a representative of the Oregon Department of Fish and Wildlife. During this meeting, Idaho contends, a 32 per cent harvest rate was determined for underescaped runs of wild B-run steelhead. Idaho argues that this per cent is a "dramatic shift away from the prior positions of the parties." Idaho continues its argument by demonstrating how the final harvest rate was determined and then states that "although the conduct of negotiations does not make the Plan unfair, it does require extremely close scrutiny of the terms of the Plan under substantive standards of conservation."

I have considered Idaho's contention regarding negotiation of

Page
17 - AMENDED OPINION

steelhead harvest rates. I note that at the meeting in question Washington, the Shoshone-Bannock Tribes and the amicus parties were not in attendance. However, by Idaho's own admission the meeting was part of the overall negotiation and later Idaho was able to present its objections. That Idaho's objections were not incorporated into the 1988 Plan is not dispositive. I find I must consider the overall balance of the Plan, the longevity of the Plan and its steelhead provisions and the often counterveiling forces of the treaty right of the Indians to fish in the Columbia River, the nontreaty fishing privilege along with the need for conservation. Idaho implies that it is the sole party concerned with the conservation of wild B-run steelhead. I am not persuaded by this as all the parties benefit to the extent that conservation is successful. I find that the per cent adopted, 32 per cent, was the same as that adopted in the two prior one year management plans. In light of this and the provision allowing reexamination of all provisions regarding steelhead after the 1988 season, I cannot find the harvest rate to be anything but fair and reasonable. As discussed below, I do not find these negotiations proscribed. Further, I do not find the per cent to be inconsistent with the public objectives of conservation and effective management of the Columbia River resources.

SHOSHONE-BANNOCK TRIBES' OBJECTIONS

The Shoshone-Bannock Tribes first note that although they are a party to this action, they are not a party to the 1988 Plan. Thus, the Shoshone-Bannock Tribes assert that they are not bound to any of the provisions to which signatories to the Plan may agree.

Page 18 - AMENDED OPINION

Accordingly, the Shoshone-Bannock Tribes urge the Court to clarify for all parties that although their rights are now set aside, once their rights are determined the 1988 Plan may be amended to incorporate their harvest and correlative rights as determined.

Section I.G of the 1988 Plan reserves any claims the Shoshone-Bannock Tribes may have against any or all of the other parties concerning their fishing rights under the Fort Bridger Treaty of July 3, 1868. The same section makes the Shoshone-Bannock Tribes a member of the TAC, a member of the Policy Committee for issues concerning the Salmon River subbasin and a management entity for Salmon River subbasin planning. Further, "(t)he moving parties do not dispute the Shoshone-Bannock Tribes' statement to the extent it emphasizes that the Plan in no way limits their treaty rights, whether recognized now or in the future." See, Moving Parties' Reply to Shoshone-Bannock Objections, United States v. Oregon, Civ. 68-513 slip op. at p. 3 (D. Or. May 5, 1988). Thus, I find the contention of the Shoshone-Bannock Tribes is not disputed.

Next, the Shoshone-Bannock Tribes contend that their participation as a management entity in Salmon River subbasin planning is limited. The Shoshone-Bannock Tribes contend that the limitations placed upon their participation on the Policy Committee, the TAC and the PAC in issues affecting the Salmon River Basin are "conspicuous, unnecessary and disruptive." Further, they contend the limitations are inconsistent with the 1988 Plan itself and contrary "to the fundamental objectives of regional efforts to achieve a coordinated and cooperative approach to managing the basin's fish resources." The

Page
     19 - AMENDED OPINION

Shoshone-Bannock Tribes specifically contend that the Salmon River Basin should not be carved up, that they have interests beyond harvest maximization and that a mainstem harvest regime should be implemented only on an emergency or interim basis.

I agree with some of the Shoshone-Bannock's contentions. The 1988 Plan is written with limitations upon the Shoshone-Bannock Tribes' participation. The Plan differentiates between members and parties. In accordance with the legal principles defining Indian treaty fishing rights and the standard of review, I cannot approve this difference. If this Plan is to be imposed upon the Shoshone-Bannock, albeit with the reservations clause I.G., it must be imposed upon the Shoshone-Bannock only with full status as a party. Accordingly, I make the following amendments to the Columbia River Fish Management Plan as submitted to the Court:

1.   Page 3, Section I.A., add numeral "9. Shoshone-Bannock Tribe, subject to Section I.G."

2.   Page 12, Section I.E., lines 4-6, delete "of the tribes party to this agreement" and insert "of the Confederated Tribes of the Warm Springs Reservation of Oregon, the Yakima Indian Nation, the Umatilla Indian Reservation and the Nez Perce Tribe."

3.   Page 16, Section I.G., line 0, change "party" to "signatory party."

4.   Page 16, Section I.G., line 5-6, delete "for issues concerning the Salmon River subbasin."

5.   Page 17, Section I.G., line 3, delete "nonparty."

6.   Page 44, Section III.C., line 18, delete "although not a party to this Plan."

7.   Page 54, Section IV.C.3., delete Section IV.C.3.

8.   Page 57, line 0, Section IV.E.1., add "treaty" (to make the "treaty tribes").

Page

20 - AMENDED OPINION

9.   Page 57, Section IV.E.1., line 8, insert "and Shoshone-Bannock" after "Indian."

I have further considered the participation of the Shoshone-Bannock Tribes in the 1988 Plan.  I find that their participation as amended is reasonable in that the area in which they may participate as a management entity relates to the Shoshone-Bannock Tribes' fishing grounds.  Further, I find their participation in the PAC and TAC and Policy Committee as amended is not proscribed.  Finally, I have considered the public interest as it relates to the interests of the Shoshone-Bannock Tribes and find that, as amended, the Plan is not contrary.  Although the Shoshone-Bannock Tribes may desire a more active role such as the States of Oregon and Washington hold under the Compact, or participation by all parties in the Compact through consensus, Congress must make that determination, not the district court.

Next, I consider the objections within the Shoshone-Bannock Tribes' Supplemental Memo in Opposition to the Plan.  First, I note that this memo was to be a reply brief, addressing only issues raised in the opposition memo and is objected to by the moving parties.  In addition, the original submission of the brief violated Local Rule 220-4.  However, in keeping with my ruling today on the Makah Indian Tribe's motion to intervene, I consider these contentions.

The first contention made by the Shoshone-Bannock Tribes in this memorandum is that the definition of applicable legal standards raises novel questions of public interest law requiring the court to determine whether the process leading to the Plan was fundamentally fair.  Here, the Shoshone-Bannock Tribes urge the court to consider whether

Page    21 - AMENDED OPINION

the 1988 Plan is capable of addressing public interest issues without inviting litigation.

I disagree with the Shoshone-Bannock's depiction of this litigation. I find, when confined to the issues in the initial complaint, the litigation is properly before the court and I have set out the appropriate legal standards at the start of this opinion. I note the Ninth Circuit's approval of this court's continuing jurisdiction. United States v. Oregon, 529 F.2d at 572. The issues raised in this case do not require the court to resolve the 1868 treaty fishing rights of the Shoshone-Bannock. Nor have I been asked to do so. Nor is this action the appropriate forum in which to litigate fishing rights for the entire Pacific Northwest or the Pacific Ocean in light of my ruling today on the Makah Indian Tribe's motion to intervene. Further, the issues in this action do not require the court to determine a dispute regarding the organizational structure of the Compact or the implications of the Magnuson Act or Northwest Power Act. To the extent that the Shoshone-Bannock Tribes wish to address these issues, they are beyond the scope of this litigation.

Second, in their reply memorandum, the Shoshone-Bannock Tribes contend that the process leading to adoption of the 1988 Plan was fundamentally flawed. Here, the Shoshone-Bannock Tribes contend the parties adopted an "expedited, harvest-driven process that was closed, hurried and not conducive to meaningful input by parties not signatory" to the Plan. I have reviewed the allegations of the Shoshone-Bannock Tribes in their letter of May 9, 1988 to the court. I have further reviewed the history of this litigation, the orders of

Page
22 - AMENDED OPINION

this court and the prior five year and one year plans. I find nothing to indicate that the process leading to the 1988 Plan or the Plan itself was unreasonable, proscribed or inconsistent with public objectives. Rather, I find evidence of initial disputes, leading to negotiations, resolutions, revisions, cooperation and agreement.

The allegations of the Shoshone-Bannock Tribes that restrictions were forced upon them as early as 1978 are not properly before me. The next allegation is that the Shoshone-Bannock were excluded between October, 1985 and July, 1986, the time when their motion for intervention was pending. By their own statement, the Shoshone-Bannock claim to have participated only as observers. As the motion to intervene had not yet been granted, I find no legal merit in this contention.

Next, the Shoshone-Bannock Tribes contend they were ignored and "none of the parties ever expressed any interest in seriously discussing the merits of our position" in regard to their 1868 Treaty harvest rights. However, by their own statements, the Shoshone-Bannock Tribes agree that the scope of their 1868 treaty fishery rights have not yet been determined, nor should it have been.

The Shoshone-Bannock Tribes next urge the court to defer ruling until the first full iteration of subbasin planning now being developed by the Columbia Basin Fish and Wildlife Authority. The gist of this argument is that the status of the Shoshone-Bannock Tribes is as a member of TAC and PAC but not as a party or management entity. Through my amendments to the Plan, this objection is obviated. As to their non-status as a management entity, I refer to my discussions above concerning the makeup of the Compact and the PFMC.

Page
    23 - AMENDED OPINION

Finally, the Shoshone-Bannock Tribes contend that a decision at this time on the moving parties' motion will hinder the Northwest Power Planning Council's fish and wildlife program and invite unnecessary and divisive litigation. The Shoshone-Bannock Tribes base this argument on the premise that the Northwest Power Planning Council "has put the region on notice" that a goal to increase Columbia River anadromous fish cannot be achieved without significant advances in cooperation and coordination. Further, the Shoshone-Bannock Tribes urge delay to permit utilization of the Snake River Basin Negotiation Model. Even if the Power Planning Council contention were true, I would not delay ruling on the motion before me on the basis of a notice of a need for increased cooperation and coordination. This action has been pending since 1968 and the parties have been negotiating the 1988 Plan before me since September 6, 1983. As part of this process, there have been incredible strides in cooperation between the parties. It would not be reasonable for this court to defer ruling on the Plan because of a "notice" by an agency created eight years ago.

Finally, I note that the Shoshone-Bannock Tribes have not complied with the terms of the September 6, 1983 order of this court. Judge Craig ordered the parties to attempt to agree upon a revised or modified agreement and made a provision if the parties were unable to reach agreement. United States v. Oregon, Civ. 68-513 (September 6, 1983). If agreement were not reached, the parties were to independently submit proposed orders for allocation and management of Columbia River anadromous fish. Id. Although the Shoshone-Bannock

Page
24 - AMENDED OPINION

Tribes intervened since that time, they still are subject to the order. Rather than submitting an independent proposed order, the Shoshone-Bannock have objected to areas of the 1988 Plan's proposed operation, contended the moving parties haven't listened to them, urged the court to consider its 1868 treaty rights (without determining those rights), contended exclusion during negotiations, criticized matters outside the scope of this litigation and objected to this court's legal standards.  I have diligently considered each of these objections, explained my analysis and amended the Plan.  I don't find merit in any of their further objections, contentions or criticisms which leads me to believe that the process leading to the 1988 Plan was anything but fair and reasonable.  Although I am not presented with an alternative plan to consider, I have considered all of these contentions and have amended the Plan to rectify those situations where I feel the Shoshone-Bannock objections had merit.

AMICUS CURIAE COMMENTS

The Washington State Trollers Association and the Northwest Gillnetters Association and Columbia River Fishermen's Protective Union have filed comments as amicus curiae to the 1988 Plan.  The Makah Tribe presented a brief in opposition to the Plan along with its motion to intervene.  To be certain that I have fully evaluated the legality and fairness of the Plan, I have considered all of these briefs, even though they raise issues outside those framed by the parties.  While I do not concede that new matters presented by the amicus or Makah are properly before me, I have examined them and dispose of them as follows:

Page
    25 - AMENDED OPINION

Washington State Trollers

The Washington State Trollers comment that the decision making process leading to development of the 1988 Plan is illegal under Washington State law and thus, the Plan is subject to collateral attack in state court. First, I note that the Washington law only applies to Washington governing bodies of public agencies and does not apply to the other states, the federal government or the Indian tribes. R.C.W. 42.30.030. Next, the parties were acting under an order of the court. Moreover, the participation by representatives of the Washington Department of Fisheries and Washington Department of Game in the Columbia River management plan negotiations is not dispositive. The Washington statute provides that "(a)ll meetings of the governing body of a public agency shall be open and public . . ." R.C.W. 42.30.030. Here, the Washington State Trollers Association has not presented evidence to the court that the "governing body of any public agency" attended these negotiations. Instead, it appears to the court that the meetings in question were attended by representatives of the agency. Subsequent meetings in which the agency acted upon its representatives' presence at the negotiations may be subject to open meetings requirements, but the negotiations themselves would not be.

Gillnetters

The Northwest Gillnetters Association and Columbia River Fishermen's Protective Union (hereinafter "Gillnetters") make the same comments as the Washington State Trollers and further attack the legal-

Page 26 - AMENDED OPINION

ity of a different set of meetings. The Gillnetters comment that the meetings of the TAC, Policy Committee and PAC violate the Oregon, Washington and federal administrative procedures acts. I disagree. First, I note that the TAC itself cannot bind any state or the federal government and it cannot approve a state or federal regulation or rule. Instead, all TAC can do is make a recommendation to the Compact. Moreover, the individuals attending the TAC meetings are generally technical representatives of the agencies and are without authority to bind their agency. Thus, subsequent meetings at which an agency acts upon its representatives' presence at the TAC meetings may be subject to allegations of violation of open meetings requirements, but the TAC meetings are not.

A similar analysis applies to the objections with regard to the PAC and the Policy Committee. With regard to the Policy Committee, I note that the individuals attending often serve in higher capacities within the representative agencies, but generally are not directors. However, even where the individual is the director of the agency, his or her recommendation from the TAC meeting to the agency is not binding on the agency.

The Gillnetters comment that various provisions of the 1988 Plan are unreasonable because the tribal allocation of fish exceeds its maximum treaty share. Specifically, the Gillnetters comment that the fall chinook, sockeye salmon, spring chinook and summer steelhead provisions are unreasonable. I note that these comments are similar to the contentions made by Idaho. Further, I note with regard to the fall chinook provision that the Indians are not required to catch

Page
27 - AMENDED OPINION

their treaty share, but are to be afforded that opportunity. This provision was most likely negotiated in return for the Indians agreement to forego their treaty share of lower river fish, such as the coho. As to the allegation that the 1988 Plan only corrects an imbalance of five per cent, I refer the Gillnetters to the balance of provision II.I.8.d. I feel that this provision, like the one for sockeye salmon, spring chinook and summer steelhead, was negotiated fairly and that the operation of the Plan as a whole complies with applicable law.

Finally, I consider the comments of the Gillnetters regarding the Indians' ceremonial and subsistence fish. I note that the Indians are required to file annual reports to the Columbia River Inter-Tribal Fish Commission and with TAC. The Gillnetters are not contesting the specific validity of any report. I recognize the difficulty of verifying these reports just as there is difficulty in verifying the disposition of the incidental catch of steelhead in the lower river.

Makah Indian Tribe

The Makah Indian Tribe (hereinafter "Makah Tribe") first comments that the 1988 Plan violates its ocean treaty fishing rights. As I held in my other opinion filed today denying the Makah Tribe's motion to intervene, this action is restricted to fishing rights in the Columbia River. The same analysis applies to the Makah Tribe comments that provisions of the Magnuson Act violate due process as that Act is concerned with ocean fisheries. Further, my other opinion also considers the effects of the recent dismissal of Makah Indian Tribe v. Verity, No. C87-747RC (W.D. Wash. May 16, 1988).

Page
    28 - AMENDED OPINION

I have already addressed the Makah Tribe's comment that the 1988 Plan violates the Washington Administrative Procedures Act above.  Next, the Makah Tribe comments that the United States has violated its trust responsibility to the Indian tribes.  Four of the tribes who are parties to this action have reached accord with the United States on the Plan.  This accord convinces me that those tribes make no such allegation.  The only tribes not in accord are the Shoshone-Bannock Tribes, whose 1868 fishing rights have yet to be adjudicated.  Accordingly, I hold that this alleged violation is not supported.

The Makah Tribe comments that an environmental impact statement (hereinafter "EIS") should be prepared pursuant to the National Environmental Policy Act, 43 U.S.C. § 4332(2)(c).  An EIS is mandated, according to the Makah Tribe, anytime there is proposed major federal action which would significantly affect the quality of the environment.  The cases cited by the Makah Tribe do not convince me that this is an appropriate situation in which to require an EIS.

CONCLUSION

I have considered the objections of Idaho and the Shoshone-Bannock Tribes, the comments of the amicus Gillnetters and Washington State Trollers and have considered the objections of the Makah Tribe.  I further consulted the court's technical expert and carefully examined the proposed 1988 Plan in terms of its overall allocation of Columbia River anadromous fish.  I find the Plan, as amended, does not violate the Constitution, a statute or jurisprudence.  Further, after considering the nature of this litigation and the purpose to be served by

Page 29 - AMENDED OPINION

the Plan, I am satisfied that the 1988 Plan, as amended, is neither unreasonable nor proscribed and it is consistent with public objectives. Finally, I am impressed with the degree of cooperation that has been reached among the original parties to this action and encourage Idaho and the Shoshone-Bannock to renew their spirit of cooperation and utilize the procedures within the Plan to resolve any future disputes. Thus, I grant the motion of the moving parties and adopt the Columbia River Fish Management Plan, as amended.

DATED this __7__ day of __October__, 1988.

_Malcolm F. Marsh_
Malcolm F. Marsh
United States District Judge

Page

30 - AMENDED OPINION