FILED

MAR 5 9 01 AM '86

CLERK, U.S. DISTRICT COURT
DISTRICT OF OREGON

BY _____

1  HOWARD G. ARNETT
   JOHNSON, MARCEAU, KARNOPP, PETERSEN & NASH
2  835 N.W. Bond
   Bend, OR  97701-2799
3  Telephone:  503-382-3011
     Attorneys for The Confederated Tribes of
4    the Warm Springs Reservation of Oregon,
     Plaintiffs
5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9                  FOR THE DISTRICT OF OREGON

10

11 UNITED STATES OF AMERICA,          )
                                      )
12      Plaintiff,                    )
                                      )
13      and                           )
                                      )
14 THE CONFEDERATED TRIBES OF         )
   THE WARM SPRINGS RESERVATION       )
15 OF OREGON, CONFEDERATED TRIBES     )
   AND BANDS OF THE YAKIMA INDIAN     )
16 NATION, CONFEDERATED TRIBES OF     )
   THE UMATILLA INDIAN RESERVATION )   Civil No. 68-513
17 and NEZ PERCE TRIBE OF IDAHO,      )
                                      )
18      Plaintiff-Intervenors,        )
                                      )   JOINT MEMORANDUM OF
19      v.                            )   COLUMBIA RIVER TRIBES AND
                                      )   STATE OF WASHINGTON IN
20 STATE OF OREGON,                   )   OPPOSITION TO SHOSHONE-
                                      )   BANNOCK TRIBES' MOTION
21      Defendant,                    )   TO INTERVENE
                                      )
22      and                           )
                                      )
23 STATE OF WASHINGTON,               )
                                      )
24      Defendant-Intervenor,         )
                                      )
25 STATE OF IDAHO,                    )
                                      )
26      Defendant-Intervenor,         )
                                      )
27      and                           )
                                      )   1338

Page  1, JOINT MEMORANDUM IN OPPOSITION TO INTERVENTION

Not properly paginated
per LR 130 J/mp

JOHNSON, MARCEAU, KARNOPP, PETERSEN & NASH
ATTORNEYS AT LAW
835 N.W. BOND STREET
BEND, OREGON 97701-2799
(503) 382-3011

SHOSHONE-BANNOCK TRIBES,            )
                                   )
        Applicant for Intervention.)

                          I.

                    INTRODUCTION

     The Shoshone-Bannock Tribes of the Fort Hall Reservation  in
southeastern Idaho  have moved  for permissive  intervention  and
intervention as of right in this eighteen-year-old Indian fishing
rights case.  The  Warm Springs, Yakima,  Umatilla and Nez  Perce
tribes (Columbia River tribes) and the State of Washington oppose
the Shoshone-Bannocks' motion because  intervention at this  late
stage in the  proceedings would  be untimely  and prejudicial  to
existing parties.   Intervention by  the Shoshone-Bannocks  would
confront the court  with novel  and difficult issues  of law  and
fact concerning the scope of the Shoshone-Bannocks' off-
reservation fishing rights under the Fort Bridger Treaty of 1868.
The litigation  of these  issues would  significantly expand  the
scope of this case and would interrupt and set back the  parties'
two-and-a-half-year effort to negotiate an allocation and manage-
ment plan for Columbia River fisheries.


                          II.

      INTERVENTION AS OF RIGHT UNDER RULE 24(a)(2)

     A motion  for intervention  as of  right must  satisfy  four
requirements:  (1) the motion must  be timely; (2) the  applicant
must assert an  interest relating  in the subject  matter of  the
litigation; (3)  the applicant's  interest must be  impaired  by
disposition of the  action without  the applicant's  involvement;

Page 2, JOINT MEMORANDUM IN OPPOSITION TO INTERVENTION

JOHNSON, MARCEAU, KARNOPP, PETERSEN & NASH
ATTORNEYS AT LAW
835 N.W. BOND STREET
BEND, OREGON 97701-2799
(503) 382-3011

1    and (4) the applicant's interest must be inadequately represented

2    by the other parties.  United States v. $129,374 in U.S.

3    Currency, 769 F.2d 583, 585 (9th Cir. 1985).  The applicant has

4    the burden of proving each of the four elements of intervention

5    as of right; the lack of one element requires that the motion to

6    intervene be denied.  Keith v. Daley, 764 F.2d 1265, 1268 (7th

7    Cir. 1985).

8

9    A.   THE SHOSHONE-BANNOCK MOTION IS UNTIMELY.

10        The threshold question in determining whether intervention

11   should be allowed, either as a matter of right or permission, is

12   whether the application is timely.  Arkansas Electric Energy

13   Consumers v. Middle South Energy, Inc., 772 F.2d 401, 403 (8th

14   Cir. 1985).  Although the issue of timeliness "is determined from

15   all the circumstances," NAACP v. New York, 413 U.S. 345, 366

16   (1973), three factors receive particular attention: (1) the

17   stage of the proceedings at which the movant seeks to intervene;

18   (2) the prejudice to other parties that would result from inter-

19   vention; and (3) the reason for and length of the delay.  United

20   States v. Oregon, 745 F.2d 550, 552 (9th Cir. 1984).

21        1.   Stage of the Proceedings.

22        This eighteen-year-old litigation entered a new phase on

23   September 1, 1983, when the district court ordered the parties to

24   negotiate a new fisheries allocation and management plan to

25   replace the 1977 Five-Year Plan.  United States v. Oregon, 745

26   F.2d at 552.  Unlike Idaho, which moved to intervene in this case

Page  3, JOINT MEMORANDUM IN OPPOSITION TO INTERVENTION

JOHNSON, MARCEAU, KARNOPP, PETERSEN & NASH
ATTORNEYS AT LAW
835 N.W. BOND STREET
BEND, OREGON 97701-2799
(503) 382-3011

1    on the same day the court ordered negotiation of a new plan, the
2    Shoshone-Bannocks' motion was filed more than two years after the
3    case entered its current phase of intensive negotiations on a new
4    allocation and management plan. Moreover, unlike Idaho, which
5    has attended and participated in all aspects of the current nego-
6    tiations, the Shoshone-Bannocks had expressed no interest in the
7    negotiations until the intervention motion was filed October 11,
8    1985.

9    The Shoshone-Bannocks claim there have been no "serious
10   negotiations" since the district court's September 1, 1983, order
11   and that the "first major negotiating session" did not occur
12   until October 21, 1985. Memorandum in Support of Motion to
13   Intervene at 17.  The Shoshone-Bannocks obviously are in no
14   position to characterize the parties' two-and-one-half years of
15   work on a new plan. Having waited more than two years before
16   attempting to intervene in the negotiations phase of the litiga-
17   tion, and having expressed no interest whatsoever in the negotia-
18   tions during that time, the Shoshone-Bannocks simply do not know
     what has occurred.

19   As shown by the Affidavit of Jean Edwards, between September
20   1983 and June 1984, fourteen large-group (policy, technical and
21   legal representatives of all parties and amici) negotiating ses-
22   sions were held as well as numerous technical and attorney sub-
23   group meetings.  A large amount of technical work and legal
24   drafting was accomplished during this period.  In late summer
25   1984, the negotiations were restructured with a five-member core
26   group undertaking intensive technical and drafting assignments

Page
     4, JOINT MEMORANDUM IN OPPOSITION TO INTERVENTION

JOHNSON, MARCEAU, KARNOPP, PETERSEN & NASH
ATTORNEYS AT LAW
835 N.W. BOND STREET
BEND, OREGON 97701-2799
(503) 382-3011

1   based on the documents developed in the earlier phase of the
2   negotiations.  From that time until the present, the parties have
3   held a number of large-group meetings to hear reports on the core
4   group's progress, give policy direction to the core group, and
5   make technical and legal drafting assignments to other subgroups.
6   In addition, a draft plan produced by the core group has been the
7   subject of large-group negotiations since the fall of 1985.
8   Affidavit of Jean Edwards at 3-6.

9        While the parties have agreed to keep the substance of the
10  negotiations confidential, it can be said that the parties have
11  made very significant progress toward agreement on a number of
12  issues, including some which the Shoshone-Bannocks claim an
13  interest in, and are unanimous in the hope that this two-and-a-
14  half-year effort can be brought to a conclusion in the very near
15  future.  This is not to say the parties know they will have a
16  plan this month or the next month; some issues may be unresolva-
17  ble through negotiation and will have to be presented to the
18  court for determination.  It is likely, however, that the parties
19  will know very soon what they can agree on and what they cannot
20  agree on, if anything.  When that point is reached, the current
21  negotiations phase of this litigation, which began September 1,
     1983, will end.

22       The Shoshone-Bannocks, instead of getting in on the ground
23  floor of this phase of the litigation, are actually trying to
24  enter the case as this phase is about to be concluded.  See Aleut
25  Corporation v. Tyonek Native Corporation, 725 F.2d 527, 530 (9th
26  Cir. 1984) ("intervention on the eve of settlement following

Page  5, JOINT MEMORANDUM IN OPPOSITION TO INTERVENTION

JOHNSON, MARCEAU, KARNOPP, PETERSEN & NASH
ATTORNEYS AT LAW
835 N.W. BOND STREET
BEND, OREGON 97701-2799
(503) 382-3011

1   several years of litigation  was not timely").  Accordingly,  the

2   Shoshone-Bannocks' motion to intervene at this late stage of  the

3   current negotiations is untimely under Fed.R.Civ.P. 24(a)(2).

4

5        2.   <u>Prejudice To Existing Parties If Intervention Is
             Permitted</u>.

6

7        Prejudice to  the existing  parties is  "the most  important

    factor in determining the timeliness of a motion to intervene  as

8   of right."  <u>Petrol  Stops Northwest v.  Continental Oil  Company</u>,

9   647 F.2d 1005, 1010  (9th  Cir. 1981).   The  Shoshone-Bannocks'

10  delayed intervention in  this case would  prejudice the  existing

11  parties in two  ways.  First,  the negotiations will  have to  be

12  suspended indefinitely  to litigate  the scope  of the  Shoshone-

13  Bannocks' off-reservation fishing rights  under the Fort  Bridger

14  Treaty of  1868.  Second,  if  the Shoshone-Bannocks  succeed  in

15  obtaining the relief  requested in their  complaint in  interven-

16  tion, the negotiations  will have to  be repeated to  accommodate

17  the newly  determined  fishing  rights  of  the  Shoshone-Bannock

18  Tribes.

19        a.   The necessary litigation of Shoshone-Bannock
                Treaty fishing rights would prejudice the existing

20              parties.

21       Unlike Idaho, which  sought to  intervene in  this case  "to

22  participate in negotiations for a modified management plan  which

23  could have significant impact on Idaho's fish resources,"  <u>United</u>

24  <u>States v. Oregon</u>, 745 F.2d at 551; <u>see</u> <u>also</u> Idaho's "Pleading  in

25  Intervention" (Civil Docket Sheet No. 1140), the Shoshone-Bannock

26  Tribes have intervened in this action to determine the nature and

Page   6, JOINT MEMORANDUM IN OPPOSITION TO INTERVENTION

JOHNSON, MARCEAU, KARNOPP, PETERSEN & NASH
ATTORNEYS AT LAW
835 N.W. BOND STREET
BEND, OREGON 97701-2799
(503) 382-3011

1   scope of their off-reservation treaty fishing rights. Specifi-

2   cally, the Shoshone-Bannocks have asked the court for a declara-

3   tory judgment that they have a right to "an equitable share" of

4   the salmon and steelhead runs, and for an injunction against the

5   plaintiff tribes and defendant states prohibiting them from

6   authorizing prior intercepting fisheries that "threatens the pre-

7   servation of the wild runs of chinook salmon and steelhead trout

8   spawning within the aboriginal fishing areas of the Shoshone-

9   Bannock Tribes." Complaint in Intervention at 9.

10   Thus, unlike Idaho, which entered this case at the beginning

11   of the current negotiations with its rights already determined,[1]

12   the Shoshone-Bannocks seek to enter this case two-and-one-half

13   years later to ensure that any new management plan satisfies

14   their right to "a fair share" of the resource (Memorandum in

15   Support of Motion To Intervene at 9) without it having ever been

16   determined that they have such a right. Recognizing this, the

17   Shoshone-Bannocks seek a declaratory judgment that the 1868 Fort

18   Bridger Treaty includes an allocation right and the right to

19   enjoin the existing parties' fisheries.

20   Simply stated, the undetermined scope of the Shoshone-

21   Bannocks' treaty fishing rights means that if intervention is

22   granted the current negotiations will have to be suspended for a

23   

24   _____

25   [1]   Idaho's rights with respect to the Columbia River tribes
have been determined by the previous decisions and orders in the
case.   Idaho's rights with respect to the other defendant states
were determined in Idaho ex rel Evans v. Oregon and Washington,
26   462 U.S. 1017 (1983).

Page   7, JOINT MEMORANDUM IN OPPOSITION TO INTERVENTION

JOHNSON, MARCEAU, KARNOPP, PETERSEN & NASH
ATTORNEYS AT LAW
835 N.W. BOND STREET
BEND, OREGON 97701-2799
(503) 382-3011

1   judicial determination of the allocation rights and injunctive

2   powers, if any, of the Shoshone-Bannock Tribes. Such a suspen-

3   sion of the negotiations clearly would be prejudicial to the

4   existing parties. As explained below, the unanswered questions

5   concerning the Shoshone-Bannocks' off-reservation fishing rights

6   means the litigation to determine these rights is likely to be

7   lengthy, complex, and the outcome uncertain.

8       The off-reservation fishing right of the Shoshone-Bannock

9   Tribes is based on language in the 1868 Fort Bridger Treaty

10  reserving to those tribes "the right to hunt on the unoccupied

11  lands of the United States so long as game may be found thereon,

12  and so long as peace subsists among the whites and Indians on the

13  borders of the hunting district." Article 4, Fort Bridger Treaty

14  of July 3, 1868, 15 Stat. 209. The Columbia River tribes, on the

15  other hand, brought this action eighteen years ago based on lan-

16  guage in 1855 treaties reserving "the exclusive right of taking

17  fish in the streams running through and bordering said reserva-

18  tion...and at all other usual and accustomed stations, in common

19  with citizens of the United States." Article 1, Treaty with the

20  Tribes of Middle Oregon, June 25, 1855, 12 Stat. 963.

21      While Article 4 of the Fort Bridger Treaty has been examined

22  by both state and federal courts, no court has held that Article

23  4 includes the right to an allocation of the salmon resource and

24  the related right to enjoin other users of the resource to ensure

25  that fish return to the Shoshone-Bannock fishing places. State

26  v. Tinno, 497 P.2d 1386 (Idaho 1972), determined that the "right

27  to hunt" in Article 4 includes the right to fish, id. at 1390,

Page  8, JOINT MEMORANDUM IN OPPOSITION TO INTERVENTION

JOHNSON, MARCEAU, KARNOPP, PETERSEN & NASH
ATTORNEYS AT LAW
835 N.W. BOND STREET
BEND, OREGON 97701-2799
(503) 382-3011

1   that a certain location on the Yankee Fork of the Salmon River in

2   central Idaho is "unoccupied lands of the United States," id. at

3   1391, and that Idaho's authority to regulate Shoshone-Bannock

4   off-reservation fishing is limited to conservation purposes only,

5   id. at 1393. State v. Cutler, No. 14699 (Idaho March 19, 1985),

6   addressed the geographical scope of the off-reservation rights

7   reserved under Article 4 and determined that "unoccupied lands of

8   the United States" did not include a state-owned wildlife manage-

9   ment unit maintained as a wintering range for elk and deer. Id.,

10  slip op. at 11. United States v. Top Sky, 547 F.2d 483 (9th Cir.

11  1976), determined that the "right to hunt" in Article 4 did not

12  include the right to sell eagles commercially. Id. at 488. None

13  of these cases addresses the issue of whether Article 4 includes

14  not only the right to hunt and fish but also the right to ensure

15  that fish and game resources will always be available for

16  Shoshone-Bannock harvest. While the existence of such rights

17  should not be determined in the context of a motion to intervene,

18  it should be noted that these rights are highly uncertain in view

19  of recent court decisions and in view of the Article 4 language

20  limiting the duration of off-reservation rights to "so long as

21  game may be found thereon."

22      The Idaho Supreme Court in State v. Cutler held that the

23  Indians' understanding of the Article 4 language was that their

24  off-reservation treaty rights "were not absolute and would dimin-

25  ish with the increased occupation of the lands and the decrease

26  in available game." Slip op. at 9 (emphasis added). The Cutler

27  court, which was focusing only on the Article 4 language

Page  9, JOINT MEMORANDUM IN OPPOSITION TO INTERVENTION

JOHNSON, MARCEAU, KARNOPP, PETERSEN & NASH
ATTORNEYS AT LAW
835 N.W. BOND STREET
BEND, OREGON 97701-2799
(503) 382-3011

referring to "unoccupied lands of the United States," relied heavily on the 1984 federal court decision in United States v. Hicks, 582 F.Supp. 1162 (W.D. Wash. 1984). The Hicks court, in determining that a treaty-reserved right to hunt on "open and unclaimed lands" did not include the right to hunt in Olympic National Park, characterized the Quinault Tribe's off-reservation hunting right as "not an absolute right" but rather a "defeasible privilege giving way as the status of 'open and unclaimed' land changes." Id. at 1165. The characterization of Article 4 of the Fort Bridger Treaty as reserving non-permanent, off-reservation rights is acknowledged even by the strong dissent in State v. Cutler which recognized as a "fact that the Indians in 1868 conceded that their hunting rights would diminish in time." Slip op. at 21.

In marked contrast to the self-limiting language of the Fort Bridger Treaty provision, the fishing clause in the 1855 Columbia River treaties was interpreted by this court almost eighteen years ago to reserve to the Indians "an absolute right" to their fisheries and to "a fair share" of the fish produced by the Columbia River system. Sohappy v. Smith, 302 F.Supp. 899, 911 (D.Or. 1969).[2] The right of the Columbia River tribes to a "fair

_____

[2] Language somewhat similar to the Article 4 Fort Bridger Treaty language appears elsewhere in the 1855 Columbia River tribes' treaties. Although it has been the subject of litigation several times, see State v. Arthur, 261 P.2d 135 (Idaho 1953); State v. Chambers, 506 P.2d 311 (Wash. 1973); Confederated Tribes of Umatilla Indian Reservation v. Maison, 262 F.Supp. 871 (D.Or. 1966), this language is not the basis of the tribes' off-reservation fishing rights.

Page    10, JOINT MEMORANDUM IN OPPOSITION TO INTERVENTION

JOHNSON, MARCEAU, KARNOPP, PETERSEN & NASH
ATTORNEYS AT LAW
835 N.W. BOND STREET
BEND, OREGON 97701-2799
(503) 382-3011

1  share" allocation, which  the Shoshone-Bannocks  also claim  they
2  are entitled to, has been quantified  to mean 50 percent of  each
3  harvestable run destined to pass the tribes' usual and accustomed
4  fishing places.  Washington v. Passenger Fishing Vessel  Associa-
5  tion, 443 U.S. 658, 685-686 (1979).  The source of the 50 percent
6  allocation right is the "in common with" language of the treaties
7  which has been held to secure  to the tribes "an interest in  the
8  fish runs themselves," id. at  677, with both  Indians and  non-
9  Indians "sharing  equally" in  the  resource.  United  States  v.
10 Washington, 384 F.Supp. 312, 343 (W.D. Wash. 1974).

11     Neither the "in common with" language, nor anything remotely
12 similar to it, appears in the Fort Bridger Treaty.  Instead,  the
13 Fort Bridger Treaty appears to disclaim "an interest in the  fish
14 runs themselves" by  limiting the  duration of  off-reservation
15 rights to "so long as game may be found thereon."  This  language
16 has never been  interpreted, nor  has  any similar  language  in
   another Indian treaty, by any court that we are aware of.

17     In sum, the best that can be said for the Shoshone-Bannocks'
18 claim of allocation and injunctive  rights is that the  existence
19 and nature of such rights  is undetermined.  Since this case  was
20 originally brought  to  allocate the  Columbia  River  anadromous
21 fishery, United States v. Oregon,  657 F.2d 1009, 1015 (9th  Cir.
22 1981), and since the parties' current negotiations are on "a  new
23 plan for allocation and management", United State v. Oregon,  796
24 F.2d 1410, 1418 (9th Cir. 1985), the uncertainty over the

25

26

Page  11, JOINT MEMORANDUM IN OPPOSITION TO INTERVENTION

JOHNSON, MARCEAU, KARNOPP, PETERSEN & NASH
ATTORNEYS AT LAW
835 N.W. BOND STREET
BEND, OREGON 97701-2799
(503) 382-3011

1  Shoshone-Bannocks' allocation and injunctive rights must be judi-
2  cially resolved, if intervention is allowed, before the  negotia-
3  tions on a new  plan can be resumed  and before a completed  plan
4  can be presented to the court for approval.

5      Such a judicial determination must first settle whether such
6  rights exist.  If they do, it must then be determined what  share
7  the Shoshone-Bannocks are entitled to, and which of the  existing
8  parties must give up a part of their allocation to the  Shoshone-
9  Bannocks. The necessity for litigation to determine the scope  of
10  the Fort Bridger Treaty fishing right, and the resulting  indefi-
11  nite suspension of the parties' current negotiations, clearly and
12  emphatically demonstrate the prejudice to the other parties  that
13  would result from the Shoshone-Bannocks' belated intervention  in
14  this case.

15          b.   Restarting the negotiations to accommodate
               Shoshone-Bannock fishing rights would pre-
16             judice existing parties.

17      Even more prejudicial  to the existing  parties is the  fact
18  that if the Shoshone-Bannocks obtain a declaratory judgment  that
19  they are entitled to an allocation of the fish runs, the  parties
20  will have to  go back and  start the negotiations  over again  to
21  accommodate the newly established rights  of the new party.   The
22  need to meet  the allocation  requirements of the  new party  may
23  very well undo  some delicately  balanced  agreements already
24  reached in the negotiations process and could frustrate the com-
25  pletion of  an  overall  allocation  and  management  agreement.
26  Clearly, the prejudice to the existing parties that would  result
   from intervention by the Shoshone-Bannock Tribes at this stage of

Page  12, JOINT MEMORANDUM IN OPPOSITION TO INTERVENTION

JOHNSON, MARCEAU, KARNOPP, PETERSEN & NASH
ATTORNEYS AT LAW
835 N.W. BOND STREET
BEND, OREGON 97701-2799
(503) 382-3011

1   the litigation is very substantial and requires denial of the

2   motion to intervene as untimely.

3

4       3.   <u>Reasons For and Length of Delay</u>.

5       This case has been in litigation for eighteen years and has

6   been in its current stage of negotiations on a new allocation and

7   management plan for two-and-a-half years. In view of these

8   obviously substantial time intervals during which the Shoshone-

9   Bannocks could have, but did not, seek to intervene, the

10  Shoshone-Bannocks should be required to give some very good

11  reasons for their delay. They have, however, offered no substan-

12  tial reasons. In their memorandum in support of the intervention

13  motion, the Shoshone-Bannocks say they did not intervene

14  previously because of "limited resources available to adequately

15  represent its interest." Yet, the Shoshone-Bannocks had the

16  resources in 1979 to intervene (without opposition) in the

17  related case of <u>Confederated Tribes of the Warm Springs Reserva-</u>

18  <u>tion of Oregon, et al., v. Kreps</u>, Civ. No. 79-541 (D.Or. 1979).

19  Moreover, the Shoshone-Bannocks' memorandum fails to explain why

20  they have the resources to intervene now but did not have such

21  resources in the preceding eighteen years of the litigation.

22      The Shoshone-Bannocks also justify their delay on the basis

23  of fears that intervention would be perceived by the Columbia

24  River tribes as "an intrusion and attack on [the Columbia River

25  tribes'] treaty fishing rights." Memorandum in Support of Motion

26  to Intervene at 19. In view of the applicant's complaint in

intervention, which seeks declaratory and injunctive relief

Page 13, JOINT MEMORANDUM IN OPPOSITION TO INTERVENTION

JOHNSON, MARCEAU, KARNOPP, PETERSEN & NASH
ATTORNEYS AT LAW
835 N.W. BOND STREET
BEND, OREGON 97701-2799
(503) 382-3011

against the Columbia River tribes, and in view of their papers in support of intervention, which charge the Columbia River tribes with allowing "greed" to replace traditional Indian values (Affidavit of Frederick Auck at 3), this factor is not a reason for delay but is a self-imposed psychological restraint which the Shoshone-Bannocks apparently have fully overcome.

The Shoshone-Bannocks also justify their delay on the grounds that they had requested that the United States represent their interests in this litigation and were still waiting for a response. However, it hardly seems reasonable to wait six years for a reply to a single, two-paragraph letter to conclude that the tribe's interest in the litigation will not be protected by the United States.

Especially puzzling on the issue of the reasons for delay is the fact that the Shoshone-Bannocks appeared at an April 19, 1985 hearing in this case and informed Judge Levy "of our intent to file a motion to intervene. We believe we will do that this coming Monday or Tuesday. And in that motion to intervene, we will be requesting to participate on a continuing basis in these proceedings." April 19, 1985 Tr., Vol. 2 at 35 (pp. 35-43 of the April 19 transcript are attached as Exhibit "A"). The Shoshone-Bannocks, however, did not file for intervention the following Monday and, as the record shows, waited until six months later to formally file for intervention.

During a November 7, 1985, telephone conference hearing held in connection with the Shoshone-Bannock intervention motion, the tribe justified this six-month delay on the grounds that it spent

JOHNSON, MARCEAU, KARNOPP, PETERSEN & NASH
ATTORNEYS AT LAW
835 N.W. BOND STREET
BEND, OREGON 97701-2799
(503) 382-3011

1   April and May negotiating with the Columbia River tribes on ways

2   to avoid intervention (which could have been done just as easily

3   after the intervention motion was filed as before), the summer

4   was spent fighting with the State of Idaho over salmon fishing

5   regulations, and so the Shoshone-Bannock tribal governing body

6   did not have time to take up the intervention matter again until

7   September. This excuse for the six-month delay from April to

8   October 1985, as well as the other reasons for the eighteen-year

9   delay since the start of the case and the two-year delay since

10  the case entered the current negotiations phase, are simply

11  inadequate. See Arkansas Electric Energy Consumers v. Middle

12  South Energy, Inc., 772 F.2d at 403-404 (reasons for delay

13  because of alleged difficulties in securing client authorization

14  to intervene were characterized as "not overly convincing" and

15  "incredulous"). Clearly, the applicant has offered no plausible

16  reasons for the extraordinary delay in seeking intervention,

17  measured both from the time the action was instituted and, more

18  importantly, from the time the district court ordered negotiation

    of a new plan.

19       In sum, because the litigation is nearing the end of the

20  current negotiations phase, intervention would seriously preju-

21  dice existing parties, and because the applicant failed to

22  justify its delay in seeking intervention, the Shoshone-Bannocks'

23  motion to intervene must be denied as untimely.

24  /////

25  /////

26  /////

Page  15, JOINT MEMORANDUM IN OPPOSITION TO INTERVENTION

JOHNSON, MARCEAU, KARNOPP, PETERSEN & NASH
ATTORNEYS AT LAW
835 N.W. BOND STREET
BEND, OREGON 97701-2799
(503) 382-3011

1

2 B. OTHER ELEMENTS OF INTERVENTION AS OF RIGHT.

3     The opposition of the Columbia River tribes and the State of

4 Washington to intervention by the Shoshone-Bannock Tribes is

5 based primarily on the untimeliness of the application. Addi-

6 tionally, the Columbia River tribes and the State of Washington

7 believe the application may also fail the other three require-

8 ments of intervention: an interest in the subject matter of the

9 action, inability to protect that interest without intervention,

10 and inadequate representation of that interest by existing par-

11 ties. However, determining whether the Shoshone-Bannocks' appli-

12 cation meets these requirements depends, in large part, on a

13 determination of whether Article 4 of the Fort Bridger Treaty

14 includes the right to an allocation of the fish runs and the

15 right to enjoin downstream users of the resource. If the

16 Shoshone-Bannocks have such rights, then they have an interest in

17 the litigation and could not rely on existing parties to protect

18 that interest. If, however, the Shoshone-Bannock treaty fishing

19 right is a limited-duration right for "only so long as game may

20 be found thereon" to catch whatever harvestable fish may reach

21 "unclaimed lands of the United States" in their aboriginal area,

22 then the Shoshone-Bannocks do not have an interest sufficient to

23 justify intervention, and the State of Idaho adequately protects

24 what interest they have in Idaho-bound fish runs. Accordingly,

25 if the court determines that the Shoshone-Bannocks' motion to

26 intervene is timely, the court may wish to consider granting the

Page 16, JOINT MEMORANDUM IN OPPOSITION TO INTERVENTION

JOHNSON, MARCEAU, KARNOPP, PETERSEN & NASH
ATTORNEYS AT LAW
835 N.W. BOND STREET
BEND, OREGON 97701-2799
(503) 382-3011

1   Shoshone-Bannock Tribes provisional intervention pending adjudi-
2   cation of the claims raised in the complaint in intervention,
3   with a final ruling on intervention to follow once the scope of
4   the Fort Bridger Treaty fishing right has been determined.

5       Regardless of the outcome of any litigation on the scope of
6   the Fort Bridger Treaty fishing right, it is unlikely that the
7   Shoshone-Bannocks can satisfy the intervention requirement of
8   demonstrating that the disposition of this case will impair or
9   impede their ability to protect their interests.

10      The Shoshone-Bannocks' complaint requesting declaratory and
11  injunctive relief assumes that a lot more fish, namely wild
12  spring chinook and summer chinook, will return to the Shoshone-
13  Bannock fishing areas in the headwaters of the Salmon River
14  system in central Idaho if the Columbia River tribes' Zone 6
15  ceremonial and subsistence fisheries and Oregon's and Washing-
16  ton's lower river and ocean fisheries are curtailed. As shown by
17  the Affidavit of Jean Edwards, this assumption is wrong.

18      The main reason for the decline and current depressed status
19  of Salmon River basin wild spring and summer chinook stocks is
20  the extensive downstream hydroelectric development, especially
21  the four lower Snake River dams completed in the early 1970s.
22  Affidavit of Jean Edwards at 17-18. Degradation of the natural
23  habitat has also been a major factor. Id. at 8. The biological
24  data show that these runs have declined even as downstream har-
25  vest on these stocks have declined to diminimus levels. Id. at
26  6-17, 20. The massive mortalities suffered by wild spring and
27  summer chinook smolts from the Salmon River system as they

Page    17, JOINT MEMORANDUM IN OPPOSITION TO INTERVENTION

JOHNSON, MARCEAU, KARNOPP, PETERSEN & NASH
ATTORNEYS AT LAW
835 N.W. BOND STREET
BEND, OREGON 97701-2799
(503) 382-3011

1   migrate to the ocean through eight reservoirs and over eight dams

2   means that these stocks cannot be rebuilt even with complete clo-

3   sure of all intercepting fisheries.   Id.   Indeed, the data show

4   that these stocks are so depressed that they make up only a  tiny

5   fraction of the total  spring and summer  chinook harvest of  the

6   intercepting fisheries, and the  complete closure of these  fish-

7   eries would  return  very  few additional  adult  salmon  to  the

8   Shoshone-Bannock fishing  areas.   Id.  at 14.   Rebuilding  these

9   stocks to  harvestable levels  simply cannot  be accomplished  by

10  further harvest restrictions.   Id. at 20.

11      The scientific evidence shows that the stocks the  Shoshone-

12  Bannocks fish on will  improve only as  improvements are made  in

13  the smolt survival  rates at the  eight downstream  hydroelectric

14  projects, as  the  spawning  habitat  is  rehabilitated,  and  as

15  hatchery-produced fish are outplanted  in the natural habitat  to

16  supplement the  wild stocks.   Id.  at 17-21.   These  corrective

17  measures, however, are not within  the scope of this  litigation.

18  Accordingly, regardless  of the  nature of  the  Shoshone-Bannock

19  treaty fishing right, intervention in this action will not ensure

20  restoration of the Shoshone-Bannock fisheries.

21                               III.

22          PERMISSIVE INTERVENTION UNDER RULE 24(b)

23      Although not discussed in the  memorandum in support of  the

24  motion to intervene, the Shoshone-Bannocks' motion also requests

25

26

Page    18, JOINT MEMORANDUM IN OPPOSITION TO INTERVENTION

JOHNSON, MARCEAU, KARNOPP, PETERSEN & NASH
ATTORNEYS AT LAW
835 N.W. BOND STREET
BEND, OREGON 97701-2799
(503) 382-3011

1   permissive intervention under Rule 24(b).  As noted above, per-

2   missive intervention is subject to denial based on the untimeli-

3   ness of the motion.  <u>Arkansas Electric Energy Consumers v. Middle</u>

4   <u>South Energy, Inc.</u>, 772 F.2d at 403.  Additionally, permissive

5   intervention will be denied if the applicant does not assert a

6   claim or defense which has a question of law or fact in common

7   with the main action.  <u>United States v. $129,374 in U.S. Cur-</u>

8   <u>rency</u>, 769 F.2d at 585.

9   Here, the Shoshone-Bannock Tribe claims that it seeks "to

10  align itself as a collective plaintiff in this action because its

11  claim against the defendants and the existing plaintiffs' claim

12  against the defendants raise common questions of law or fact."

13  Motion to Intervene at 5.  However, it is obvious from their

14  pleadings, as well as their appearance at the April 19, 1985

15  hearing to support Idaho's motion for an injunction against the

16  Columbia River tribes' ceremonial and subsistence fisheries, that

17  the Shoshone-Bannocks' claims are more directed against the

18  existing plaintiffs, including the United States, than against

19  the defendant states.  It is hard, therefore, to see what the

20  Shoshone-Bannock claims have in common with the plaintiffs'

21  claims against the defendants.

22  Moreover, the language of the Fort Bridger Treaty securing

23  off-reservation fishing rights to the Shoshone-Bannock Tribes has

24  nothing in common with fishing clause language in the treaties of

25  the plaintiff tribes.  As a result, intervention will require

26  extensive litigation to determine the meaning of the Fort Bridger

27  Treaty language.  Instead of furthering judicial economy by

Page

19, JOINT MEMORANDUM IN OPPOSITION TO INTERVENTION

JOHNSON, MARCEAU, KARNOPP, PETERSEN & NASH
ATTORNEYS AT LAW
835 N.W. BOND STREET
BEND, OREGON 97701-2799
(503) 382-3011

1  seeking to join this case  to litigate issues already before  the

2  court, the Shoshone-Bannocks seek to  use this case as a  vehicle

3  to litigate  in  a  federal forum  unique  and  difficult  issues

4  regarding the scope of their treaty fishing rights, thus signifi-

5  cantly expanding the scope of this case.  Permissive intervention

6  must be denied.

7

8                              IV.

9                          CONCLUSION

10       For the reasons set out above, the Columbia River tribes and

11  the State of Washington respectfully  request that the motion  to

12  intervene of the Shoshone-Bannock Tribes be denied.

13                          Respectfully submitted,

14

15                          HOWARD G. ARNETT
                            Attorney for the Confederated
16                              Tribes of the Warm Springs
                                Reservation of Oregon

17

18

19                          TIM WEAVER
                            Attorney for the Confederated
20                              Tribes and Bands of the
                                Yakima Indian Nation

21

22

23                          ROBERT C. STROM
                            Attorney for the Nez Perce Tribe

24  /////

25  /////

26  /////

Page  20, JOINT MEMORANDUM IN OPPOSITION TO INTERVENTION

1

2

3        _____
         WEISHA MIZE
4        Attorney for the Confederated
            Tribes of the Umatilla Indian
5           Reservation

6

7        _____
         DANIEL WYCKOFF
8        Assistant Attorney General
         Attorney for the
            State of Washington
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page    21, JOINT MEMORANDUM IN OPPOSITION TO INTERVENTION

JOHNSON, MARCEAU, KARNOPP, PETERSEN & NASH
ATTORNEYS AT LAW
835 N.W. BOND STREET
BEND, OREGON 97701-2799
(503) 382-3011

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3   UNITED STATES OF AMERICA,              )

4              Plaintiff,                   )

5        vs.                               )

6   THE CONFEDERATED TRIBES AND            )
    BANDS OF THE WARM SPRINGS
    RESERVATION OF OREGON;                 )
7   CONFEDERATED TRIBES AND BANDS
    OF THE YAKIMA INDIAN NATION;           )  Civil Case No. 68-513
8   CONFEDERATED TRIBES OF THE
    UMATILLA INDIAN RESERVATION:           )
9   AND NEZ PERCE TRIBE OF IDAHO;
                                           )
10             Plaintiff-Intervenors,
                                           )
11       vs.
                                           )
    STATE OF OREGON,
12                                         )
              Defendant,
13                                         )
         and
14                                         )
    STATE OF WASHINGTON,
15                                         )
              Defendant-Intervenor,
16                                         )
         and
17                                         )
    STATE OF IDAHO,
                                           )
18            Defendant-Intervenor.
                                           )

19   _____

20             Hearing before The

21          HONORABLE EDWARD LEAVY

            Friday, April 19, 1985

22         United States District Court

23              Portland, Oregon

24

25

                    EXHIBIT "A"
                     Page 1

35

1    tribal affidavits will be treated as live

2    testimony.  For that reason, we have made

3    our witnesses available for cross examination

4    and in fact, Idaho has taken advantage

5    of that opportunity and just cross examined

6    one of our witnesses. We want to cross

7    examine Mr. Hansen.  He isn't here.  We

8    can't do that.  We felt that there is

9    a fundamental problem about the fairness

10   of treating his affidavit as if it were

11   live testimony wherein we have  no oppor-

12   tunity to cross examine.  We submit it

13   should be stricken.

14       THE COURT:  It's denied.

15       I take it that that is all of the

16   evidence parties are going to present.

17       I haven't heard anything that the

18   Shoshone Tribe seeks to present.

19       MR. ECHOHAWK:  Thank you., Your

20   Honor.

21       For the record, my name is Larry Echohawk,

22   Tribal Attorney for the Shoshone-Bannock

23   Tribe, located in Idaho.

24       Your Honor, it's our intent in requesting

25   leave to make special appearance here today

36

1   is to, in general terms, inform the Court

2   of our intent to file a motion to intervene.

3   We believe we will do that this coming

4   Monday or Tuesday. And in that motion

5   to intervene, we will be requesting to

6   participate on a continuous basis in these

7   proceedings.

8        We do not have any affidavits or

9   witnesses to call at this time. But with

10  the indulgence of the Court, I would

11  request some latitude in addressing our

12  general concern about this particular

13  injunction.

14       THE COURT:  You can do that.

15       MR. ECHOHAWK:  Your Honor--

16       THE COURT:  I want to make it

17  clear to you that I will hear you and the

18  Court has not ruled that you can intervene,

19  either generally, in this case. And I'm

20  going to leave that to Judge Craig to decide,

21  in any event. And I've not ruled that you

22  will be permitted to intervene on this

23  motion. That will be decided. And I presume

24  the Court will have to decide, if the Court

25  decides the motion. But I want to hear you

1     now so that in the event the Court does

2     decide to let you intervene on this motion,

3     your position will be reported.

4         BY MR. ECHOHAWK:  Your Honor, to

5     reemphasize, we will be filing papers that

6     will contain much of the information that

7     I will state here.  In general, I want to

8     provide some background to the Court about

9     the Shoshone-Bannock Tribe.  As a tribal

10     attorney, I represent the tribes that make

11     up approximately 3,300 members.  The

12     reservation is located in Southeast Idaho.

13     Initially, the Shoshone and Bannock people

14     that now reside on the reservation actually

15     come from five differant bands or groups

16     of Shoshone and Bannock Indians.  And

17     originally, they asserted aboriginal owner-

18     ship to approximately twenty-five million

19     acres of land.  Although that has never been

20     judicially determined, that is an approximate

21     amount and included not only extensive

22     portions of Southeast Idaho--Southern Idaho,

23     but also included portions of other states.

24         Pursuant to the Fort Richards Treaty

25     of 1868, this tribe ceded it's land claims

1   for a reservation that was to take up 1.6
2   million acres of land and that being in
3   existence today, the Fort Hall Reservation.
4   The size has been reduced to approximately
5   five hundred and fifty thousand acres.
6   But by virtue of the 1868 Treaty, the tribes
7   reserved to themselves the right to hunt
8   on the unoccupied land of the United States
9   under Article Four of that Treaty.
10          In 1972, the Idaho Supreme Court
11  entertained a challange to that Treaty right
12  by the State of Idaho in that there had been
13  a member of the tribe that had been arrested
14  and prosecuted for fishing for salmon in
15  the Yankee Fork Area, the Salmon River Basin.
16          The unanimous decision of the Supreme
17  Court, the State of Idaho, upheld the
18  interpretation of that 1868 Treaty.  There
19  the term, the right to hunt on unoccupied
20  lands of the United States included the
21  right to fish.  And just recently in a
22  Court case known as State vs. Cutler decided
23  in a slip opinion form issued on March 19th
24  of this year, the Court again unanimously
25  reaffirmed that position and the interpre-

1  tation.

2       So the Shoshone-Bannock Tribes are

3  virtually interested in what is occurring

4  within these proceedings.  What I want to

5  point out to the Court, in the last decade,

6  approximately, from 1975, the tribe began

7  a process of having to impose upon it's

8  members a series of restrictive regulations.

9  To describe a few of those things, under

10  tribal regulation, right now, tribal members

11  are not able to exercise the off reservation

12  Treaty rights unless they have been members

13  of the reservation and residents for at

14  least one year.  In addition to that, there

15  is a limitation to the number of salmon

16  that can be taken per family to forty

17  salmon per family.  The tribes also have

18  imposed restrictions that the only method

19  of taking the salmon is with the traditional

20  Indian spear.  And along with that, there

21  has been a series of partial and total

22  closures of that fishery.

23       The tribes have--it's estimated between

24  1981 and 1983--only taken 142 fish.  Last

25  year we had a total closure because of the

40

size of the run.

Essentially, what the tribes' concerns are:  Primarily, the wild run of salmon that move up to the Columbia River system that spawn in the aborigional and traditional areas of the tribe, those runs have been decimated.  In the last years, each reduction in the numbers of salmon have required these restrictions to be imposed.

In the most and recent years, in the past five years, what fishing the tribe has done would be only characterized as symbolic fishing.  The regulations were specifically written to open a fishery when we knew that the fish actually wouldn't be on site. And in 1978, the State of Idaho joined with The United States Government and ruled to close down and limit the tribal fisheries, so we find it of grave concern when we look down the river and we see other tribes that are able to enjoy some degree of sussistence in ceremonial fishing and for the Shoshone-Bannock people upriver where the wild runs are coming in, we don't have any fisheries to speak of at all.

1    This is our concern in moving to

2    intervene in the proceedings and, of course,

3    we are concerned in the present injunction

4    efforts on the part of the State of Idaho

5    because, as we read the five-year plan,

6    which we have been excluded from, the

7    minimum escapement goal calls for 120 fish

8    over Lower Bonneville Dam.  And the figures

9    that we are talking about right now are

10   not near that amount.  It simply means to

11   us that given even the optimum figure of

12   90,000 fish coming over the Lower Dam, the

13   Shoshone-Bannock people are going to once

14   again be placed in a situation where they

15   are going to have a very restrictive or

16   probably totally closed fishery again for

17   their subsistence and ceremonial fishing.

18        The Shoshone-Bannock Tribes are, as

19   far as I know, the only Northwest tribe

20   that has only a subsistence and ceremonial

21   fishery and not a commercial fishery.  I

22   think they have gone out of their way to

23   impose restrictions upon their own membership,

24   in the name of conservation, and trying to

25   keep those wild runs preserved. Whereas we

1    see other Indian people fishing, we respect

2    their Treaty rights.  We are not appearing,

3    in any way, to say that those Treaty rights

4    are to be abbrogated.  But we are concerned

5    about an equitable distribution.

6        It does not make sense to the Shoshone-

7    Bannock Tribe for one Indian tribe to be

8    granted a subsistence and ceremonial fishery

9    when the upriver groups are totally denied

10    from that.  And I think the Shoshone-Bannock

11    Tribes are to be commended for the restric-

12    tions that they have placed but they have

13    tried to not only impose self-preservation

14    but to go in and improve the habitat spawning

15    area to participate in sound management

16    decisions that would bring more fish back.

17        But  that process, I guess, as the

18    tribes have learned, is not going to bring

19    the number of salmon back into their fishing

20    areas.  And so I think that's why they are

21    determined to make the attempt to intervene

22    in these proceedings so that they can try

23    to do something through the Court orders

24    or if the plan is to be renegotiated to

25    participate in that process.  And with

43

1    expression, I would just simply say to the

2    Court that we are  hoping that the  Court

3    will consider that in a decision on this

4    injunction matter and to consider other tribes

5    with the Treaty rights that would like to

6    have a subsistence in ceremonial fishing as

7    well.

8         THE COURT:  Very well.

9         Now, does the State of Idaho want to make

10   an argument?

11        MR. GODDARD:  Yes, Your Honor, but I

12   think I could keep it brief.

13        THE COURT:  Well, go ahead.

14        MR. GODDARD:  Your Honor, as we have gone

15   through these proceedings together,  I  think

16   it's been clear that no one has predicted

17   that the minimum spawning escapements will

18   be met at the  Lower Granite Dam.   This will

19   be the seventh year that these spawning

20   escapements at  Lower Granite Dam have not

21   been met.

22        The evidence also shows, clearly, that

23   the minimum spawning escapements will not be

24   met through wild and natural  runs coming to

25   Idaho for the seventh consecutive year.