IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| and | ) | |
| | ) | |
| CONFEDERATED TRIBES and BANDS | ) | Civil No.  68-513-KI |
| OF THE YAKAMA INDIAN | ) | |
| NATION, et al. | ) | |
| | ) | FINDINGS OF FACT AND |
| Plaintiff-Intervenors, | ) | CONCLUSIONS OF LAW |
| vs. | ) | |
| | ) | |
| STATE OF OREGON, STATE OF | ) | |
| WASHINGTON, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| CONFEDERATED TRIBES OF THE | ) | |
| COLVILLE INDIAN RESERVATION, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

KING, Judge:

The Court makes the following Findings of Fact and Conclusions of Law as a result of the dispute between two tribes, the Confederated Tribes and Bands of the Yakama Nation ("Yakama") and the Confederated Tribes of the Colville Reservation ("Colville") (representing its constituent tribe, the Wenatchi),[1] over fishing rights purportedly granted by an 1894 agreement at the "Wenatshapam Fishery" near the town of Leavenworth, Washington.

The dispute is part of a longstanding case brought by the United States to define certain Indian tribes' treaty rights to take fish at all usual and accustomed places along the Columbia River and its tributaries. Colville sought to intervene in the case on two occasions, once in 1989 and once in 1999, but its requests were denied. See United States v. Oregon, 29 F.3d 481 (9th Cir. 1994) ("Oregon I"). In 2002, instead of moving to intervene yet again, the Colville Wenatchi began fishing at Icicle Creek.

On August 18, 2003, I granted Yakama's motion for injunctive relief, enjoining Colville and its constituent tribes from fishing at Icicle Creek and holding that Colville was precluded by res judicata from asserting the arguments it raised in opposition to Yakama's motion. Colville appealed that holding, and the Ninth Circuit reversed and remanded the case "for trial on the merits." United States v. State of Oregon, 470 F.3d 809, 818 (9th Cir. 2006) ("Oregon II"). Upon remand from the Ninth Circuit, the matter was tried to the court on May 6, 7 and 8, 2008. Upon conclusion of the trial, Yakama, Colville, the United States, and the State of Washington submitted post-trial briefing.

---

[1]I refer to the respondent as the Wenatchi or Colville Wenatchi, except where the larger Colville tribe is involved.

Page 2 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

For the reasons stated below, I find the Wenatchi and Yakama have joint fishing rights to fish at the Wenatshapam Fishery, which is located at the confluence of the Wenatchee River and Icicle Creek. Due to the alteration of this site by white settlement, and the fact that the evidence demonstrates fishing on Icicle Creek, in addition to fishing on the Wenatchee River, the nearest location for the Wenatshapam Fishery is the Leavenworth National Fish Hatchery on Icicle Creek.

## FINDINGS OF FACT

I.    <u>The 1855 Treaty</u>

In 1855, the United States, through Governor Stevens, began the "hasty effort to clear land occupied by Indians for development by settlers." <u>Oregon I</u>, 29 F.3d at 484. At the treaty council, Governor Stevens negotiated directly with Yakama leader Kamiakin, who Stevens had identified as a representative for many tribes including the Wenatchi (also known as Pisquose) and Kittitas, but there were over eighteen hundred Indians present at the treaty council from all the "Tribes in Washington from the Bitter Root to the Cascade, except the Spokane, Coeur d'Alene, Colvilles and Pend D'Oreilles." E. Richard Hart, <u>Wenatchi Fishing Rights and the 1894 Agreement</u>, Colville Ex.102, at 31 (Dec. 14, 2007) (quoting transcript of council meeting) (hereinafter, "Hart"). The Wenatchi leader Tecolekun was present, along with many other leaders, including the Kittatas chief Owhi.

The weeks-long negotiation ended with the completion of the 1855 Treaty, for the benefit of the fourteen confederated tribes of the Yakama Nation who, "for the purposes of this treaty,

are to be considered as one nation, under the name of 'Yakima.'"[2]  Treaty with the Yakima, 12 Stat. 951 (June 9, 1855, ratified March 8, 1859, proclaimed April 29, 1859) ("1855 Treaty"). The 1855 Treaty set out lands Yakama ceded to the United States, and reserved certain other lands for the tribes.  Yakama also received the "exclusive right of taking fish in all the streams, where running through or bordering said reservation" and also "the right of taking fish at all usual and accustomed places, in common with the citizens of the territory[.]"  Id., art. III, § 2, 12 Stat. at 953.

As a condition of his agreement, Kamiakin requested a provision be added to the treaty that established a reservation at Wenatshapam.  This was at the request of Tecolekun and Owhi, and possibly others.  The minutes of the council meeting report that Kamiakin stated he was "satisfied with the Reservation in his country, but desired a small piece of land at the place called Wenatshapam–where the Indians take many fish–for the Pisquose & Methows."  Hart at 34.  The minutes reflect that "[s]everal headmen of the Palouse, Pisquouse & Methows were present and unanimously assented to Kamiakun's decision."  Id.

Wenatshapam was the "principal salmon fishing grounds of the Wenatchi."  Id. at 9.

More than any other place, the Wenatshapam fishery was the hub around which the Wenatchi tribe's cycle of activities rotated.  The center of the Wenatshapam fishery was the confluence of the Icicle River with the Wenatchee River.  At the fishery each year all tribal members were able to obtain much of the fish supply necessary for their survival throughout the remainder of the year.

---

[2] The spelling used in the 1855 Treaty and 1894 Agreement is "Yakima."  The current spelling is "Yakama."

Page 4 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Id. at 6.[3]  The evidence reflects that Chelan, Entiat, Kittitas, Methow, and tribes as far away as Sanpoil and Nespelem, visited the fishery.  The area had about 200 permanent residents, but at the peak of salmon fishing the number of people rose to 2,000 or 3,000.  One anthropologist, early in his work, described a "joint village of the Kittitas and Wenachi near the present town of Leavenworth."  Yakama Ex. DEW 18 at 8.

As a result of Kamiakin's request, Article X of the Treaty established a separate plot as follows:

> That there is also reserved and set apart from the lands ceded by this treaty, for the use and benefit of the aforesaid confederated tribes and bands, a tract of land not exceeding in quantity one township of six miles square, situated at the forks of the Pisquouse or Wenatshapam River, and known as the "Wenatshapam Fishery," which said reservation shall be surveyed and marked out whenever the President may direct, and be subject to the same provisions and restrictions as other Indian reservations.

1855 Treaty, art. X, 12 Stat. at 954.

Fourteen Indian leaders signed the 1855 Treaty, including Kamiakin, Tecolekun and Owhi.

## II.    Events Leading up to the 1894 Agreement

Subsequent to signing the 1855 Treaty, Yakama Indians killed six miners who had come to the area upon reports of gold, and killed the Indian Agent who came to investigate the murders.  When the United States sent troops to gain control of the area, Kamiakin entreated the Wenatchi and other tribes to fight the government.  The Wenatchi declined.  Colonel George Wright led the United States troops into the Wenatchee Valley in search of Yakamas hiding out.  He came upon a number of Indians, including Kittitas, fishing at the Wenatshapam Fishery, and

---

[3]See also Proposed Findings of Fact 21 of Plaintiff Intervenor Yakama Nation.

allowed them to fish for a short period before removing them to the Yakama Reservation.  He did

not remove the Wenatchi.  He reportedly said of the fishery, "I have examined all the fishing

places south of this, and there are none to compare with this, at this season of the year."  Hart at

39.

The Wenatchee Valley remained difficult to reach by white settlers for much of the late

1800s and the Wenatchi continued their way of life as they always had, moving "up and down

the drainage as the seasons changed in order to acquire necessary foods."  Id. at 57.  In March

1882, Francis Marion Streamer, a journalist and Civil War veteran, visited Dick Thompson who

had married an Indian.  Streamer described walking to the "Wenatchee tumwater" and observing

hundreds of salmon dressed and drying on racks at the confluence of the "Nescickle[4] and

Wanatchee rivers."   Id. at 58.  Streamer also described observing Wenatchi and Kittitas fishing

"near Wenatchee Lake" giving a detailed summary of their cooperative efforts.  Dr. Deward E.

Walker, Jr.,  The Yakama Nation and the Wenatshapam Fishery:  A Report Prepared for Tim

Weaver, Attorney at Law, and the Yakama Nation, Ex. 1, at 58 (Dec. 14, 2007) (hereinafter

"Walker").

In 1888 or 1889, United States Special Agent George W. Gordon, who had undertaken

the job of identifying Indian fishing rights, visited the Wenatchee Valley to investigate Article X

of the 1855 Treaty.  After speaking with some residents, Gordon understood that the Article X

reservation was located at the confluence of the Icicle and Wenatchee rivers.  When he

---

[4]The evidence supports the conclusion that "Icicle" is derived from the word "Nysicle," in the Salish language spoken by the Wenatchi.

investigated that area, he discovered "fishing camps, camp equipage, drying scaffolds and canoes of the Indians who were absent in the mountains hunting." Hart at 62.  He reported,

> My information, obtained from the Whites on the We-nat-chee, is that the Indians have not been interfered with or deprived of the privilege of taking fish on this stream, except that some years ago, the Whites refused to allow them to build their traps at the mouth of Mission Creek as they had been accustomed to do previous to that time[.]

Id. at 63.  He learned that "Indians from the Colville and Yakima reservations also came here to fish and that from four to six hundred Indians visit these We-nat-chee fisheries during the season." Walker at 62.

When Streamer visited the Wenatchi again in 1889, he observed them catching, cleaning, slicing, and drying hundreds of salmon, and enjoying a "feast of salmon broiled on sticks by the fire" "within a mile of its [the Wenatchee River's] junction of Nysickle [Icicle] and Peshastin rivers." Hart at 64-65.

Beginning in the 1890s, with the development of steamboat and railroad service to the area, white settlers began making claims on the land there.  The Great Northern Railroad Company laid track across the territory in 1892, and government officials started pressuring the Wenatchi to move to the Colville Reservation.  Even with the incursion of settlers, the Wenatchi maintained "the aboriginal pattern of subsistence gathering and hunting and fishing" until about 1900.  Id. at 67.

The United States never lived up to its commitment to survey the Article X plot and remove it from the public domain.

In July of 1892, the United States Indian Agent Jay Lynch contacted the Commissioner of Indian Affairs to inquire about the status of the Article X land.  In response, the Commissioner

sought authority from the Secretary of the Interior to survey the land as it was "reserved and set apart," but no "action was ever taken to locate said tract of land[.]"  Letter of August 27, 1892 from T.J. Morgan to Sec'y of the Interior, reprinted in S. Exec. Doc. No. 67, 53rd Cong., 2d. Sess. (1894) (hereinafter "Senate Doc. 67") at 5.  The Acting Secretary authorized the survey, but requested that the plot not "interfere with any vested rights of settlers or other parties."  Letter of August 29, 1892 from Acting Sec'y Geo. Chandler to the Comm'r of Indian Affairs, Senate Doc. 67 at 5.

When word of the proposed survey reached the settlers, several complained.  One settler, James H. Chase, Esq., wrote to the Secretary explaining that the Valley is long and narrow, and a reservation in the middle of the Valley would require settlers living above it to come through the reservation to reach the Columbia River.

The Secretary responded by explaining:

[T]he Wenatchee is not established as a *new reservation*, but as the fulfillment of a treaty obligation, which had been heretofore overlooked or neglected by the Government since the ratification of the Yakima treaty in 1869.  It is now as much Indian land as the Yakima Indian Reservation itself, the only difference being that the one had distinct boundaries named and described in the treaty, while the other was referred to as a tract of land not exceeding in quantity one township of 6 miles square, situated at the forks of the Pisquause or Wenatchapam River, which the Government stipulated and agreed should be surveyed and marked out whenever the President might direct.

Letter of July 18, 1893 from the Comm'r of Indian Affairs to James H. Chase, Esq., Senate Doc. 67 at 8 (emphasis in original).  He suggested that the settlers file a petition with the President requesting that the government negotiate with the Indians to purchase the Article X reservation.

Agent Lynch placed the reservation over ten miles upstream from the confluence of Icicle Creek and the Wenatchee River, but included approximately ten miles of the Wenatchee River.

Page 8 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

A survey was ordered of the proposed location, but Agent L.T. Erwin, who had replaced Agent Lynch, ordered the surveyor to stop his work and survey an area in the mountains approximately 20 miles above the confluence of Icicle Creek and the Wenatchee River in order to avoid including in the reservation several miles of the Great Northern's railroad track.

When former Agent Lynch learned of the incorrect survey, he wrote of "a great injustice done to the Yakima Indians by reason of a recent survey of the boundary line of a reservation" and that Agent Erwin "has very materially changed the boundary lines . . . leaving the best portion of the lands and river outside of the tract surveyed." He quoted an Indian who had approached him about the incorrect location of the reservation,

> "Does our Great Father at Washington think a salmon is an eagle that lives on top of a mountain, or does he think a salmon is a deer that lives in the woods and hills, or does he think a salmon is a mountain goat that lives among the rocks of the snow-covered mountains?
>
> Tell our Great Father the Indian does not care for the little trout in the lake but wants the salmon that lives in the rocky places in the river where the Indian can find him. Our fishery is in the river where you saw it, and was destroyed by the white men and the Indians driven away. We want our fishery in the river where Governor Stephens gave it to us a long time ago."

Letter of December 26, 1893 from Jay Lynch to Hon. Darwin R. James, Senate Doc. 67 at 21.

In response to the Commissioner of Indian Affairs, the settler James Chase reported that Yakama would sell because,

> the reservation as *now* being laid off is not where the fisheries were in 1855, or ever at any time. They will claim, with a good deal of reason, that it was the intention to give the land (23,000 acres) *around the then existing fisheries*. To do this would bring the reserve down the river 25 or more miles to what is known as Mission Creek and Valley, and would be still more unfortunate for the people, for the land is all taken and settled upon and much of it is patented by the Government to them.

Page 9 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Letter of August 28, 1893 from James H. Chase to Comm'r of Indian Affairs, Senate Doc. 67 at

11 (emphasis in original).

Chase also reported his concern about the treatment of Indians other than the Yakama,

reporting:

> While the correspondence seems only to concern the Yakima tribe, who live 100 miles away, I am convinced there are quite a number of Indians old in years who were born and have always lived on the Wenatchee River, and on the very land which they now claim should be the reservation, and who at the time helped build and owned a part in all the fisheries on the Wenatchee River, and who will be as much entitled to a share of the proceeds of the sale (in case one is made) as any Yakima Indian, and much more so, for not one in twenty of the Yakimas ever saw the Wenatchee River.  There is no doubt in my mind but what the intention was to secure the reserve to the Indians who owned the fisheries, and that while the contract or treaty of 1855 mentioned the Yakimas it really intended to give the land to the Indians who owned the fisheries, no matter who they were.  These Indians, not like the Yakimas, who already own 800,000 acres of fine land, have been content and self-supporting on homesteads of 160 acres or less, and they justly claim if more is to be given they wish to be considered.

Id., Senate Doc. 67 at 11-12.

After receiving a petition from over forty settlers, the Acting Secretary of the Interior

authorized the Commissioner to negotiate with Yakama for the sale of the Article X reservation.

He noted, though, "It seems from letters submitted from your communication that there are

Indians other than the Yakimas living in the neighborhood of this reservation who have, or claim,

some rights therein.  The rights of such Indians in land or fishing privileges should be taken into

consideration and protected."  Letter of October 2, 1893 from Acting Sec'y Wm. H. Sims to

Comm'r of Indian Affairs, Senate Doc. 67 at 15.

In designating Agent Erwin and Special Agent John Lane, Esq. to negotiate the sale of the

Article X reservation, the Commissioner of Indian Affairs noted a few things, including that the

Yakama "are entitled to the land under the treaty and that the survey was but the tardy fulfillment of a treaty obligation that had either been overlooked or neglected for thirty years."  Letter of October 13, 1893 from Comm'r of Indian Affairs to John Lane, Esq. and L.T. Erwin, Senate Doc. 67 at 16.  He requested that the agents obtain a "cession and surrender of all [the Yakama] rights to the land and fishery reserved under the tenth article" of the 1855 Treaty.  Id.  He also noted that the Indians other than the Yakama living in the area were likely signatories to the 1855 Treaty, as members of the Pisquouses or Wenatshapams (other names for the Wenatchi), and should be included in the discussions.  In addition, whether signatories to the treaty or not, they "should be informed . . . that it is not contemplated by these negotiations to deprive them of any individual rights they may have acquired by reason of their settlement on the public domain, or to the lawful use of the fisheries in common with the white people of the State."  Id.

By this time, settlers were laying claim to land at the confluence of Icicle Creek and the Wenatchee River, where the preponderance of the evidence demonstrates the Wenatshapam Fishery was supposed to have been located, and where the Great Northern was platting out the town of Leavenworth.

III.    The December 1893 and January 1894 Councils

Agent Erwin and Special Agent Lane called a council on December 18, 1893 on the Yakama Reservation to present the Commissioner's proposal to the Yakama.  Four Wenatchi leaders, including their chief, John Harmelt,[5] traveled over 150 miles to be there.  An official transcript of the council, which was conducted through interpreters, reflects that Agent Lane read the Commissioner's October 13, 1893 letter, including the portion explaining that Wenatchi

_____

[5]The record of the negotiations spells the name "Hamilk."

rights "in lands or fishing privileges should be taken into consideration and protected" and that they have "lawful use of the fisheries in common with the white people of the State."  Senate Doc. 67 at 24, referring to the Letter of October 13, 1893 from Comm'r of Indian Affairs to John Lane, Esq. and L.T. Erwin, Senate Doc. 67 at 16.

Agent Erwin explained that the agents wanted to hear from all the Indians, but especially from the Wenatchi who lived near the fishery.  Yakama tribal members who spoke also explained that the Article X reservation belonged to the Wenatchi, and that the agents should ask the Wenatchi what they wanted.

Harmelt summarized the history of broken promises, and quoted a former chief who said, "This country is just like my mother.  From this land I receive food for my own tribe.  The Wenatshapam River is just like my mother.  I get my salmon out of there and have good food."  Id. at 26.  Harmelt initially reported that he did not want to sell the reservation.  Agent Erwin questioned Harmelt further, and asked him whether he would take land "where you now live," but Harmelt did not answer.  Id. at 27.

The next day, the council met again.  Agent Erwin summarized the situation, suggesting that the Indians sell the piece of land that had been improperly surveyed, and that the Wenatchi take allotments where they lived.  He also said, "I have something further that I want to say about the fishery privilege and that is that even if you should agree to sell, the Department says that you shall have the lawful use of the fisheries in common with the white people," and read the letter from the Commissioner on this point again. Id. at 28, referring to the Letter of October 13, 1893 from Comm'r of Indian Affairs to John Lane, Esq. and L.T. Erwin, Senate Doc. 67 at 16.

After listening to the agents and the Yakama members speak, Harmelt said,

> I don't want to say many words to-day.  I felt good by you two men's statements.
> I came out in the cold and got tired and came through many hardships on your
> account.  You have shown me that I can take land where I now live.  That went to
> my heart, and I feel good about it.  I don't want to be surrounded by white men; I
> want the Indians to live apart from the white man.  Many of these here people
> never saw that land, and you are asking them to sell it.  They all understand what
> you said to them, but the Indians over at Wenatchee did not hear your statements
> here to-day.  I myself alone have heard what you said; and if all the Indians over at
> Wenatchee would hear what you said, then they would decide on this land.  I think
> those people out [ought] to know about this matter, then let the decision come
> afterwards.

Id. at 30.

Agent Erwin immediately responded:

> This trade is a long ways from being finished.  There is one thing I want to
> impress on these Indians from the Wenatchee, and that is that they are not to be
> robbed of an acre of land, but, on the contrary, the Government proposes to give
> them land where they now are.  The selling of this fishery does not interfere with
> their rights at all.  The proposition is to buy this little piece of land and to allot to
> the Indians where they now live.

Id. at 30.

On the third day, after listening to the agents and Yakama, Harmelt said, "I don't want to

say very much.  I am well satisfied between you two.  These two old men are talking about

selling that land and also talking about the money.  Whatever they ask for the land that is my

same price." Id. at 32.  He also explained that he wanted the land allotted together and his "own

tribe to live with me, and then I can see that they do right."  Id.  Agent Erwin responded

favorably to the idea of grouping the allotments together, but warned,

> If we succeed in getting this land all together then you must not let any bad
> Indians come among you.  If there is a white man in Montana, Oregon, or Idaho
> commits a crime and comes to Washington, the people of Washington will send
> him back to that State, and if you do that there never will be any bad reports if you

Page 13 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

> keep the bad Indians away.  We will do all we can to allot the land to you just
> where you want it.

Id.  Agent Erwin promised to visit "in a short time" to "fix up the allotment matter" and

reiterated that the "Wenatchee Indians should get a part of the money, for the reason that the

fishery is close to them."  Id.  The council made an offer to the government of $1.50 per acre.

On January 6, 1894, the agents called a council to report that the government had rejected

the offer.  Harmelt was not present.  Several Yakama reiterated that selling the Article X

reservation was a decision for the Wenatchi.  One said,

> I will not sell this piece of land away from the Wenatchee Indians that owns the
> land.  We all heard what you said when these Indians said they would sell; you
> said you would allot them other lands.  These Wenatchee Indians said they wanted
> land where they lived.  It was the land of his fathers and he wanted to stay there.
> You said you would allot this land where they lived.  Everybody heard it.  We are
> having another council here to-day and I feel that I have no right to take this land
> away from the Indians because they are the right owners of it.  We ought to have a
> good council and think over it, and see what would be the best for these Indians
> over there.

Id. at 33.  Agent Erwin responded, "We would agree that the Wenatchee Indians should have

land allotted to them where they now live . . . ."  Id.  Agent Lane represented that the Wenatchi

had left the decision up to the Yakama.  Agent Erwin reported that the Wenatchi would be

allotted 10,000 acres of land in allotments.  The Yakama proposed a lump sum payment of

$20,000, which was accepted.  According to the Yakama expert, reviewing the signatures on the

agreement, few Yakama of Wenatchi or Kittitas descent voted in favor of the sale.

IV.    The 1894 Agreement

The Agreement, dated January 8, 1894, provides as follows:

ARTICLE I.

The said Indians hereby cede and relinquish to the United States all their right, title, interest, claim, and demand of whatsoever name or nature of in, and to all their right of fishery, as set forth in article 10 of said treaty aforesaid, and also all their right, title, interest, claim, or demand of, in, and to said land above described, or any corrected description thereof and known as the Wenatshapam fishery.

ARTICLE II

In consideration of the foregoing cession and relinquishment the United States hereby agrees to pay or expend through their Indian Agent, Yakima Agency, twenty thousand dollars . . . .  After the ratification of this agreement by Congress and the further consideration that the Indians known as the Wenatshapam Indians, residing on the Wenatchee River, State of Washington, shall have land allotted to them in severalty in the vicinity of where they now reside, or elsewhere, as they may select, in accordance with article 4 of the general allottment law.

The agreement was submitted to Congress on March 19, 1894, and Congress ratified it on August 15, 1894.  Act of Aug. 15, 1894, ch. 290, § 13, 28 Stat. 286, 320, Agreement with the Yakima Nation of Indians (1894) ("1894 Agreement").

The Commissioner's letter accompanying the 1894 Agreement to the Department of Interior explained that allotments had been provided to the Wenatchi "in severalty to those Indians of said Yakima Nation, known as the Wenatshapam Indians, who are living upon the Wenatchee River, in that vicinity, under the fourth section of the general allotment act of 1887, a right which they already possess without its incorporation in this agreement."  Senate Doc. 67 at 3.

V.    Post-Agreement History

Agent Erwin visited the Wenatchi nearly a year later, in December 1894, and notified them of the agreement.  He informed them that they were entitled to a pro rata share of the

$20,000, which worked out to $9.30 per person, and to allotments under the General Allotment

Act.  The Wenatchi declined the offer and instead demanded a reservation along the Wenatchee

River, which Agent Erwin characterized as "a section of country that has been settled and

occupied by whites for more than twenty years."  Colville Ex. WX 232, Letter of January 22,

1895 from Agent L.T. Erwin to Commiss'r Browning.  In 1889, though, only five years before,

Streamer had described the Wenatchi fishing within a mile of the Wenatchee River's confluence

with Icicle.  Furthermore, the town of Wenatchee was not laid out until 1892, and the first white

child was not born in the county until 1884.

In 1897, Indian Inspector W. J. McConnell arrived at Yakama and reported on Yakama

complaints about Agent Erwin.  While he was there, he learned of the Wenatshapam Fishery

cession, and the "normally staid McConnell wrote a blistering letter to the Secretary of the

Interior[.]"  Hart at 123.

> Are we a nation of thieves and unmitigated scoundrels?  Are we devoid of
> all sense of honor?  Does seventy millions of people because of their superior
> numbers . . . propose, little by little to deprive the sorely depleted tribes in the
> West of the small patrimony their more magnanimous conquerors the early
> settlers in this country gave them?  or more properly speaking allowed them to
> retain.  After wresting from them the heritage which had descended to them from
> generation to generation.
>
> Will the interest of private individuals or the greed of corporations be
> allowed to sully our nation's honor?  Must men like myself who assisted in
> redeeming the wilderness and who are to-day powerless to undo the wrongs which
> were partially of our doing, bow our heads in humiliation at the recital of the
> falsity of the promises we have made?

Id., quoting WX 237, Letter of September 21, 1897 from McConnell to Sec'y of the Interior.  He

urged the buy-out of the settlers on the fishery, and the provision of the land to its "rightful

owners."  Id. at 125.

Harmelt went to Washington, D.C. in 1899 to meet with officials of the Department of Interior, and again in 1900, seeking the appointment of an allotting agent. When the allotting agent arrived, he urged the Wenatchi to move to the Colville Reservation. He "initially denied allotments to women and children and to those who already had Indian homesteads in trust, creating considerable pressure on Wenatchi homesteaders to convert their trust patents to fee patents in order that other members of their family might receive an allotment." Hart at 134. Once converted to fee status, many of the homesteads were lost by tax sales. Only 18 out of 166 allotments were provided. Landless Wenatchi were forced to move to the Colville Reservation, or move north along the Columbia and Okanogan Rivers until they too ended up on the Colville Reservation. By 1910 almost all Wenatchi were enrolled members of the Colville as the Wenatchi Constituent Tribe.

The Wenatchi did not give up, however. From 1910 until his death in 1937, Harmelt petitioned the government, published letters in the Washington Historical Quarterly, wrote a letter to a Senator, organized a pow-wow near the fishery, attempted to retain an attorney, chaired a council with the Colville and Yakama superintendents at which sworn testimony was taken, requested the restoration of Wenatchi fishing and hunting rights, and filed suit against the United States. The lawsuit languished when the Commissioner of Indian Affairs refused to approve the contract for the tribe's attorney. The government continued to offer the Wenatchi their $9.30 per capita share of the $20,000. With few exceptions, the Wenatchi consistently refused to take the money.

Throughout these years, Harmelt repeatedly reported that he had received no notice of the council session at which the vote was taken to sell the fishery, that the land was more valuable

than the sales price, that the reservation abutted the Wenatchee River where his people caught fish that provided a food supply for many months, and that the 1894 Agreement took away the Wenatchi reservation and the tribe's hunting and fishing rights.

During the first several decades of the twentieth century, the Wenatchi were given permission to fish on the lands owned by the Lamb-Davis Lumber Mill above and below the company's dam on the Wenatchee River. Subsequently, whether they were permitted to or not, members of Wenatchi families fished at the Wenatshapam Fishery throughout the remainder of the twentieth century.

VI.    <u>Fishing in 2007</u>

Colville adopted fishing regulations to regulate fishing by members of the Wenatchi Constituent Tribe at the Wenatshapam Fishery that do not conflict with the fishing regulations adopted by Yakama. Colville enforcement officers patrolled the fishery throughout the fishing season. The season proceeded without any altercations between Yakama and Wenatchi. Approximately 15 Wenatchi harvested 54 fish. The hatchery's 712 surplus fish were shared between the tribes–395 to Yakama, 38 to Wenatchi, 26 to Native American Encampment, 43 to the Spokane Tribe, and 210 to the local Trout Unlimited chapter.

The United States takes no position on whether the Wenatchi obtained fishing rights under the 1894 Agreement. The manager of the Leavenworth Hatchery testified that the joint fishing by Colville Wenatchi and Yakama in 2007 did not jeopardize hatchery operations.

**CONCLUSIONS OF LAW**

The Ninth Circuit tasked this court with providing a "trial on the merits" to determine the meaning of Article I and Article II of the 1894 Agreement, suggesting that the provisions "appear

to be ambiguous in light of the context in which the agreement took place, the statements of the parties concerning the meaning of the terms of the agreement, and the recognition that this was an agreement drafted by the Government to reflect the understanding of the Indians, who had a lesser familiarity with the legal technicalities involved." Oregon II, 470 F.3d at 817.

I.    Wenatchi Fishing Rights

The Wenatchi claim they obtained from the 1894 Agreement the right to fish at the Wenatshapam Fishery, and suggest that construing the 1894 Agreement to obtain this result would involve providing fishing rights to "just one small tribe, at just one fishing station, located entirely on federal land."[6]  Post-Trial Reply Br. of the Colville Respondents ("Colville Reply") at 3.

According to the Wenatchi, three different principles of construction naturally result in a finding that they obtained fishing rights pursuant to the 1894 Agreement.  First, the Wenatchi suggest I may consider the letters and statements made before and at the time of the negotiations, and construe the agreement as the Indians would have understood it, without first making a finding of ambiguity.  Second, the Wenatchi assert I could find the 1894 Agreement to be ambiguous, and resolve the ambiguity in their favor.  Finally, they contend the doctrine of "implied rights" dictates a finding that fishing rights accompany a grant of land since the grant of land was to a tribe that fishes.

After reviewing these Indian law canons of construction, according to the Wenatchi, I should find that in agreeing to sell the Article X reservation Yakama relied on the agents'

---

[6]Although the purported location for the Wenatshapam Fishery is on federal land, at the Leavenworth National Fish Hatchery, and the United States supervises the fishery, the State of Washington regulates fishing there.

promise to Harmelt that the Wenatchi would have "the lawful use of the fisheries in common with the white people." Senate Doc. 67 at 28. Alternatively, I should find that the provision of allotments to the Wenatchi, from the perspective of the Indians, meant that the Wenatchi were to have land "where they now live" accompanied by fishing rights. Id.

    A.      The Court May Consider Senate Doc. 67

Yakama argues that I must look only to the language of the 1894 Agreement, which clearly provides allotments to the Wenatchi and no fishing rights. Yakama asserts that I may not consider the council minutes and related background, contained in Senate Doc. 67, and argues that the Wenatchi improperly look first to the negotiations leading up to the 1894 Agreement to prove the Agreement is ambiguous. Relying on South Dakota v. Yankton Sioux, 522 U.S. 329, 349 (1998) and Rosebud Sioux v. Kneip, 430 U.S. 584 (1977), Yakama contends I may only refer to the letters and statements made at and before the council hearing, contained in Senate Doc. 67, if I first find that the language of the 1894 Agreement is ambiguous.

Yankton Sioux and Rosebud Sioux, however, support the court's consideration of the legislative history in construing the meaning of an agreement. Yankton Sioux, 522 U.S. at 351 (consider the "manner in which the transaction was negotiated" with the tribe in determining the meaning of the challenged provision, even where provision is clear on its face); Rosebud Sioux, 430 U.S. at 587 (court to examine "the face of the Act, the surrounding circumstances, and the legislative history"). In short, treaties and agreements "are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." Choctaw Nation of Indians v. United States, 318 U.S. 423, 431-32 (1943).

Page 20 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Relatedly, a treaty or agreement "between the United States and an Indian tribe must be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians." United States v. Choctaw Nation, 179 U.S. 494, 532 (1900); Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 676 (1979); Antoine v. Washington, 420 U.S. 194, 199 (1975) (applying cannon of construction to statutes ratifying agreements). Indeed, it is the court's

> responsibility to see that the terms of the treaty are carried out, so far as possible, in accordance with the meaning they were understood to have by the tribal representatives at the council and in a spirit which generously recognizes the full obligation of this nation to protect the interest of a dependent people.

Tulee v. Washington, 315 U.S. 681, 684-85 (1942). Furthermore, important in this instance is the reminder that, "[f]ederal agreements with Indians draw their meaning from representations by Government agents to the Indians, as well as from the Indians' own understanding." United States v. Oneida Nation of N.Y., 576 F.2d 870, 877 (Ct. Cl. 1978).

I recognize, however, that I may not "disregard clear expressions of tribal and congressional intent." Yankton Sioux, 522 U.S. at 349.

Accordingly, in construing the provisions of the 1894 Agreement, I consider Senate Doc. 67 to determine the Indians' "contemporaneous understanding" of the 1894 Agreement. Id. at 352.[7]

> B.   Considering the Statements During the Negotiations, the Indians Understood that the Wenatchi Obtained Fishing Rights

---

[7]The State of Washington argues that the 1894 Agreement does not demonstrate the federal government's intent to preempt state fishing laws at Icicle Creek. Federal preemption of state law is a separate question that is dealt with below.

The events leading up to the 1894 Agreement, and the negotiations themselves, demonstrate that Yakama tribal members were concerned about protecting the Wenatchi right to the fishery. As a result, the agents promised Yakama that the government would provide fishing rights and land to the Wenatchi in exchange for the sale of the Article X reservation.

James Chase, Esq., a settler who wrote to the Commissioner of Indian Affairs, was perhaps one of the first to alert the Commissioner that Indians other than those on the Yakama Reservation would be interested in the disposition of the Article X reservation. He reported, "[T]here are quite a number of Indians old in years who were born and have always lived on the Wenatchee River, and on the very land which they now claim should be the reservation, and who at the time helped build and owned a part in all the fisheries on the Wenatchee River[.]" Letter of August 28, 1893 from James Chase, Esq. to Comm'r of Indian Affairs, Senate Doc. 67 at 11-12. The Acting Secretary of the Interior directed the Commissioner to note the Indians "other than the Yakimas" living near the Article X reservation and instructed that "[t]he rights of such Indians in land or fishing privileges should be taken into consideration and protected." Letter of October 2, 1893 from Acting Sec'y Wm. H. Sims to Comm'r of Indian Affairs, Senate Doc. 67 at 15.

The Commissioner of Indian Affairs, in his letter of instruction to Agent Erwin and Special Agent John Lane, Esq., noted that the Indians other than Yakama living in the area were probably treaty signatories to the 1855 Treaty, as Pisquosuses or Wenatshapams, contemporary names for the Wenatchi. Nevertheless, whether signatories or not, they "should be informed . . . that it is not contemplated by these negotiations to deprive them of any individual rights they may have acquired by reason of their settlement on the public domain, or to the lawful use of the

fisheries in common with the white people of the State."  Letter of October 13, 1893 from

Comm'r of Indian Affairs  to John Lane, Esq. and L.T. Erwin, Senate Doc. 67 at 16.

During the negotiations in December of 1893, Agent Erwin asked specifically to hear

from the Wenatchi who lived near the fishery.  In addition, Yakama tribal members reported to

the agents that the Article X reservation had been included in the 1855 Treaty for the Wenatchi,

and that the government should talk to them about the sale.  One said, "It is for the Government

to treat these Wenatchee Indians right.  They want the government to protect them and hold their

reservation.  You talk to these Wenatchee Indians and ask them what they want for that land, but

not the Yakimas."  Senate Doc. 67 at 25.  Another Yakama said, "Whatever the 4 men from

Wenatchee decide, the Yakimas will decide as soon as we know what they say."  Id. at 26.

Another said, "My desire is not to throw the Wenatchee out of this land so that I may fill up

myself out of it."  Id. at 28.

In order to assure the sale of the Article X reservation, the government agents made two

promises to the Yakama tribal members who were concerned for the Wenatchi.  First, the

Wenatchi were promised allotments "where they now live."  Second, Agent Erwin promised that

they would have the "lawful use of the fisheries in common with the white people."  Senate Doc.

67 at 28.  He made this promise in an explicit way on the second day of the negotiations when he

said,

> I have something further that I want to say about the fishery privilege and
> that is that even if you should agree to sell, the Department says that you shall
> have the lawful use of the fisheries in common with the white people.

Id.

In addition, during the three days in December, Agent Erwin read the Commissioner's letter of instruction to the gathered Indians three times; in the letter, the Commissioner assured the Wenatchi they would have "the lawful use of the fisheries in common with the white people of the State." Senate Doc. 67 at 24, 28, 31 (Erwin "[r]eads letter from the Department" on Dec. 18; "[r]eads letter from Department referring to" fishery privilege on Dec. 19; "interpreter reads letter" on Dec. 19).

The Wenatchi had no representatives at the January 6, 1894 council when the agreement was drawn up. Nevertheless, in response to Yakama concerns about the Wenatchi receiving their due, Agent Erwin made it clear that his promises to the Wenatchi served as part of the consideration for Yakama's sale of the reservation. He said,

> Just what we said to those Wenatchee Indians we will carry out. I had a letter from Mr. Chase, a representative of the Wenatchee Indians a few days ago, and he said that the Indians wanted land where they now are. If we can come to an agreement on the price, we want you to select six of your head men to draw up the papers with us. We would agree that the Wenatchee Indians should have land allotted to them where they now live, and we would agree that Congress should pay this money at once, and we would agree what we should do with the money.

Senate Doc. 67 at 33.

When he left the council in December, Harmelt was "well satisfied" by the promises given him. Senate Doc. 67 at 32. As noted in detail above, Wenatchi fishing on the Wenatchee River, including at the confluence with Icicle Creek, at the time of these negotiations is well-documented. As a result, I agree that "[i]t is obvious that Harmelt would not have considered any arrangement 'beneficial' to the Wenatchi people if it did not afford them fishing rights at Wenatshapam." Colville Post-Trial Opening Br. at 3 (quoting Tr. 119:8-9).

The promise of fishing rights nowhere appears in writing in the Agreement itself. Nevertheless, the promise is so clearly evidenced in the negotiations, and plainly served as part of the consideration for cession of the Article X reservation, I find the government provided the Wenatchi with fishing rights.  See Iowa Tribe of Indians v. U.S., 68 Ct. Cl. 585, *13 (1929) (evidence "clearly establishes the existence of an agreement, the terms of which are not expressed in the written contract" that the Indians were to receive additional compensation for the sale of the reservation).  Accordingly, I find the evidence clearly establishes an agreement that the Wenatchi were to have the right to fish at the Wenatshapam Fishery.

Washington and Yakama argue that the language used by the agents indicates the Wenatchi would not be "deprived" of fishing rights, not that they would gain "new rights."  The record of the negotiations, however, indicates much confusion about the status of the Wenatchi at the time–whether as a member of the Yakama Nation or not.  If the government considered the Wenatchi a member of the Yakama Nation, since it was a signatory, the government may have wanted to ensure the Wenatchi would not be "deprived" of fishing rights under Article III of the 1855 Treaty.  Nevertheless, when making the promise to the Wenatchi, Agent Erwin phrased it as a new right–"the Department says that you shall have the lawful use of the fisheries in common with the white people."  Senate Doc. 67 at 28.  It is evident from this statement that the government intended the Wenatchi to have the right to fish at the Wenatshapam Fishery.

Nothing in the 1894 Agreement is to the contrary or supersedes the oral promise.  The Agreement provides for "allotments," but the record of the negotiations contains no indication that the provision of allotments was intended to cut off fishing rights.  In fact, the opposite is true.  Viewing the negotiations from the Indians' perspective, Harmelt told the agents he did not

want to be surrounded by white men, he wanted his people to be provided allotments together
and his "own tribe to live with" him.  Senate Doc. 67 at 32.  Agent Erwin told Harmelt the
government "will do all we can to allot the land to you just where you want it," and described
Harmelt's obligation to keep "bad Indians" off of the land, and extradite people who commit
crimes, appearing to describe a form of reservation.  Id.  When the Wenatchi were told about the
deal, they asked for land along the Wenatchee River.

Indeed, the provision of land by the government is frequently viewed by courts to contain
an implied fishing right.  Alaska Pacific Fisheries v. United States, 248 U.S. 78 (1918)
(reservation impliedly included fishing rights); Menominee Tribe v. United States, 391 U.S. 404,
406 n.2 (1968) (treaty reserving lands implicitly provided hunting and fishing rights);
Muckleshoot Indian Tribe v. Trans-Canada Enter., Ltd., 713 F.2d 455, 457-58 (9th Cir. 1983)
(executive order reserving lands impliedly provided riverbed for fishery); Colville Conf. Tribes
v. Walton, 647 F.2d 42, 48 (9th Cir. 1981) (executive order reserving lands impliedly protected
fishing rights).

I do not find an implied fishing right in the provision of allotments, however.  Yakama
and the State of Washington point out the General Allotment Act of 1887 and the amended Act
of 1891 were intended to encourage the assimilation of Indians into white culture, making
allotments different in character from reservations.  The acts provided Indians with federal land
to "make settlement" for farming, grazing and mining.  Act of Feb. 8, 1887, ch. 119, § 4, 24 Stat.
389 (codified at 25 U.S.C. § 334) and Act of Feb. 28, 1891, ch. 383, § 3, 26 Stat. 795 (codified as
amended at 25 U.S.C. § 397).  Neither act makes any mention of fishing rights.  It is possible, as
Yakama argues, that any "allotment fishing right" would belong only to the Wenatchi who took

allotments, and such a right would be an individual right and not a tribal right.  Nevertheless, as I explain above, the provision of allotments is not contrary to the oral promise to the Wenatchi that they were entitled to " the lawful use of the fisheries in common with the white people."  Senate Doc. 67 at 28.

Accordingly, I find that the 1894 Agreement confers on the Wenatchi a right to fish at the Wenatshapam Fishery.[8]

C.    Harmelt's Post-Treaty Conduct Does Not Shed Light on the Meaning of the Agreement

Yakama suggests I consider Harmelt's subsequent view of the 1894 Agreement as indicative of the meaning of the provisions.  Harmelt widely published his belief that the 1894 Agreement took away the Wenatchi reservation and the tribe's hunting and fishing rights.

First, in terms of construing the meaning of the 1894 Agreement, it is Yakama's understanding that is important.  As set forth above, in agreeing to sell the Article X reservation, Yakama relied on the agents' promise to Harmelt that the Wenatchi would have "the lawful use of the fisheries in common with the white people."

Furthermore, Harmelt's later position must be viewed in the larger context.  Despite Agent Erwin's promise to visit "in a short time," to group the allotments together and "just where you want it," he neglected to come to the reservation until a year later.  Senate Doc. 67 at 32. When he did visit, he refused to allot the land where the Wenatchis wanted it.  Harmelt visited Washington, D.C. twice, once in 1899 and again in 1900, seeking the appointment of an allotting agent.  When the agent finally came to the Valley, he repeatedly encouraged the Wenatchi to

_____

[8]I discuss below the location of this fishery.

Page 27 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

move to the Colville Reservation.  It is not surprising that Harmelt viewed the 1894 Agreement

in a negative light.

      D.      The Wenatchi have Maintained Tribal Status to Hold Fishing Rights

Yakama argues the Wenatchi have not maintained the necessary tribal status in order to

administer their fishing rights.

The Wenatchi is a "tribe," and may exercise the rights obtained pursuant to the 1894

Agreement, if "some defining characteristic of the original tribe persists in an evolving tribal

community." Oregon I, 29 F.3d at 484 (quoting United States v. Washington, 641 F.2d 1368,

1372-73 (9th Cir. 1981)).  Here, the Ninth Circuit has asserted, "The record shows that the

constituent tribes [to the 1855 Treaty] in 1938 had identifiable cultural and political

characteristics that led to their recognition as constituent tribes of the Colville Confederacy." Id.

at 485.  According to this ruling, the Wenatchi, as a constituent tribe to the 1855 Treaty, was a

"tribe" as of 1938.

Yakama argues the Ninth Circuit's finding as to the tribal status of the Wenatchi does not

extend to the Wenatchi having "fishery management power."  It suggests Judge Marsh found as

much.  It also makes much of the Wenatchi stipulation in the litigation before Judge Marsh that it

was a "village," as opposed to a "tribe."  Yakama contends, too, that the Wenatchi have had no

chief and no political organization since 1938, have no "salmon chief," and cannot pass their

own fishing regulations.

Neither the State of Washington nor the United States make any argument about the tribal

status of Wenatchi to hold fishing rights.

Yakama provides no legal authority for the proposition that the Wenatchi could be considered a "tribe" for some purposes but not others. The Ninth Circuit concluded that the Wenatchi were a tribe in 1938. Judge Marsh's holding is not to the contrary; it was limited to determining whether the Wenatchi, as a treaty signatory, had separated from the Yakama Nation, which was the entity vested with the rights of the 1855 Treaty.

To the extent Colville stipulated the "village was the principal political unit of the Wenatchi" in the litigation before Judge Marsh, I do not find that statement conflicts with a finding that the Wenatchi is a "tribe" for purposes of this decision. As Judge Marsh explained, "[A] group identified as a 'band' which functioned as a cohesive political unit may fall within the meaning of the word 'tribe,' as used by the courts, if it maintained continuous cultural and political cohesion." United States v. Oregon, 787 F. Supp. 1557, 1566-67 (D. Or. 1992) (discussing three levels of political organization: village, band and tribe). I also note the numerous stipulations by Yakama in the same litigation referring to the Wenatchi as a "tribe." Id., at App. 2, Agreed Facts 1, 3, 4, 5, and 6.

As for whether the Wenatchi have remained a tribe since 1938, I find the testimony presented by the Wenatchi persuasive.

The Colville Confederated Tribes is a confederacy of twelve separate tribes that maintain their own identities. The Wenatchi Advisory Board provides information and recommendations to the Colville Business Council about Wenatchi-related issues. This litigation is evidence of the persuasive abilities of the Wenatchi over the Colville Business Council. The Wenatchi are generally grouped together on the western portion of the Colville Reservation, and are somewhat separated from the other tribes on the Reservation.

Page 29 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Wenatchi experts submitted substantial evidence that the Wenatchi "have continued to gather food, dig for roots, gather materials for constructing baskets and other implements, gather medicines in the Wenatchee drainage at accustomed places throughout the twentieth century and to the present time." Hart at 175-76. The Wenatchi have fished at Icicle Creek, and in the Wenatchee River, when salmon were available. Id. at 174. They fish in the traditional manner, with spears, weirs and scaffolds. Dr. Lillian A. Ackerman, To Preserve the Traditions: Wenatchi Fishing Rights (Dec. 3, 2007) (hereinafter "Ackerman"), Ex. 108, at 19. They have also continued to fight for the right to fish at Icicle Creek. A great-grandson of Harmelt explained,

> One of the things that holds us together is the sense of injustice over what we lost. The valley where we lived, the fishery, and the mountains were a paradise. No one can go there without feeling its beauty. But for us, we feel it in our hearts. The right to fish at Icicle Creek is a part of that whole feeling. It is hard to separate the right to fish at Icicle Creek from any other part of our life because within our culture there isn't a separation from our social life, our food gathering life or our spiritual life.

Matthew Dick, Reply Expert Report (Feb. 29, 2008), Colville Ex. 104 at 14.

In short, the Wenatchi have "identifiable cultural and political characteristics" to administer the fishing rights furnished to them by the government.

II.   Yakama Fishing Rights

A.   Yakama did not Cede its Fishing Rights

In addition to determining whether the Wenatchi obtained new rights to fish at the Wenatshapam Fishery as a result of the 1894 Agreement, the Ninth Circuit remanded for an assessment of Yakama's rights to fish there. As the Ninth Circuit explained, "If the Yakama

Nation did give up all its fishing rights at the Wenatshapam Fishery, then it would have no basis for showing the harm necessary for injunctive relief." <u>Oregon II</u>, 470 F.3d at 817.

The provision at issue reads as follows:

### ARTICLE I.

The said Indians hereby cede and relinquish to the United States all their right, title, interest, claim, and demand of whatsoever name or nature of in, and to all their right of fishery, as set forth in article 10 of said treaty aforesaid, and also all their right, title, interest, claim, or demand of, in, and to said land above described, or any corrected description thereof and known as the Wenatshapam fishery.

1894 Agreement, art. I, 28 Stat. 320.

The Wenatchi argue that, pursuant to this language, Yakama gave up its fishing rights to fish at the Wenatshapam Fishery, and that these rights were on-reservation rights. If Yakama retained fishing rights under Article III of the 1855 Treaty, the tribe must show that the fishery met the Article III standard of being a Yakama "usual and accustomed" fishery at the time of the 1894 Agreement. At the 1893 and 1894 cession councils, Yakama made it clear that it had no interest in the Wenatshapam Fishery, that tribal members considered it a Wenatchi fishery, and many Yakama had never even seen the fishery. In essence, the Wenatchi argue that fishing rights are either on-reservation or off-reservation. Since Yakama ceded its on-reservation rights, it must demonstrate that at the time of the Article X cession, the Wenatshapam Fishery was a usual and accustomed fishing station for Yakama. It claims Yakama cannot make that showing.

According to Yakama, since the reservation was never surveyed it was never created, making the fishing that took place there off-reservation fishing under Article III of the 1855 Treaty. There is no dispute that the Wenatchi fished at the Wenatshapam Fishery, the Wenatchi were a party to the 1855 Treaty, and the 1855 Treaty vested Yakama with all of the fishing rights

of the Wenatchi.  As a result, Yakama concedes it ceded what it calls inchoate on-reservation exclusive fishing rights, but argues it retained off-reservation fishing rights as preserved by the Wenatchi at and before the 1855 Treaty.

Article I plainly reads Yakama gave up "all their right of fishery," but only "as set forth in article 10 of" the 1855 Treaty.  Accordingly, Yakama ceded only its *exclusive* right to fish at the Wenatshapam Fishery.

With regard to whether Article X created a reservation, the vast authority is to the contrary of Yakama's position.  As the Supreme Court explained,

> [W]hen the United States, in a treaty with an Indian tribe, and as part of the consideration for the cession by the tribe of a tract of country to the United States, make a reservation . . . of a specified number of sections of land, whether already identified, or to be surveyed and located in the future, the treaty itself converts the reserved sections into individual property; the reservation, unless accompanied by words limiting its effect, is equivalent to a present grant of a complete title in fee simple . . . .

Jones v. Meehan, 175 U.S. 1, 21 (1899).  Accordingly, Article X of the 1855 Treaty created the reservation, and the requirement of a survey was but a ministerial detail.[9]

Nevertheless, I agree with Yakama that it need not demonstrate that it fished at the Wenatshapam Fishery as a "usual and accustomed" fishing station at the time of the 1894 Agreement.  As Yakama explains the only difference between on-reservation fishing rights and off-reservation fishing rights is that the former are exclusive and the latter are "in common with" non-treaty right fishermen.  Yakama ceded the "exclusivity" portion of its fishing right.

---

[9]Contrary to Yakama's statement that the Ninth Circuit "specifically determined that the Article 10 Reservation was never created," the Ninth Circuit simply stated that the reservation was never "set aside."  Oregon II, 470 F.3d at 816.  By operation of law, the treaty itself created the reservation.

My conclusion is consistent with Judge Boldt's description of the continuation of fishing

rights upon the termination of a reservation.

> [I]n Menominee (1968) the United States Supreme Court held that termination of
> a tribal reservation established pursuant to a treaty did not extinguish hunting and
> fishing rights, reserved in the treaty by implication, or impair the exercise of such
> rights within the area of the terminated reservation.  In the opinion of this court,
> treaty right fishing within the area of a former Indian reservation cannot be
> exclusive when that reservation no longer exists, but such fishing must be 'in
> common' with non-treaty right fishermen.

United States v. Washington, 384 F. Supp. 312, 339 (D. Wash. 1974).  Judge Boldt did not

require the tribes to demonstrate their use of the fishing station at the time of the termination of

the reservation.

As I explained in my April 11, 2008 Opinion on Yakama's Motion for Summary

Judgment, the Ninth Circuit "recognized the tribes created by Governor Stevens as the entities

receiving treaty rights," and that such rights "were to be enjoyed communally."  Oregon I, 29

F.3d at 484.  Furthermore, "[r]ights under a treaty vest with the tribe at the time of the signing of

the treaty."  Id. (citing United States v. Washington, 520 F.2d 676, 692 (9th Cir. 1975)).

Additionally, the Ninth Circuit noted,

> The present Yakima Nation was recomposed in 1974 and has exercised treaty
> rights as a successor to the entities that signed the original 1855 Yakima Treaty.
> As Judge Boldt explained in United States v. Washington, 384 F. Supp. [312,]
> 381 [W.D. Wash. 1974], "the Yakima Indians have continued to assert their off-
> reservation fishing rights, including fisheries in the case area."  The Yakima
> Nation has thus continually exercised the off-reservation fishing rights and
> continued the fishing culture of the original signatories to the 1855 treaty.

Id. at 486.  Finally, the Ninth Circuit held that neither Colville nor any of its constituent bands

such as the Wenatchi "retain[ed] any treaty fishing rights accorded signatories to the 1855

treaty."  Id.  "Rather, we conclude that by deliberately separating from the Yakima Nation, these

Page 33 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

tribes failed to maintain political cohesion with the tribal entity in which the treaty fishing rights are vested." Id. In sum, the prior cases demonstrate that the Wenatchi were a party to the 1855 Treaty, and that all fishing rights of the original signatories, including the Wenatchi, vested in Yakama at the signing of the treaty. Accordingly, Yakama maintains the Wenatshapam Fishery as a "usual and accustomed" fishing station under Article III of the 1855 Treaty.

Additionally, lest there be concern that Yakama claims fishing rights through the Wenatchi, while at the same time attempting to deprive the Wenatchi of fishing rights, I note the substantial evidence presented by Yakama of individual members of the Wenatchi who moved to the Yakama Reservation and who maintained their use of the Wenatshapam Fishery. In addition, Yakama presented evidence of another signatory tribe's use of the Wenatshapam Fishery, the Kittitas. As I describe below, the evidence demonstrates that the Kittitas enjoyed the Wenatshapam Fishery as a "usual and accustomed" fishing station at and before treaty times. Accordingly, Yakama retained the Article III fishing rights and precedent and the preponderance of the evidence demonstrate that the Wenatshapam Fishery was a "usual and accustomed" fishing station for Yakama at and before the 1855 Treaty.

B.    The Wenatshapam Fishery is Located Near the Icicle Creek Hatchery

The United States attempts to turn Agent Lynch's and Agent Erwin's incorrect determinations of the location of the Article X reservation to Yakama's favor, arguing the Wenatchi cannot establish Yakama ceded its right to fish at the Wenatshapam Fishery because there is no evidence it was ever located on the Article X reservation. I reject this argument. Agent Lynch located the reservation in order to avoid as much as possible the claims of white settlers, and Agent Erwin himself noted the inaccurate placement of the reservation he had

surveyed.  Harmelt stated during the first council session that the survey was inaccurate.

Furthermore, Article I specifically recognizes the possibility that the Article X reservation was

never correctly located, noting that Yakama cedes the "land above described, or any corrected

description thereof and known as the Wenatshapam fishery."  1894 Agreement, art. I, 28 Stat.

320.  The evidence supports the placement of the Wenatshapam Fishery at the confluence of

Icicle Creek and the Wenatchee River.

In a similar vein, the State of Washington argues that "[t]he evidence submitted by both

Tribes does show that, at treaty time, their Wenatchi ancestors fished *on the Wenatchee River* at

its confluence with Icicle Creek.  But the record now before the Court cannot support any

conclusion with respect to Icicle Creek itself."  Washington's Post-Trial Brief at 9 (citations

omitted).  The State explains that the hatchery is a mile or two upstream of where Icicle Creek

enters the Wenatchee River.  Nevertheless, the State recognizes Yakama's treaty fishing right at

the "usual and accustomed" fishing place, which is the area of Icicle Creek where it borders the

Leavenworth National Fish Hatchery to a point 500 feet downstream of the hatchery fish intake.

State fisheries management has treated it as a place where persons possessing fishing rights under

the Yakama Treaty may fish.

The State of Washington is correct that much of the evidence supports a conclusion that

the traditional fishing station was at the confluence of the Wenatchee River and Icicle Creek.

During peak fishing times, however, the size of the village at that confluence swelled to 2,000 to

3,000 people.  Hart placed the village on both sides of the Wenatchee and indicates it reached the

area where the fish hatchery is located now.  The evidence also shows that the Indians fished on

many of the tributaries to the Wenatchee River, especially Icicle Creek.  Finally, due to the

Page 35 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

alteration of this site by white settlement, the nearest location for the Wenatshapam Fishery is the

Leavenworth National Fish Hatchery on Icicle Creek.

III.    The Wenatchi do not have a Primary Fishing Right to the Wenatshapam Fishery

The Wenatchis' alternative argument is that if the court finds Yakama and the Wenatchi

share fishing rights, then the court should conclude the Wenatchi have primary rights to the

fishery.  It explains it presents this evidence to further challenge Yakama's showing of injury; if

Yakama's fishing rights are secondary, then Yakama can show no injury from fishing at

Wenatshapam by the Wenatchi, and no entitlement to an injunction.[10]

"A primary right is the power to regulate or prohibit fishing by members of other treaty

tribes."  United States v. Skokomish Indian Tribe, 764 F.2d 670, 671 (9th Cir. 1985).  The

flexible four-part test considers whether the home tribe controlled the fishing area, and includes

the following considerations:  "(1) proximity of the area to tribal population centers, (2)

frequency of use and relative importance to the tribe, (3) contemporary conceptions of control or

territory, and (4) evidence of behavior consistent with control."  United States v. Lower Elwha

Tribe, 642 F.2d 1141, 1143 n.4 (9th Cir. 1981).

The controversy presented here is different in kind from the cases on which the Wenatchi

rely.  I found above that Oregon I determined Yakama holds the Article III 1855 Treaty rights to

fish at the Wenatshapam Fishery.  It holds those rights through its treaty signatory, the Wenatchi,

who used the site as a "usual and accustomed" fishing station.  The Wenatchi argue they hold the

_____

[10]Yakama's motion in limine, arguing that in previous litigation Colville sought "equal" rights not primary rights, is denied for this reason.  In addition, this was not an issue that could have been raised in Oregon I because a condition for intervention was acceptance of the Columbia River Fish Management Plan, which meant Colville could not challenge Yakama's Article III rights.

primary right to fish there, but Yakama holds that right as the tribe in which all treaty rights are vested.

Even if the Wenatchi are correct, and "this case is . . . in exactly the same posture as the Lower Elwha and the Skokomish cases," Colville Reply at 14 n.7, the Wenatchi have not met their burden of proving they held a primary right to fish at the Wenatshapam Fishery. In Skokomish, the court noted the Twana occupied the territory and thus "held the primary right to fish in the territory," but here Yakama submitted evidence that the Kittitas, a Yakama signatory, occupied the Wenatshapam Fishery along with the Wenatchi. See United States v. Washington, 626 F. Supp. 1405, 1490 (W.D. Wash. 1978-85), aff'd sub nom. United States v. Skokomish Indian Tribe, 764 F.2d 670 (9th Cir. 1985). In addition, trial testimony indicated the Twana, and the Lower Elwha Tribe in Lower Elwha, "recognized a hierarchy of primary and secondary or permissive use rights, including fishing rights." Id.; Lower Elwha, 642 F.2d at 1143. As I discuss below, no reliable evidence was submitted that the Wenatchi held this view. Finally, the Twana submitted evidence of "readily available means to deter unauthorized use" of the fishing area. Id. at 1490-91. No expert discussed such means in this case.

When the 1855 Treaty was drafted, the Wenatshapam Fishery was included for the use of all fourteen tribes, and it was requested by Kamiakan, the Yakama leader, for the Methow as well as the Wenatchi. Furthermore, there is evidence Owhi, on behalf of the Kittitas, and others persuaded Kamiakan to make the request. This is evidence that the Wenatshapam Fishery was of great importance to tribes other than the Wenatchi.

In addition, the evidence reflects a very close relationship between the Wenatchi and Kittias. Even Wenatchi expert Hart agreed there was "considerable intermarriage" between the

Wenatchi and Kittitas.  Hart at 24-25.  More relevant to the issue of control, however, is the fact that in 1939, Dr. Verne Ray, an anthropologist upon whom both experts rely for various points, described a "joint village of the Kittitas and Wenatchee at the present town of Leavenworth" as an example of how "settlements of ethnically mixed composition" share authority in the village assembly and have no division of control.  Yakama Ex. DEW 18 at 10-11.[11]  The Kittitas spoke Sahaptin, while the Wenatchi spoke Salish, but Dr. Ray noted most members of each tribe were bilingual.  The word "wenatchi" is a Sahaptin word.

     Wenatchi expert Dr. Ackerman agreed with Dr. Ray about the existence of a joint village at Leavenworth.  Tr. 505: 1-18.  Similarly, Wenatchi expert Gooding agreed there "had to be joint village . . . Kittitas and Wenachi . . . ."  Tr. 593: 12-20.  In his deposition, Wenatchi expert Hart agreed with Dr. Ray that "at the time of the treaty, there was a bilingual village, the Kittitas and Wenatchi."  Tr. 356.  He subsequently attempted to explain his deposition testimony by implying the location of the joint village was not near Leavenworth, and suggesting that Dr. Ray's later testimony before the Indian Claims Commission was more reliable.  I note, however, that Dr. Ray's 1939 observation is consistent with Streamer's description of joint Wenatchi and Kittitas fishing efforts during Streamer's visit to the area in 1882, including building semi-permanent weirs together.  In addition, Yakama expert Dr. Walker referred to several sources in support of his conclusion that Wenatchi and Kittitas fished cooperatively together.

     The Wenatchi rely on the Indian Claims Commission's finding that the "territory . . . was exclusively used and occupied by the Wenatchee Indians" and that "[u]nder such circumstances

---

[11]Dr. Ray's information came from Sam Armstrong who was a Wenatchi, and his wife, who was a Kittitas.

we believe that the visiting Indians were not using and occupying territory in Indian fashion but were merely present during the height of the fishing season as visitors . . . "   12 Ind. Cl. Com. 301, 378-79 (1963).  Dr. Ray was never asked to explain his 1939 conclusion about a joint village at the fishery.  Furthermore, the ICC relied on testimony that the weirs were constructed by the Wenatchi alone, but Streamer described in detail the cooperative efforts of the Wenatchi and Kittitas in fishing together.

No reliable evidence was submitted that the Wenatchi "recognized a hierarchy of primary and secondary or permissive use rights, including fishing rights."  United States v. Washington, 626 F. Supp. at 1490.  Indeed, although the Wenatchi experts describe ritual control by a salmon chief, "[a]ll present were entitled to an equal share of the fish and all were interested in seeing that the activity was properly conducted as directed by the salmon chief."  Hart at 11.  As Wenatchi expert Dr. Ackerman noted in her initial report, "Visitors and relatives were welcome to participate in the fishing with the consent of the Salmon Chief."  This is in contrast with "strangers or outsiders" who were "always required to ask permission."  Ackerman at 30.[12]  The evidence reflects a hierarchy only in the sense that the salmon chief controlled the fishery, but there was no testimony that as between tribes the Wenatchi and Kittitas fell within a hierarchy of fishing rights.  Additionally, no expert mentioned any means by which the Wenatchi could exclude the Kittitas from fishing at the Wenatshapam Fishery.  Finally, while I recognize this is not a heavily-weighted factor, I note that all the experts unanimously agree the Wenatchi never excluded anyone.

---

[12]I note Dr. Ackerman's testimony that her report should be amended to refer only to hunting, but her statement here refers specifically to a "salmon chief" and thus to fishing.

In sum, the Wenatchi failed to meet their burden in demonstrating they held primary control of the Wenatshapam Fishery at and before treaty times.

IV.    Remaining Issues

Yakama includes in its Proposed Findings of Fact and its Proposed Conclusions of Law statements about the allotment of fish between the two tribes, and requests a finding that the Wenatchi fish harvest will not be deducted from Yakama's share of the harvest. Yakama is also concerned that its harvest will be affected by overfishing by the Wenatchi. As the State of Washington urges, I do not reach these issues but reserve them for future resolution should the parties request it.

In addition, the State of Washington argues that the 1894 Agreement does not contain the express language necessary to preempt state regulation of fishing. The State of Washington does not discuss the alternative means by which federal law may preempt state law, and that is when state law conflicts with the federal law in a way that "stands as an obstacle to the accomplishment of the full purpose and objectives of Congress." Cal. Coastal Comm'n v. Granite Rock Co., 480 U.S. 572, 581 (1987). The Wenatchi argue the 1894 Agreement "confers a federal fishing right on an Indian tribe," and any contrary state law would "stand[] as an obstacle" to Congress' objectives and would be preempted. Colville Reply at 5. This is an issue that is beyond the Ninth Circuit's order of remand, which was limited to determining whether the 1894 Agreement granted fishing rights to the Wenatchi and took away fishing rights from Yakama. Furthermore, the State of Washington did not have an opportunity to submit a response to the Wenatchi argument. The parties are directed to confer, and request the court's assistance if necessary.

Finally, given the confusion evidenced in the records about the status of the Wenatchi, there is nothing in the record to evidence an intent on the part of the government to give the Wenatchi a fishing right different in kind from the fishing right retained by Yakama under the 1855 Treaty. Indeed, Yakama, in support of its argument that it did not cede off-reservation fishing rights, argues that Agent Erwin's comment that the tribes "shall have the lawful use of the fisheries in common with the white people" tracks the language of Article III of the 1855 Treaty, which provides off-reservation fishing "in common with the citizens of the territory." Yakama Proposed Findings of Fact, 75. The United States offers no opinion on the meaning of the statements, nor does the State of Washington. Accordingly, I find that the 1894 Agreement confers on the Wenatchi a federal right to fish at Icicle Creek that is of the same character as Yakama's Article III right to fish there.

## CONCLUSION

Based on the foregoing, I find the Wenatchi and Yakama have joint fishing rights to fish at the Wenatshapam Fishery, which is located at the confluence of the Wenatchee River and Icicle Creek. Due to the alteration of this site by white settlement, and the fact that the evidence demonstrates fishing on Icicle Creek, in addition to fishing on the Wenatchee River, the nearest location for the Wenatshapam Fishery is the Leavenworth National Fish Hatchery on Icicle Creek.

Dated this _____13th_____ day of August, 2008.


＿＿/s/ Garr M. King＿＿＿＿＿＿＿＿＿
Garr M. King
United States District Judge


Page 41 - FINDINGS OF FACT AND CONCLUSIONS OF LAW