**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

United States of America,
                          *Plaintiff,*

          v.

Confederated Tribes of the
Colville Indian Reservation,
                  *Respondent-Appellee,*

          and

State of Oregon; State of
Washington,

                      *Defendants,*

          v.

Confederated Tribes and Bands
of the Yakama Indian Nation,
          *Plaintiff-intervenor-Appellant.*

No. 08-35961
D.C. No.
3:68-cv-00513-KI

7621

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

                    v.

CONFEDERATED TRIBES OF THE
COLVILLE INDIAN RESERVATION,
            *Respondent-Appellant,*

                and

STATE OF OREGON; STATE OF
WASHINGTON,

                    *Defendants,*

                    v.

CONFEDERATED TRIBES AND
BANDS OF THE YAKAMA INDIAN
NATION,
            *Plaintiff-intervenor-Appellee.*

No. 08-35963
D.C. No.
3:68-cv-00513-KI
OPINION

Appeal from the United States District Court
for the District of Oregon
Garr M. King, Senior District Judge, Presiding

Argued and Submitted
March 2, 2010—Portland, Oregon

Filed May 27, 2010

Before: Richard A. Paez, Richard C. Tallman, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Tallman

## COUNSEL

Thomas Zeilman, Esq., (argued) Law Offices of Thomas Zeilman, Yakima, Washington, for plaintiff-intervenor-appellant, Confederated Tribes and Bands of the Yakama Indian Nation.

Robert Lundman, Esq., (argued) United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., for plaintiff United States of America.

Harry R. Sachse, Esq., (argued) Sonosky Chambers Sachse Endreson & Perry, Washington, D.C., for respondent-appellee Confederated Tribes of the Colville Indian Reservation.

## OPINION

TALLMAN, Circuit Judge:

This appeal is the latest chapter in the saga of Pacific Northwest Native American treaty fishing rights; a saga that has spanned many generations and over forty years of federal litigation. If history is our guide, it will not be the last chapter written. After a 2006 remand from this court, the district court conducted a trial primarily based on expert anthropological opinions, century-old documents, and reliable hearsay. The Confederated Tribes and Bands of the Yakama Indian Nation

("Yakama") appeal, and the Confederated Tribes of the Colville Indian Reservation ("Colville") cross-appeal on behalf of their Wenatchi Constituent Tribe ("Wenatchi"), the district court's finding that they share joint fishing rights at the "Wenatshapam Fishery" on Icicle Creek—a tributary to the Wenatchee River which flows into the Columbia River—under an 1894 agreement between the United States and the Yakama. We have jurisdiction pursuant to 28 U.S.C. § 1291.

For over a century—as the result of broken and forgotten promises—the Wenatchi's fishing rights at their aboriginal home and fishing station have been in doubt. We hold that the district court's ruling is supported by historical evidence establishing that it was the intent of the 1894 negotiators to grant the Wenatchi fishing rights at Wenatshapam, that the Yakama did not sell all of their fishing rights at Wenatshapam, and that both tribes' fishing rights are non-exclusive. We therefore affirm the judgment of the district court.

## I

## A

Before the arrival of Anglo-American settlers, the Wenatshapam Fishery was the aboriginal salmon fishing ground of the Wenatchi.[1] More than any other place, the Wenatshapam Fishery was the hub around which the Wenatchi's cycle of life rotated. The center of the Wenatshapam Fishery was the confluence of Icicle Creek and the Wenatchee River in north central Washington State near the modern-day town of Leavenworth.

---

[1]The Wenatchi have also been referred to as "Wenatchee" and "Wenatshapam Indians." The facts recited in this opinion are adopted from our prior opinions addressing this dispute or adopted from the district court's findings of fact, which we hold to be plausible in light of the record viewed in its entirety and not clearly erroneous. *See Husain v. Olympic Airways*, 316 F.3d 829, 835 (9th Cir. 2002).

In 1855, the United States began "a hasty effort to clear land occupied by Indians for development by settlers" in Washington Territory. *United States v. Oregon*, 29 F.3d 481, 484 (9th Cir. 1994) ("*Oregon I*"), *as amended*, 43 F.3d 1284 (9th Cir. 1994). Territorial Governor Isaac Stevens, "under pressure to extinguish Indian title to all lands, consolidated small tribes or bands into larger tribal entities for the purposes of the treaties." *Id.* "The Wenatchi Tribe was one of the fourteen tribes represented at the negotiation of the Yakama Treaty. The treaty specified that tribes for the purposes of this treaty, are to be considered as one nation, under the name of Yakama."[2] *United States v. Oregon*, 470 F.3d 809, 811 (9th Cir. 2006) ("*Oregon II*") (quoting Treaty with the Yakamas, June 9, 1855, 12 Stat. 951 (1855) [hereinafter 1855 Treaty]) (internal quotation marks omitted).

Under the 1855 Treaty "the tribes gave up most of their lands in return for a specific reservation with set boundaries." *Oregon II*, 470 F.3d at 811. The land for the reservation was subsequently surveyed and "set apart as provided in the treaty." *Id.* With regard to fishing rights, Article III of the Treaty provided,

> The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing them; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land.

---

[2] The spelling of the name was changed from "Yakima" to "Yakama" in 1994 to reflect the native pronunciation. "Yakama" is used in this opinion, except where historical accuracy requires that "Yakima" be used.

1855 Treaty at 953. In addition, tribal leader Kamiakin—the spokesman for the fourteen tribes that would constitute the Yakama Nation—insisted on a reservation at Wenatshapam "where the Indians take many fish." This was done at the request of—among others—the Wenatchi leader Tecolekun. Accordingly, Article X of the 1855 Treaty set aside a second reservation, providing,

> That there is also reserved and set apart from the lands ceded by this treaty, for the use and benefit of the aforesaid confederated tribes and bands, a tract of land not exceeding in quantity one township of six miles square, situated at the forks of the Pisquouse or Wenatshapam River, and known as the "Wenatshapam Fishery," which said reservation shall be surveyed and marked out whenever the President may direct, and be subject to the same provisions and restrictions as other Indian reservations.

*Id.* at 954.

**B**

Despite the promise made in Article X of the 1855 Treaty, "no attempt was made by the United States to survey the six-square-mile reservation for almost forty years. The Wenatchi remained at this Wenatshapam Fishery Reservation and fished there during this time, firmly believing that a survey would be made and they would be secure in this reservation." *Oregon II*, 470 F.3d at 811.

The Wenatchee Valley remained difficult to reach by settlers for much of the late 1800s, but by 1892, the Great Northern Railroad reached the area, laying tracks up the Wenatchee River and through the Wenatshapam Fishery—which had never been taken out of the public domain—to Leavenworth, a townsite developed by the railroad.

In July 1892, Yakama Reservation Indian Agent Jay Lynch contacted the Commissioner of Indian Affairs, D.M. Browning, inquiring as to whether or not the Wenatshapam Fishery Reservation had "ever been definitely located and what disposition ha[d] ever been made of it, if any." Letter of July 11, 1892, from Jay Lynch to Comm'r of Indian Affairs, *reprinted in* S. Exec. Doc. No. 67 at 5 (1894) [hereinafter Senate Doc. 67]. As a result of this letter, the Acting Secretary of the Interior, William H. Sims, authorized a survey of the reservation in 1893. Senate Doc. 67 at 6-7. However, before the survey commenced, Agent Lynch was removed from his post.

The survey went forward, slowly setting out an area at the confluence of the Wenatchee River and Icicle Creek. *Oregon II*, 470 F.3d at 812. This prompted several settlers in the Wenatchee Valley to complain that "to form a new reservation across this valley from mountain to mountain, as is proposed, it not only embraces the Great Northern Railway, but many settlers." Senate Doc. 67 at 8. Commissioner Browning responded,

> In reply you are advised that the Wenatchee is not established as a *new reservation*, but as the fulfillment of a treaty obligation, which had been heretofore overlooked or neglected by the Government since the ratification of the Yakima treaty in 1869. It is now as much Indian land as the Yakima Indian Reservation itself, the only difference being that the one had distinct boundaries named and described in the treaty, while the other was referred to as a tract of land not exceeding in quantity one township of 6 miles square, situated at the forks of the Pisquause or Wenatchapam River, which the Government stipulated and agreed should be surveyed and marked out whenever the President might direct. This was not done until last fall when the President ordered the survey and the location of this tract, which is now being made.

*Id.* Commissioner Browning suggested that the settlers petition the President to enter into negotiations with "the Indians" for the purchase of the Article X reservation, which they did. *Id.*

Before the survey could be completed, "the newly appointed Yakima Indian Agent, Lewis T. Erwin, ordered [the surveyor] to stop the surveying and [to] destroy all the monuments and trees that had markings. Instead, he directed the surveyor to survey an area some distance away in the mountains next to a lake, but not near the river." *Oregon II*, 470 F.3d at 812. Shortly thereafter, settler James H. Chase, Esq., contacted Commissioner Browning. Significantly, he observed,

> I am convinced there are quite a number of Indians old in years who were born and have always lived on the Wenatchee River, and on the very land which they now claim should be the reservation, and who at the time helped build and owned a part in all the fisheries on the Wenatchee River . . . .

Senate Doc. 67 at 11. He concluded, "There is no doubt in my mind but what the intention was to secure the reserve to the Indians who owned the fisheries and that while the contract or treaty of 1855 mentioned the Yakimas it really intended to give the land to the Indians who owned the fisheries . . . ." *Id.* at 11-12.

Once former Agent Lynch learned that the proposed location of the Wenatshapam Fishery Reservation had now been moved far above the confluence, he wrote a letter decrying "a great injustice done to the Yakima Indians by reason of a recent survey of the boundary line of a reservation . . . known as the Wenatchapam fishery." *Id.* at 20. In the letter he quoted an "old Indian" who protested,

> Does our Great Father at Washington think a salmon is an eagle that lives on top of a mountain, or does

he think a salmon is a deer that lives in the woods and hills, or does he think a salmon is a mountain goat that lives among the rocks of the snow covered mountains?

Tell our Great Father the Indian does not care for the little trout in the lake, but wants the salmon that lives in the rocky places in the river where the Indian can find him. Our fishery is in the river where you saw it, and was destroyed by white men and the Indians driven away. We want our fishery in the river where Governor Stephens gave it to us a long time ago.

*Id.*

Secretary Sims subsequently authorized Commissioner Browning to enter into negotiations to purchase the Wenatshapam reservation, specifically noting, "It seems from letters submitted with your communication that there are Indians other than the Yakimas living in the neighborhood of this reservation who have, or claim, some rights therein. The rights of such Indians in land or fishing privileges should be taken into consideration and protected." *Id.* at 15.

On October 13, 1893, Commissioner Browning authorized Agent Erwin to enter into negotiations. *Id.* He reiterated Secretary Sims' observation that "Indians other than the Yakimas" were living at Wenatshapam and the Secretary's express instruction that "the rights of such Indians in lands or fishing privileges should be taken into consideration and protected." *Id.* at 16. He also instructed Agent Erwin to take great care in recording the proceedings, which prompted the agent in 1893 to hire a stenographer to produce a transcript of the negotiations. The district court heavily relied on that transcript in rendering its factual findings supporting the decision we review here.

## C

Agent Erwin convened a tribal council at the Yakama Reservation on December 18, 1893, to open negotiations for the purchase of the Article X reservation. *Id.* at 24. Four Wenatchi leaders, including Chief John Harmelt, made the 150 mile journey from Wenatshapam to attend. Agent Erwin began the negotiations by reading Commissioner Browning's letter offering to purchase the land, but promising not to deprive "the Indians" of the use of the fisheries. *Id.*

Agent Erwin proposed that the council sell the incorrectly located mountain reservation and that the Wenatchi take allotments in the Wenatchee Valley where they resided. *Id.* Importantly, he stated, "I have something further that I want to say about the fishery privilege and that is that even if you should agree to sell, the Department says that you shall have the lawful use of the fisheries in common with the white people." *Id.*

Chief Harmelt did not initially agree to the sale. He stated, "I myself alone have heard what you said; and if all the Indians over at Wenatchee would hear what you said, then they would decide on this land. I think those people out [ought] to know about this matter, then let the decision come afterwards." *Id.* at 30 (alteration in original). Chief Harmelt suggested he return to Wenatshapam to inform the Wenatchi of the proposal. *Id.* After the Yakama proposed a price of $1.50 per acre, however, Chief Harmelt stated, "I am well satisfied between you two. Whatever they ask for the land that is my same price." *Id.* at 32.

On December 20, 1893, Special Agent John Lane informed the council that he would telegraph the Department of the Interior to see if the price was agreeable, and would reconvene the council when he received a reply. He then stated, "If the Wenatchee Indians are not here then we will send a letter over there to notify them of the condition of affairs." *Id.* The

council adjourned. *Id.* The Wenatchi representatives returned to their homes.

The agents reconvened the council at the Yakama Reservation on January 6, 1894, without Wenatchi representatives present. *Id.* at 33. The agents rejected the Yakama proposal of $1.50 per acre and proposed a lump sum of "$10,000 or $15,000." *Id.* Yakama members protested the fact that the Wenatchi were not present. Charley Skummit said,

> I will not sell this piece of land away from the Wenatchee Indians that owns the land. We all heard what you said when these Indians said they would sell; you said you would allot them other lands. These Wenatchee Indians said they wanted land where they lived. It was the land of his fathers and he wanted to stay there . . . . We are having another council here to-day and I feel that I have no right to take this land away from the Indians because they are the right owners of it.

*Id.* Agent Erwin promised in reply, "Just what we said to those Wenatchee Indians we will carry out." *Id.*

Tom Simpson, speaking for the Yakama, then counter-offered, "All the headmen agree to finishing this matter up . . . . We will relinquish all our rights to the Wenatshapam fishery for $20,000 . . . ." *Id.* at 34.

## D

The 1894 Agreement was ultimately signed by 246 members of the Yakama Nation in person, and seven by proxy. *Id.* at 3. In relevant part, the agreement provided,

Article I.

The said Indians hereby cede and relinquish to the United States all their right, title, interest, claim, and

demand of whatsoever name or nature of[,] in, and to all their right of fishery, as set forth in article 10 of said treaty aforesaid, and also all their right, title, interest, claim, or demand of, in, and to said land above described, or any corrected description thereof and known as the Wenatshapam fishery.

### Article II.

In consideration of the foregoing cession and relinquishment the United States hereby agrees to pay or expend through their Indian Agent, Yakima Agency, twenty thousand dollars, which said sum is to be deposited in a United States depository for their use and benefit as soon as approved by Congress, and subject to their order, the Indians reserving the right to dispose of said money as they may decide in general council to be held by them and for that purpose. After the ratification of this agreement by Congress and the further consideration that the Indians known as the Wenatshapam Indians, residing on the Wenatchee River, State of Washington, shall have land allotted to them in severalty in the vicinity of where they now reside, or elsewhere, as they may select, in accordance with article 4 of the general allotment law.[3]

Agreement with the Yakama Nation of Indians in Washington, Act of Aug. 15, 1894, ch. 290, § 13, 28 Stat. 320, 320-21 (1894) [hereinafter 1894 Agreement].

Despite the promise in the 1894 Agreement to provide allotments to the members of the Wenatchi still living at the fishery, "the government again failed to fulfill its promise, as it never made the allotments available to the Wenatchi." *Ore-*

---

[3]"The Wenatshapam Indians referred to in the 1894 Agreement are the same as the Wenatchi Indians." *Oregon II*, 470 F.3d at 813 n.4.

*gon II*, 470 F.3d at 813. "The Wenatchi remained and fished on their aboriginal lands at the Wenatshapam Fishery until they were moved by the federal government in 1902 and 1903 to the Colville Reservation." *Id.* at 811. Chief Harmelt never enrolled at the Colville Reservation, located some 150 miles east of Wenatshapam, although he attended several Wenatchi enrollment hearings. He continued to reside in the Wenatchee Valley and advocated for Wenatchi rights at Wenatshapam by traveling to Washington, D.C., twice before his death.

## II

### A

"The United States initiated the underlying litigation in 1968 on behalf of certain Indian tribes in Oregon and against the State of Oregon to define, at least in part, the Indians' treaty rights to take fish at 'all usual and accustomed places' on the Columbia River and its tributaries." *Oregon I*, 29 F.3d at 482-83 (citing *Sohappy v. Smith*, 302 F. Supp. 899, 903-04 (D. Or. 1969)).

Originally, four tribes asserted treaty fishing rights: The Yakama Indian Nation, The Confederated Tribes and Bands of the Warm Springs Reservation of Oregon, The Confederated Tribes of the Umatilla Reservation, and The Nez Perce Tribe of Idaho. *Id.* at 483. In 1969, the district court ruled that the tribes were entitled to treaty rights providing them a "fair share" of the Columbia River salmon. *Sohappy*, 302 F. Supp. at 911.

In 1974 and 1983, the states of Washington and Idaho intervened. *Oregon I*, 29 F.3d at 483. In 1988, the District of Oregon adopted a "comprehensive fish management plan." *Id.*

In 1989, the Colville sought to intervene on behalf of five constituent tribes that they maintained were parties to the Yakama Treaty of 1855: the Wenatchi, the Entiat, the Chelan,

the Columbia, and the Palus. *Id.* Colville has never "explained why it waited over twenty years after *United States v. Oregon* was initiated and why it did not seek to intervene while the district court was considering the comprehensive management plan adopted in 1988." *Id.* "After considering voluminous exhibits, stipulations and evidence presented during a three-day court trial, the district court denied Colville's intervention motion, finding that Colville could not assert treaty fishing rights reserved to its constituent tribes." *Id.* at 482.

In 1994, we affirmed the district court's denial of Colville's motion to intervene and as a result foreclosed the Wenatchi from exercising 1855 Treaty fishing rights at the Wenatshapam Fishery. *See id.* at 486. We reasoned, "[r]ights under a treaty vest with the tribe at the time of the signing of the treaty," *id.* at 484 (citing *United States v. Washington*, 384 F. Supp. 312 (W.D. Wash. 1974) (Boldt, J.), *aff'd*, 520 F.2d 676, 692 (9th Cir. 1975) ("*Washington I*"), *cert. denied*, 423 U.S. 1086 (1976)), but "Indians later asserting treaty rights must establish that their group has preserved its tribal status," *Oregon I*, 29 F.3d at 484 (citing *United States v. Washington*, 641 F.2d 1368, 1372-73 (9th Cir. 1981) ("*Washington II*"), *cert. denied*, 454 U.S. 1143 (1982)).

We ruled that the constituent tribes—including the Wenatchi—had not "maintained political cohesion with the tribal entities created by the [1855] treaties and receiving fishing rights." *Oregon I*, 29 F.3d at 485. We relied upon the district court's factual "findings relating to the history of the bands who [sought] to trace their cultural and political lineage to the tribes that signed the 1855 treaty," and we concluded that "the tribes, prior to being subsumed in the Colville Confederacy, were separate bands who disengaged from the Yakima Nation by refusing to relocate to the reservation established by the 1855 treaty." *Id.* at 486.

We subsequently amended our opinion to note that the "[f]ailure to move onto [a] reservation is not the determinative

factor in deciding whether a group has retained treaty rights." *United States v. Oregon*, 43 F.3d 1284 (9th Cir. 1994). Instead, we reasoned, "it is only one consideration relevant to an essentially factual inquiry—*i.e.*, whether a group claiming treaty rights has maintained sufficient political continuity with those who signed the treaty that it may fairly be called the same tribe." *Id.*

**B**

Throughout this litigation, whether they were permitted or not by the terms of any treaty, descendants of the Wenatchi have fished at their aboriginal Wenatshapam Fishery. In 2003, the Yakama Nation sought and obtained an injunction preventing these Wenatchi from fishing at Wenatshapam. The Wenatchi opposed the injunction by arguing that they had the right to fish at Wenatshapam under the 1894 Agreement. The district court concluded res judicata prevented the Wenatchi from asserting this claim. The Wenatchi appealed.

In 2006 we reversed, concluding, "Through unfulfilled promises and procedural rulings, [the Wenatchi] would, under [the district court's] ruling, lose both the land they were guaranteed adjacent to the fishery and their fishing rights." *Oregon II*, 470 F.3d at 813. We further reasoned,

> The 1894 Agreement was not set forth as an amendment to the 1855 Treaty. Rather, it was an agreement for the sale of the Wenatshapam Fishery that had been given to the tribes of the Yakama Nation by the 1855 Treaty, with specific benefits being reserved for the Wenatchi Tribe, which had continued to reside and fish there.

*Id.* at 816. We then held, "Colville is not precluded by res judicata from asserting the claim of the Wenatchi Tribe to fishing rights at the Wenatshapam Fishery based on the 1894

Agreement." *Id.* at 818. We remanded for a trial on the merits to determine fishing rights under that agreement. *Id.*

## C

Following a three-day bench trial primarily relying on expert testimony and the transcript of the 1893 and 1894 negotiations, both parties submitted extensive post-trial briefing. The United States also filed a post-trial brief addressing only one issue: the government argued that the 1894 Agreement did not in any way limit Yakama from taking fish at usual and accustomed places under Article III of the 1855 Treaty. The United States took no position on whether the Wenatshapam Fishery is a usual and accustomed fishing place of the Yakama, or whether the Wenatchi obtained fishing rights at Wenatshapam under the 1894 Agreement. The district court found,

> The events leading up to the 1894 Agreement, and the negotiations themselves, demonstrate that Yakama tribal members were concerned about protecting the Wenatchi right to the fishery. As a result, the agents promised Yakama that the government would provide fishing rights and land to the Wenatchi in exchange for the sale of the Article X reservation.

*United States v. Oregon*, No. 68-513-KI, 2008 WL 3834169, at *12 (D. Or. Aug. 13, 2008). It cited the letter exchange between the Secretary of the Interior, the Commissioner of Indian Affairs, Agent Erwin, Special Agent Lane, and the settlers living at Wenatshapam, as well as the statements made during the negotiations, as evidencing a conscious effort to protect Wenatchi fishing rights at the Wenatshapam Fishery. *Id.*

The court found the evidence "establishes an agreement that the Wenatchi were to have the right to fish at the

Wenatshapam Fishery." *Id.* at *14. It reasoned that the Yakama are entitled to usual and accustomed Article III fishing rights at Wenatshapam under the 1855 Treaty, because the tribe only sold its exclusive on-reservation fishing rights at that location. *Id.* at *18. Finally, the court determined that Wenatchi fishing rights at Wenatshapam are not superior to those of the Yakama, but are instead of the same character. *Id.* at *22. In effect, the district court's ruling formally recognized that the Wenatchi have the legal right to fish at their aboriginal home and fishing station.

Yakama now argues that the district court erred in finding an "implied agreement" to provide the Wenatchi with fishing rights at Wenatshapam. On cross-appeal, the Wenatchi argue the district court erred in finding that Yakama has fishing rights at Wenatshapam, and, in the alternative, erred in failing to find Wenatchi fishing rights superior to Yakama fishing rights.

## III

We review the district court's interpretation of treaties, statutes, and executive orders *de novo*. *United States v. Idaho*, 210 F.3d 1067, 1072 (9th Cir. 2000). "Findings of historical fact, including the district court's findings regarding treaty negotiators' intentions, are reviewed for clear error." *Id.* at 1072-73. "We therefore review for clear error all of the district court's findings of historical fact, including its findings regarding the treaty negotiators' intentions. We then review *de novo* whether the district court reached the proper conclusion as to the meaning of the [1894 Agreement] given those findings." *United States v. Washington*, 157 F.3d 630, 642 (9th Cir. 1998).

## IV

## A

As a preliminary matter, we consider whether our analysis should be limited to the four corners of the 1894 Agreement

itself—as Yakama suggests—or whether we should also consider the document introduced in the Senate prior to ratification that contains the transcript of the negotiations and the letters exchanged regarding the agreement. *See* Senate Doc. 67.

The 1894 Agreement contains two articles relevant to our inquiry. As we noted in our 2006 opinion,

> Both provisions appear to be ambiguous in light of the context in which the agreement took place, the statements of the parties concerning the meaning of the terms of the agreement, and the recognition that this was an agreement drafted by the Government to reflect the understanding of the Indians, who had a lesser familiarity with the legal technicalities involved.

*Oregon II*, 470 F.3d at 817.

The Supreme Court has repeatedly instructed us that when interpreting a treaty or agreement between the United States and Native Americans, it must always be borne in mind,

> that the negotiations for the treaty [were] conducted, on the part of the United States . . . by representatives skilled in diplomacy . . . , understanding the modes and forms of creating the various technical estates known to their law, and assisted by an interpreter employed by themselves; that the treaty [was] drawn up by them and in their own language; that the Indians, on the other hand . . . [were] wholly unfamiliar with all the forms of [Anglo-American] legal expression, and whose only knowledge of the terms in which the treaty [was] framed [was] that imparted to them by the interpreter employed by the United States; and that the treaty must therefore be construed, not according to the technical meaning of

> its words to learned lawyers, but in the sense in
> which they would naturally be understood by the
> Indians.

*Jones v. Meehan*, 175 U.S. 1, 11 (1899). With regard to trea-
ties negotiated between the United States and the Yakama, we
have observed, "[t]he inadequacy of the treaties is further
exacerbated by the fact that the Indians signing the treaties
generally did not speak English, and the Indian argot into
which the treaty provisions were translated was inadequate to
convey the meaning of the treaties." *Oregon I*, 29 F.3d at 484
(citing *Washington I*, 520 F.2d at 683).

**[1]** The Supreme Court "has often held that treaties with
the Indians must be interpreted as they would have under-
stood them, and any doubtful expressions in them should be
resolved in the Indians' favor." *Choctaw Nation v. Oklahoma*,
397 U.S. 620, 631 (1970) (internal citation omitted). This
principle has been applied to treaties, agreements, and execu-
tive orders negotiated with Native Americans. *See United
States v. Washington*, 235 F.3d 438, 442 (9th Cir. 2000) (not-
ing that the "time-honored principle that ambiguities in agree-
ments and treaties with Native Americans are to be resolved
from the native standpoint . . . extends to executive orders").

**[2]** In determining the sense in which treaties would natu-
rally be understood by Native Americans, the Supreme Court
has looked "beyond the written words to the larger context
that frames the Treaty, including 'the history of the treaty, the
negotiations, and the practical construction adopted by the
parties.' " *Minnesota v. Mille Lacs Band of Chippewa Indi-
ans*, 526 U.S. 172, 196 (1999) (quoting *Choctaw Nation v.
United States*, 318 U.S. 423, 432 (1943)); *see also South
Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 351-52 (1998)
(considering the "manner in which the transaction was negoti-
ated," the "negotiations themselves," and the "tenor of legisla-
tive Reports presented to Congress" (internal quotation marks
omitted)); *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 587

(1977) (considering "the face of the Act, the surrounding circumstances, and the legislative history" (internal quotation and citation omitted)).

**[3]** The 1894 Agreement is silent as to the Wenatchi's fishing rights. As previously noted, "[b]oth provisions [of the 1894 Agreement] appear to be ambiguous." *Oregon II*, 470 F.3d at 817. Given the 1894 Agreement's ambiguity as to the fishing rights of the Wenatchi and the Supreme Court's direction to construe Native American treaties in the "sense in which they would naturally be understood by" the Native Americans, we consider the transcript of the agreement negotiations in order to ascertain how those present at the council understood the agreement. *Jones*, 175 U.S. at 11.

## B

The district court found that the Native Americans present at the negotiations understood the 1894 Agreement as providing the Wenatchi with non-exclusive fishing rights at Wenatshapam. The record supports that finding.

The Wenatchi and Yakama disagree as to whether the district court's determination is a finding of fact reviewed for clear error, or a conclusion of law reviewed *de novo*. A finding as to what a negotiator understood involves the same kind of factual analysis as a finding of intent—including for example the consideration of the events leading up to a negotiation, statements made during a negotiation, and the overall context of the negotiation—which is entitled to deferential clear error review. See *Idaho*, 210 F.3d at 1072-73. We accordingly review for clear error the district court's findings as to the understanding of the Native Americans present at the negotiations.[4]

---

[4]We add, however, that even reviewing the record *de novo*, we would reach the same conclusion as the district court.

**[4]** The transcript of the 1893 and 1894 negotiations is helpful in discerning the motivations and understandings of those present. It is evident from the transcript that, as the district court found, the Yakama were concerned about protecting Wenatchi rights over Wenatshapam. Captain Eneas, a Yakama, said,

> I am not going over to my friends house and throw him off his place and tell him I would get rich and fat off of his place. It is for the Government to treat these Wenatchee Indians right. You talk to these Wenatchee Indians and ask them what they want for that land, but not the Yakimas.

Senate Doc. 67 at 25. Joe Stwire, a Yakama, said, "There are [four] men here from Wenatchee. Whatever the [four] men from Wenatchee decide, the Yakimas will decide as soon as we know what they say." *Id.* at 26. Thomas Simpson said, "It is true you all know that I am not fit to talk about the Wenatchee lands. My desire is not to throw the Wenatchee out of this land so that I may fill up myself out of it." *Id.* at 28.

**[5]** In addition, the transcript reveals a desire on the part of the United States to negotiate not only with the Yakama, but with the Wenatchi as well. Agent Erwin specifically addressed Chief Harmelt and asked, "Can we arrive at any agreement by which your lands are to be allotted to you and you relinquish your claims in the Wenatshapam fishery for ten or fifteen thousand dollars?" *Id.* at 25. The agents also expressed to both parties—in accordance with their instructions from Commissioner Browning—that the rights of the Wenatchi in their land and fishery were to be protected. Agent Erwin explicitly stated,

> There is one thing I want to impress on these Indians from the Wenatchee, and this is that they are not to be robbed of an acre of land, but on the contrary, the Government proposes to give them land where they

now are. The selling of this fishery does not interfere
with their rights at all.

*Id.* at 15. Agent Erwin repeatedly read the letter from Commissioner Browning and Secretary Sims providing that the "rights of such Indians [living near Wenatshapam] in land or fishing privileges should be taken into consideration and protected." *Id.* Most importantly, Agent Erwin promised, "you shall have the lawful use of the fisheries in common with the white people." *Id.* at 28.

Finally, the district court correctly observed that after the agents reconvened the negotiations in January 1894 without the Wenatchi present, the Yakama were hesitant to consummate an agreement. Charley Skummit said, "We are having another council here to-day and I feel that I have no right to take this land away from the [Wenatchi] Indians because they are the right owners of it." *Id.* at 33. When the Yakama were uncomfortable proceeding without the Wenatchi, Agent Erwin reassured them, stating, "Just what we said to those Wenatchee Indians we will carry out." *Id.* Only then did the Yakama agree to sell their rights in the Article X reservation.

**[6]** In sum, the Yakama instructed the agents, "It is for the Government to treat these Wenatchee Indians right," *id.* at 25, Agent Erwin promised the Wenatchi, "you shall have the lawful use of the fisheries in common with the white people," *id.* at 28, and the Yakama would only agree to the sale after Agent Erwin reiterated his promises to the Wenatchi. Based on this record, the district court correctly held that the evidence establishes the Native Americans present at the negotiations understood the 1894 Agreement to provide the Wenatchi with the right to fish at their aboriginal home and fishing station—the Wenatshapam Fishery—as consideration for the Yakama's sale of the Article X reservation.

**[7]** Although the written 1894 Agreement is ambiguous as to the fishing rights of the Wenatchi, agreements "with the

Indians must be interpreted as they would have understood them," and applying that principle, we must interpret the 1894 Agreement as securing the non-exclusive rights of the Wenatchi to fish at Wenatshapam.[5] *Choctaw Nation*, 397 U.S. at 631; *see also Iowa Tribe of Indians v. United States*, 68 Ct. Cl. 585, 17 (1929) ("[T]he evidence taken in connection with the circumstances of the case clearly establishes the existence of an agreement, the terms of which are not expressed in the written contract.").

## C

On cross-appeal, the Wenatchi do not challenge the district court's conclusion that Wenatshapam can be considered a "usual and accustomed" fishing station of the Yakama under Article III of the 1855 Treaty. Instead, the Wenatchi contend that—from 1855 to 1894—the only fishing rights the Yakama possessed at Wenatshapam were exclusive on-reservation fishing rights through Article X of the 1855 Treaty, and that when the Yakama signed the 1894 Agreement ceding "all their right of fishery, as set forth in article 10," they relinquished every fishing right they possessed at Wenatshapam. We disagree.

## 1

The Wenatchi correctly note that Yakama derives all of its fishing rights at Wenatshapam from Article III of the 1855 Treaty. Contrary to the Wenatchi's assertions, however, that Article reserved to the Yakama two distinct fishing rights at Wenatshapam.

**[8]** First, the Yakama had the "exclusive right of taking

---

[5]Because we interpret the negotiations in conjunction with the 1894 Agreement as providing the Wenatchi with fishing rights at Wenatshapam, we decline to address Colville's argument that the provision of allotments in the agreement carried with it an implied promise of fishing rights.

fish in all the streams, where running through or bordering"
reservations. 1855 Treaty at 953. This Article III right entitled
the Yakama to exclusive fishing rights at the reservation
established in Article X. Second, the Yakama had the "right
of taking fish at all usual and accustomed places, in common
with citizens of the Territory." *Id.* This Article III right enti-
tled the Yakama to an in-common share of fish at all usual
and accustomed fishing stations. The exclusive Article III
fishing right depended on the existence of the Article X reser-
vation, whereas the non-exclusive fishing right existed inde-
pendently of Article X and depended on whether or not
Wenatshapam could be considered a "usual and accustomed"
fishing ground.

[9] Evidence in the record indicates that two 1855 Treaty
signatory tribes—the Wenatchi and the Kittitas—customarily
fished at Wenatshapam both at and before treaty time. It is
well established that,

> every fishing location where members of a tribe cus-
> tomarily fished from time to time at and before
> treaty times, however distant from the then usual
> habitat of the tribe, and whether or not other tribes
> then also fished in the same waters, is a usual and
> accustomed ground or station at which the treaty
> tribe reserved, and its members presently have, the
> right to take fish.

*Washington I*, 384 F. Supp. at 332. As the Yakama Nation
communally possesses the fishing rights of the Kittitas, *see
Oregon I*, 29 F.3d at 484, Wenatshapam can be considered a
usual and accustomed fishing ground of the Yakama for the
purposes of Article III fishing rights.

The Wenatchi's argument—that from 1855 to 1894, the
only fishing rights that Yakama possessed at Wenatshapam
were exclusive Article III fishing rights dependent on the
existence of the Article X reservation—presupposes that a

tribe cannot possess both exclusive fishing rights and in-common usual and accustomed fishing rights at the same location, at the same time. When the Yakama entered the 1893 negotiations, the Wenatchi argue, any cession of their exclusive right to fish at Wenatshapam would have constituted a cession of all their rights to fish at Wenatshapam, as they were incapable of reserving a distinct non-exclusive fishing right that could not exist "at the same time" as their exclusive right.

While we recognize that the existence of both exclusive and non-exclusive fishing rights at the same location, at the same time, could be construed as redundant or unnecessary, we cannot conclude that the Yakama's reservation of an exclusive Article III right to fish at Wenatshapam renders inoperable their separate and distinct reservation of a non-exclusive Article III right to fish at the same location. One need only consider the present scenario—in which the Yakama subsequently ceded their exclusive right to fish at Wenatshapam—in order to ascertain the utility of reserving such a separate and distinct non-exclusive fishing right.

Ultimately, we need not—and do not—resolve the question inherent to Wenatchi's presupposition, because whether or not Yakama possessed both exclusive and non-exclusive Article III rights at Wenatshapam "at the same time," we agree with the district court's conclusion that non-exclusive fishing rights can and do exist on former reservations. Indeed, courts have observed that a tribe's fishing rights on a former reservation "cannot be exclusive when that reservation no longer exists, but such fishing must be 'in common with' non-treaty right fishermen." *Washington I*, 384 F. Supp. at 339. That is, once an 1855 Treaty tribe sells a reservation—and with it the exclusive right to fish at that location—it is free to exercise non-exclusive fishing rights at its usual and accustomed fishing grounds pursuant to Article III, absent an agreement to extinguish those rights. *See id.*; *see also Mille Lacs Band of Chippewa Indians*, 526 U.S. at 200-01 (holding that non-

exclusive usufructuary rights survived the sale of a reservation where the instrument terminating the reservation was silent as to those rights).

**[10]** The cession of a reservation does not change the fact that the rivers, streams, and lakes on the reservation may have been where a tribe "customarily fished from time to time at and before treaty times." *Washington I*, 384 F. Supp. at 332. It follows that while the 1894 Agreement's provision for the sale of the Article X reservation may have terminated Yakama's right to exclude others from fishing there, the Agreement did not change Yakama's non-exclusive Article III usual and accustomed fishing rights at that location unless it expressly provided for a cession of those rights.

### 2

**[11]** No such provision exists in the 1894 Agreement. Yakama's cession—with regard to fishing rights—is limited to its rights under Article X of the 1855 Treaty. Article I of the 1894 Agreement provides,

> The said Indians hereby cede and relinquish to the United States all their right, title, interest, claim, and demand of whatsoever name or nature of[,] in, and to all their right of fishery, as set forth in article 10 of said treaty aforesaid and also all their right, title, interest, claim, or demand of, in, and to said land above described, or any corrected description thereof and known as the Wenatshapam fishery.

1894 Agreement at 320. The Yakama therefore expressly sold "all their right of fishery, *as set forth in article 10*" of the 1855 Treaty. *Id.* (emphasis added). The Agreement does not implicate or extinguish the Yakama's non-exclusive Article III fishing rights under the 1855 Treaty, but rather references fishing rights derived from Article X. *See id.* As the only Yakama fishing rights derived from Article X are exclusive

rights under Article III, those are the only rights Yakama ceded.

Nevertheless, the Wenatchi would have us interpret the language ceding Yakama's "right, title, interest, claim, or demand of, in, and to said land above described" as impliedly ceding Yakama's on-reservation fishing rights. The Wenatchi argue that such an interpretation would render the qualifying language "as set forth in article 10 of said treaty aforesaid" mere surplusage if it were construed as limiting the cession of fishing rights to on-reservation rights—a disfavored reading. *See United States v. Bendtzen*, 542 F.3d 722, 727 (9th Cir. 2008) ("legislative enactments should not be construed to render their provisions mere surplusage" (citation and internal quotation omitted)). The Wentachi therefore urge us to view the language "as set forth in article 10" as a description of the location of the fishery instead of a limitation on the fishing rights sold by the Yakama.

We decline to adopt such a strained interpretation. A plain reading of the language, "and to all their right of fishery, as set forth in article 10 of said treaty aforesaid," indicates that the qualifying language, "as set forth in article 10," identifies what "right of fishery" is being ceded, not the location of the fishery itself. The only right of fishery derived from Article X is an exclusive right pursuant to Article III. The Wenatchi's suggestion that we employ the rule of construction disfavoring surplusage depends on an implied cession of fishing rights supplementing the plainly worded express cession, which contravenes our obligation to refrain from interpreting the agreement "according to the technical meaning of its words to learned lawyers." *Jones*, 175 U.S. at 11.

**[12]** We must interpret the words of the 1894 Agreement "in the sense in which they would naturally be understood by the Indians." *Id.* We cannot conclude that the Native Americans present throughout the negotiations would somehow discern an implied cession of exclusive on-reservation fishing

rights accompanying their cession of land, therefore rendering their separate express cession of "all their right of fishery" a cession of non-exclusive Article III fishing rights at their usual and accustomed fishing places, despite the qualifying language, "as set forth in article 10." We instead reason that the language, "all their right of fishery, as set forth in article 10," does not implicate the Yakama's non-exclusive Article III rights.

**[13]** Where a Native American tribe cedes a right through a treaty or agreement, courts must be mindful that the instrument is "not a grant of rights to the Indians, but a grant of rights from them—a reservation of those not granted." *United States v. Winans*, 198 U.S. 371, 381 (1905). The 1894 Agreement sold all exclusive fishing rights reserved by the Yakama through the establishment of the Article X reservation. However, because the Yakama did not agree to sell their non-exclusive Article III fishing rights—as evidenced by the transcript of the negotiations and the 1894 Agreement itself—the Yakama reserved them. *See id.*

**[14]** We accordingly decline to construe the 1894 Agreement as ceding the Yakama's non-exclusive Article III fishing rights at Wenatshapam. *See Choctaw Nation*, 397 U.S. at 631.

## D

**[15]** The Wenatchi argue that, should we conclude the Yakama retain non-exclusive fishing rights at Wenatshapam, Wenatchi fishing rights should be "primary" rights. "A primary right is the power to regulate or prohibit fishing by members of other treaty tribes." *United States v. Skokomish Indian Tribe*, 764 F.2d 670, 671 (9th Cir. 1985). We have held that when two tribes claim "usual and accustomed" fishing rights at the same location under two separate treaties signed with the United States at a common "treaty time," the tribe that controlled the fishing ground at treaty time—to the exclusion of other tribes—enjoys primary rights there. *United*

*States v. Lower Elwha Tribe*, 642 F.2d 1141, 1143 (9th Cir. 1981). We conclude the Wenatchi do not have primary rights at Wenatshapam because we find the "primary" rights analysis contained in *Skokomish Indian Tribe* and *Lower Elwha* inapplicable to the present dispute.

**[16]** Our cases addressing primary fishing rights have analyzed pre-treaty "control" over a fishing ground because the treaties in those cases were intended to preserve fishing rights as they existed at and before "treaty time." *See Skokomish Indian Tribe*, 764 F.2d at 671 ("The treaties reserved to the signatory tribes their pre-treaty fishing rights in relation to one another."); *Lower Elwha*, 642 F.2d at 1144 ("[T]he tribes reasonably understood themselves to be retaining no more and no less of a right vis-a-vis one another than they possessed prior to the treaty."). Thus, if one tribe had the right to exclude another tribe from fishing at a particular fishing ground at "treaty time," the applicable treaty reserved that "primary" right. *Skokomish Indian Tribe*, 764 F.2d at 673; *Lower Elwha*, 642 F.2d at 1144.

**[17]** Importantly, *Lower Elwha* determined fishing rights arising under two treaties signed at virtually the same time. 642 F.2d at 1142. The Elwha Indians signed the Treaty of Point No Point on January 26, 1855, and the Makah Indians signed the Treaty with the Makah five days later on January 31, 1855. *Id.* When both tribes claimed the same location as a usual and accustomed fishing station under treaties signed at the same "treaty time," we considered four factors to determine which tribe controlled the location "at treaty time."[6] *Id.*

---

[6]Four factors were presented by an expert witness to determine "whether a tribe legitimately controlled an area: (1) proximity of the area to tribal population centers, (2) frequency of use and relative importance to the tribe, (3) contemporary conceptions of control or territory, and (4) evidence of behavior consistent with control." *Lower Elwha*, 642 F.2d at 1143 n.4. We subsequently noted that our opinion in *Lower Elwha* did not consider these factors "a rigid formula or test, but rather, indicated they were useful as an analytical tool." *Skokomish Indian Tribe*, 764 F.2d at 673.

In *Skokomish Indian Tribe*, we applied the same analysis to determine fishing rights between two tribes that also signed treaties with the United States in 1855. 764 F.2d at 673. Here, however, the Wenatchi's fishing rights exist pursuant to the 1894 Agreement and the Yakama's rights exist pursuant to the 1855 Treaty. Thus, unlike in *Lower Elwha* and *Skokomish Indian Tribe*, we are presented with a treaty and an agreement signed almost forty years apart. As a result, there is no common "treaty time" at which to determine control over Wenatshapam.

**[18]** Moreover, the 1894 Agreement did not reserve the pre-1855 Treaty fishing rights of the Wenatchi, but instead granted them new fishing rights independent of the 1855 Treaty. *See Oregon II*, 470 F.3d at 816 ("The 1894 Agreement was not set forth as an amendment to the 1855 Treaty."). While the Wenatchi's traditional presence at Wenatshapam undoubtedly played a large part in the decisions of the Yakama and the United States to convey these rights, the conveyance itself was not a preservation of fishing rights as they existed in 1855. Whether or not the Wenatchi can establish that they controlled Wenatshapam in 1855, they do not have 1855 Treaty fishing rights. *See Oregon I*, 29 F.3d at 486. We therefore conclude the Wenatchi do not have primary fishing rights at Wenatshapam.[7]

---

[7]We note that, were the Wenatchi able to establish they controlled Wenatshapam at "treaty time," applying the primary rights analysis would potentially prejudice their present fishing rights. We have held that the Wenatchi do not possess 1855 Treaty fishing rights, and that the "treaty time" fishing rights of all 1855 Treaty signatories—including the Wenatchi—vested in the Yakama Nation at the time of signing the treaty. *See Oregon I*, 29 F.3d at 486. If the Wenatchi were able to demonstrate that they controlled Wenatshapam in 1855, their primary rights would theoretically be vested in the Yakama Nation through the 1855 Treaty. *See id.*; *Lower Elwha*, 642 F.2d at 1143. The Yakama could then exclude the Wenatchi from fishing at Wenatshapam using the very rights gained as a result of the Wenatchi's aboriginal control of the fishery. *See Oregon I*, 29 F.3d at 486. The possibility of such an inequitable result further persuades us that the primary rights analysis is inapplicable to the present dispute.

Case 3:68-cv-00513-MO    Document 2576    Filed 05/27/10    Page 31 of 31
Case: 08-35961      05/27/2010      Page: 31 of 31      ID: 7351752      DktEntry: 51-1

7654          UNITED STATES V. CONFEDERATED TRIBES

## V

**[19]** In sum, both the Yakama and the Wenatchi retain non-exclusive federal fishing rights at Wenatshapam. Article III of the 1855 Treaty reserves to the Yakama the right of taking fish at Wenatshapam "in common with citizens of the Territory." 1855 Treaty at 953. In 1894, as consideration for Yakama's sale of the Article X reservation, the United States promised—and conveyed to—the Wenatchi the right of taking fish at Wenatshapam "in common with the white people" and assured them of their right to fish at Wenatshapam "in common with the white people of the State." Senate Doc. 67 at 28. We accordingly construe the 1855 Treaty and the 1894 Agreement as conferring on the parties similar non-exclusive fishing rights at Wenatshapam that they share "in common with" non-treaty and non-agreement fishermen.

**AFFIRMED.**