IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**UNITED STATES,** et al.,                                    Civil Case No. 68-513-KI

               Plaintiffs,

    vs.                                                                 OPINION AND ORDER ON
                                          2008-2017 MANAGEMENT
**STATE OF OREGON,** et al.,                                   AGREEMENT

               Defendants.

KING, Judge:

       The Court is faced with a dispute between the United States and several of the tribes

about the correct interpretation of the 2008-2017 Management Agreement, which I entered as a

Court Order on August 11, 2008.  The Nez Perce Tribe and the Confederated Tribes of the

Umatilla Indian Reservation ("Umatilla") have filed what they have styled a "Joint Motion for

Enforcement" alleging a "Violation of Court Order and 2008-2017 Management Agreement."

(hereinafter, "Mot.") (#2508).  The motion is supported by the Confederated Tribes of the Warm Springs Reservation of Oregon ("the Warm Springs") and the Confederated Tribes and Bands of the Yakama Indian Nation ("the Yakama Nation") (collectively, "The Tribes").  The State of Idaho also submitted an argument in support of the United States' interpretation of the Management Agreement.  For the following reasons, I deny the Tribes' motion.[1]

## BACKGROUND

I.      The 2008-2017 Management Agreement

The 2008-2017 Management Agreement is the result of "more than ten years of negotiation."  All Parties' Joint Mot. and Stipulated Order Approving 2008-2017 United States v. Oregon Management Agreement 3 (#2546).  The parties to the Management Agreement are:  the United States, through its agencies NOAA Fisheries, Bureau of Indian Affairs, and the Fish and Wildlife Service; the States of Oregon, Washington and Idaho; the Yakama Nation; the Warm Springs; the Nez Perce Tribe; Umatilla; and the Shoshone-Bannock Tribes.  In the Agreement, the parties set up a "framework within which the Parties may exercise their sovereign powers in a coordinated and systematic manner[.]"  2008-2017 United States v. Oregon Management Agreement 1 (hereinafter, "Mngmt. Agmt.") (#2545).

The Agreement is divided into three parts:  Part I identifies individual party roles, the scope of the Agreement, performance obligations, and dispute resolution, which all parties joined.  Part II, which all parties except the Shoshone-Bannock Tribes and Idaho joined, contains the provisions dealing with harvest issues.  Part III, which all parties joined except the Shoshone-

---

[1]The Court apologizes for the delay in issuing this Opinion and Order.  Given the amount of time and energy the parties devoted to negotiating the 2008-2017 Management Agreement, I spent more time than is reflected in the length of this document pondering the correct outcome.

Page 2 - OPINION AND ORDER ON 2008-2017 MANAGEMENT AGREEMENT

Bannock Tribes, addresses production issues.  All of the parties agreed that Parts II and III were to "help upriver stocks rebuild over time."  Id. at 25.

The focus of this dispute is a provision in Part II of the Agreement, which reads as follows:

> This Agreement describes specific provisions for managing mainstem fisheries and certain tributary fisheries.  Harvest plans for the Parties' other tributary fisheries will be developed cooperatively by the management entities with primary management responsibility in the respective sub-basin (as specified in Table 1: Lead Management Entities for each Sub-Basin).  Other Parties may be affected by, and therefore have an interest in, tributary harvest plans, and therefore shall be provided an opportunity to review and comment on the development of such plans.

Id. at 34.  Table 1 specifies that the lead management entities for the Imnaha River sub-basin are the Oregon Department of Fish and Wildlife, the Nez Perce Tribe and the Umatilla.  These entities are also the lead management entities for the Grande Ronde River, along with the Washington Department of Fish and Wildlife.

The Shoshone-Bannock Tribes are only a lead management entity for the Salmon River sub-basin just "outside the Nez Perce Reservation . . . where [they] exercise treaty-secured fishing rights, and such other sub-basin areas as may subsequently be agreed upon by the affected parties hereto."  Id. at 88.  Notably, as relevant to this dispute, they are not a lead management entity for the Grande Ronde River and Imnaha River sub-basins.

The Court retained jurisdiction over any disputes arising from the Agreement.

II.    Genesis of the Dispute

NOAA accepted a tributary harvest plan from the Shoshone-Bannock Tribes for off-reservation fisheries in the Grande Ronde River and Imnaha River sub-basins in northeast

Oregon.  NOAA characterizes the submission as a Tribal Resources Management Plan ("TRMP"

or "Tribal Plan") pursuant to NOAA regulations at 50 C.F.R. § 223.204 ("the Tribal 4(d) Rule").

The Tribal 4(d) Rule provides as follows:

> (a) Limits on the prohibitions.  The [ESA take] prohibitions . . . do not apply to
> any activity undertaken by a tribe . . . in compliance with a Tribal resource
> management plan (Tribal Plan), provided that the Secretary determines that
> implementation of such Tribal Plan will not appreciably reduce the likelihood of
> survival and recovery of the listed salmonids.  In making that determination the
> Secretary shall . . . determine the Tribal Plan's impact on the biological
> requirements of the species, and will assess the effect of the Tribal Plan on
> survival and recovery, consistent with legally enforceable tribal rights and with
> the Secretary's trust responsibilities to tribes.
>
> (b) Consideration of a Tribal Plan.
>
>     (1) . . . The Secretary will consult on a government-to-government basis
> with any tribe that so requests and will provide to the maximum extent practicable
> technical assistance in examining impacts on listed salmonids and other salmonids
> as tribes develop Tribal resource management plans that meet the management
> responsibilities and needs of the tribes.

50 C.F.R. § 223.204.  A Tribal Plan may consist of "plans that address fishery harvest, artificial

production, research, or water or land management[.]"  Id. at (b)(1).

The Shoshone-Bannock Tribes did not discuss their plan with any of the other entities

responsible for co-managing the sub-basins.

The first paragraph of the Shoshone-Bannock Tribes' plan states,

> The Shoshone-Bannock Tribes (Tribes) exercise their right to hunt for Chinook
> salmon (Oncorhynchus tshawytscha) under inherent rights and the Fort Bridger
> Treaty of July 3, 1868 (15 Stat 673).  50 CFR 223 (Section 4(d) Rule) provides a
> mechanism for tribal governments to submit a Tribal Resources Management Plan
> (TRMP) with the intent of exempting the tribes [sic] harvest of protected species
> from take prohibitions of the Endangered Species Act (ESA).  The purpose and
> scope of this TRMP is to provide the Tribes an exemption under the ESA to
> harvest listed Snake River spring/summer Chinook salmon located in the Grand
> Ronde and Imnaha sub-basins.

Tribal Resource Management Plan for Shoshone-Bannock Tribes Snake River Spring/Summer

Chinook Salmon Fisheries within the Grande Ronde and Imnaha Sub-Basins 6 (Apr. 22, 2010)

(#2580-7).[2]

> The Shoshone-Bannock Tribes' plan further explains:

> The [Shoshone-Bannock] Tribes will coordinate their fishery intentions with the relevant co-managers and NOAA Fisheries, with special emphasis and discussion on areas where multiple agencies elect to open fisheries.  Coordination between the tribes, co-managers, and NOAA Fisheries will occur throughout the fishery.

> The Tribes are full parties to the *U.S. v. Oregon* (Civil No. 68-513-KI) proceeding and are affected by the long-term management agreement.  In [Fishery Management Areas] that are jointly shared with other co-managers, the *U.S. v. Oregon* dispute resolution process may be used in order to achieve an equitable sharing of harvest allocation.

Id. at 33.

However, as reflected in the Management Agreement, the Shoshone-Bannock Tribes'

fishing rights are undetermined in the locations that are the subject of their TRMP and they are

not denominated a "co-manager" or a "management entity" in the basins at issue.  The Shoshone-

Bannock Tribes sought to intervene in this case on October 10, 1985, but they have taken no

action on the complaint in intervention since then.  All of the parties agreed in the Management

Agreement that the Shoshone-Bannock Tribes' participation in the Management Agreement "in

no way represents an admission, determination, settlement, or adjudication of any legal or factual

issues related to the nature and scope of the Shoshone-Bannock Tribes' off-reservation fishing

rights[.]"  Mngmt. Agmt. 2-3.

---

[2]This document is also denoted NOAA: 10 (6 of 38) in NOAA Fisheries Materials, Part 3 of 3.

Consequently, according to the Tribes, NOAA should have declined to process the

Shoshone-Bannock Tribes' harvest plan.

The Nez Perce, Umatilla, and Oregon had already submitted harvest plans for NOAA's

review in the sub-basins addressed by the Shoshone-Bannock Tribes' plan.

III.    NOAA's Response and Explanation

On June 14, 2010, Peter Dygert, the Chief of NOAA's Northwest Salmon Harvest

Branch, Sustainable Fisheries Division, responded to the Shoshone-Bannock Tribes' submission.

In that letter, Dygert stated, NOAA "has requested a commitment that all co-managers work on

these fishery plans and implement rigorous in-season monitoring and reporting for planning and

conducting fisheries."  Letter to Shoshone-Bannock Tribes from Peter Dygert 1 (June 14, 2010)

(hereinafter, "Dygert Letter") (#2580-5).[3]  Dygert also stated, "We plan to move ahead on the

evaluation and determination on this TRMP, consistent with and in conjunction with plans for

the same area provided by the [Umatilla] and [Oregon]" and "NMFS is hopeful that current

coordination efforts with other Snake River Basin co-managers will result in completion of this

process in time for the 2011 fishing season."  Id. at 1-2.[4]

NOAA accepted the plan under the Tribal 4(d) Rule, and intended to submit the plan for

public comment and issue a formal determination in the Federal Register.  If NOAA concluded

the Shoshone-Bannocks Tribes' TRMP would not appreciably reduce the likelihood of survival

---

[3]Also denoted NOAA: 3 (pg 1 of 3) in NOAA's Fisheries Materials, Part 1 of 3.

[4]The Tribes report that within a month of receiving this letter, members of the Shoshone-Bannock Tribes were fishing in the Imnaha River.  The Shoshone-Bannocks respond they were only trying to get the attention of the Nez Perce and the Dygert Letter had nothing to do with their actions.

or recovery of threatened species, the Shoshone-Bannock Tribes would know NOAA would not enforce the ESA's take prohibitions against them so long as they fished consistent with the requirements of their plan.  According to NOAA, its conclusion would have no effect on whether the Shoshone-Bannock Tribes possessed the right to fish in the first place.

IV.    Relief Requested

The Tribes seek an order from the Court directing NOAA to "act in accordance with the tributary harvest planning framework set forth in Part II and Table 1 of the Management Agreement, and enjoin NOAA from engaging in tributary harvest planning with the Shoshone-Bannock Tribes in the Grande Ronde and Imnaha River sub-basins[.]"  Mot. at 2.

## LEGAL STANDARDS

The Management Agreement, adopted by the Court as a Court Order, is considered a consent decree.  See United States v. State of Oregon, 913 F.2d 576, 580 (9th Cir. 1990). "Without question courts treat consent decrees as contracts for enforcement purposes."  United States v. Asarco, 430 F.3d 972, 980 (9th Cir. 2005).  Federal law controls the interpretation of a contract with the United States entered into pursuant to federal law.  Kennewick Irrigation Dist. v. U.S., 880 F.2d 1018, 1032 (9th Cir. 1989).  Accordingly, "[a] consent decree, like a contract, must be discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the decree."  Asarco, 430 F.3d at 980.  Furthermore,

> [a] written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations. Contract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself.  Whenever possible, the plain language of the contract should be considered first.  The fact that the parties dispute a contract's meaning does not establish that

the contract is ambiguous; it is only ambiguous if reasonable people could find its terms susceptible to more than one interpretation.

Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206, 1210 (9th Cir. 1999) (internal citations omitted).

## DISCUSSION

The Tribes argue that NOAA violated the unambiguous language of the Management Agreement. The Shohone-Bannock Tribes are not a lead management entity in the sub-basins for which they submitted a harvest management plan. Instead, the Management Agreement identifies those entities with which NOAA should consult. As a result, NOAA should have "politely refus[ed] to engage in tributary harvest planning with an entity lacking any management role" in those sub-basins. Tribes' Mem. in Supp. of Joint Mot. for Enforcement 22 (hereinafter, "Tribes' Mem."). Instead, NOAA has allowed itself to be used by the Shoshone-Bannock Tribes as providing "tacit agency recognition of fishing rights in an area where the [Shoshone-Bannock Tribes] would not otherwise be able to obtain judicial recognition[.]" Id. at 23.

Accordingly, the questions presented by this dispute are: whether the dispute is ripe and, if so, whether NOAA's acceptance of the Shoshone-Bannock Tribes' TRMP violated the terms of the Management Agreement which does not give management authority to them in the Imnaha and Grande Ronde sub-basins.

I.    Whether the Dispute is Ripe

NOAA argues the Tribes' motion is not ripe because NOAA has not, in fact, made any decision on the Shoshone-Bannock Tribes' submission. NOAA has indicated only that it will review the plan; it must then publish a draft decision in the Federal Register to obtain public

Page 8 - OPINION AND ORDER ON 2008-2017 MANAGEMENT AGREEMENT

comment, and a final decision must be signed by the regional administrator of NOAA.  NOAA

refers to the provision of the Administrative Procedures Act which requires that, to be subject to

review, the agency action must be final.  See 5 U.S.C. § 704.  The Dygert Letter merely states

that NOAA will begin the evaluation and has completed the first step in a long process.  NOAA

contends, then, that the Tribes have suffered no harm.

       The justiciability doctrine of ripeness is intended "to protect the agencies from judicial

interference until an administrative decision has been formalized and its effects felt in a concrete

way by the challenging parties."  National Park Hospitality Ass'n v. Dep't of Interior, 538 U.S.

803, 807-8 (2003) (citation omitted).  Considerations in evaluating ripeness are whether the

issues are fit for judicial review and how the parties would be affected if the court declined to

rule on the issues presented.  Id. at 808.  "[P]ure legal questions that require little factual

development are more likely to be ripe."  San Diego County Gun Rights Comm. v. Reno, 98 F.3d

1121, 1132 (9th Cir. 1996) (citation omitted).

       I find this dispute to be ripe.  The Tribes disagree with NOAA over an interpretation of

the terms of the Management Agreement and related Court Order; their dispute does not arise

under the APA.  The question is whether NOAA's treatment of the Shoshone-Bannock Tribes as

a co-manager in the Imnaha and Grande Ronde sub-basins breaches the Management Agreement.

The Tribes, therefore, request resolution of a purely legal question, making it appropriate for

judicial review.

       Further, I accept the Tribes' statement that they suffered immediate harm, and will suffer

harm in the future without judicial review.  The lead management entities (the Nez Perce, the

Umatilla, and Oregon) are now uncertain about the harvest planning and consultation process, the

Page 9 - OPINION AND ORDER ON 2008-2017 MANAGEMENT AGREEMENT

thing they say the Management Agreement was supposed to orchestrate.  Indeed, the Dygert letter

states that NOAA will "move ahead on the evaluation and determination on this TRMP,

consistent with and in conjunction with plans for the same area provided by the [Umatilla] and

[Oregon]" and "NMFS believes that commitments and plans by the [Shoshone-Bannock Tribes]

to conduct fisheries in 2010 are consistent with these TRMPs and afford adequate protection to

the affected Snake River spring/summer Chinook Salmon populations listed under the under the

[sic] ESA." Dygert Letter at 1-2.  It is this last statement that NOAA regularly uses to let co-

managers know it will not enforce the take prohibitions of the ESA. Oatman Reply Decl. ¶ 2

(#2586).  Additionally, nothing in the correspondence or in NOAA's response brief indicates

NOAA intends to reconsider its interpretation of the Management Agreement–an interpretation

that is very different from the Tribes'–making it a dispute ripe for resolution.

II.    Meaning of the Management Agreement

     A.    Characterization of the Shoshone-Bannock Tribes' Plan

As an initial matter, there is much folderol about whether NOAA was proceeding

pursuant to the Tribal 4(d) Rule or processing the Shoshone-Bannock Tribes' plan under the

Management Agreement.  It is a distinction without a difference.  The Tribal 4(d) Rule permits

tribes to plan for fishery harvest, which is the very subject matter covered by Part II of the

Management Agreement.  The question, then, is whether NOAA's acceptance of the Shoshone-

Bannock Tribes' plan, whether labeled a TRMP or a harvest plan, violated the terms of the

Management Agreement.

Page 10 - OPINION AND ORDER ON 2008-2017 MANAGEMENT AGREEMENT

B.    Application of the Principles of Contract Interpretation

In order to resolve the conflict between NOAA and the Tribes, I must interpret the

following language, to which the Shoshone-Bannock Tribes did not agree, but to which the

United States did agree:

> This Agreement describes specific provisions for managing mainstem fisheries
> and certain tributary fisheries.  Harvest plans for the Parties' other tributary
> fisheries will be developed cooperatively by the management entities with primary
> management responsibility in the respective sub-basin (as specified in Table 1:
> Lead Management Entities for each Sub-basin).  Other Parties may be affected by,
> and therefore may have an interest in, tributary harvest plans, and therefore shall
> be provided an opportunity to review and comment on the development of such
> plans.

Mngmt. Agmt. at 34.  Table 1 in Part II sets out the "Lead management entities" for each sub-

basin.  For the Grande Ronde, they are:  Oregon, Washingon, Nez Perce and Umatilla.  For the

Imnaha River, they are:  Oregon, Nez Perce and Umatilla.  The Shoshone-Bannock Tribes are

separately identified as "a management entity" for portions of the Salmon River sub-basin only.

A notation provides, "The lead management entities will consult with USFWS and NOAA

Fisheries as necessary when fish listed under the Endangered Species Act inhabit a sub-basin

and/or when the USFWS funds or has a production facility in the sub-basin."  Id. at 88.

"Management entity" is defined in the Agreement to mean, in relevant part, "The agency (tribal,

state, or federal) having fisheries management or production authority over the specific area and

subject matter involved."  Id. at 125.

It is enticing to read this language as assigning to the Shoshone-Bannock Tribes an

"Other Part[y]" designation–limiting their participation to reviewing and commenting on plans–

and as obligating NOAA to treat them as such.  Reading the third paragraph of Part II in this way

would mean NOAA violated the Management Agreement by accepting the Shoshone-Bannock

Tribes' harvest plan, when only the parties designated "lead management entities" appear to have

the authority to engage in harvest planning in the affected sub-basins.

       I cannot, in good faith, read the Management Agreement to impose an obligation on

NOAA that would conflict with its regulatory responsibilities and that would simultaneously

affect the right of a non-signatory sovereign to seek federal agency approval of a proposed

action.[5]  The provisions of Part II quoted above may only fairly be read as setting forth a scheme

for organizing the harvest planning engaged in by the Tribes, Washington and Oregon.  It

requires these signatory sovereigns to allow "Other Parties" to comment on any plans, but it does

not and cannot prohibit a non-signatory entity from engaging in harvest planning on its own.  See

Keith v. Volpe, 118 F.3d 1386, 1392 n.9 (9th Cir. 1997) ("A consent decree binds only the

consenting parties.").  Furthermore, the only reference to NOAA's role in the harvest

management planning process is that the management entities must consult with it when ESA-

listed fish are present in the relevant sub-basins.  That provision certainly does not preclude

NOAA from engaging in the consultation process with a non-signatory entity.

       Even considering the Management Agreement as a whole, as the Tribes urge and as I am

required to do by Asarco, I cannot read into the agreement an obligation on NOAA that simply is

not there.  Neither the express purpose of the Agreement nor the explicit statement regarding the

Shoshone-Bannock Tribes' status in this litigation relieves NOAA of its obligation to exercise its

regulatory responsibilities under the ESA.

---

       [5]In coming to this conclusion, I rely heavily on the State of Idaho's clear, concise, and
persuasive response supporting the United States' position.

Page 12 - OPINION AND ORDER ON 2008-2017 MANAGEMENT AGREEMENT

My interpretation of the Management Agreement is consistent with the Tribal 4(d) Rule, which provides that the "Secretary will consult on a government-to-government basis with any tribe that so requests[.]"  50 C.F.R. § 223.204(b)(2).  The language is mandatory.  If NOAA had agreed to a scheme under which only "management entities" could submit harvest plans for the covered sub-basins, to the exclusion of other sovereigns not party to the Management Agreement, it would conflict with its obligations under the Tribal 4(d) Rule.  NOAA is required to comply with its own regulations.  See United States ex. rel. Accardi v. Shaughnessy, 347 U.S. 260, 265-66 (1954) (agency must comply with its published regulations).

I do note, however, that the United States' communications with the Shoshone-Bannock Tribes unnecessarily inflamed the situation.  In the Dygert Letter, NOAA accepted the TRMP from the Shoshone-Bannock Tribes as a "co-manager," borrowing the lingo from the Management Agreement, rather than explicitly recognizing that the Shoshone-Bannock Tribes hold no such position.  Nevertheless, contrary to the Tribes' wishful thinking, the Management Agreement simply does not preclude NOAA from accepting a harvest management plan from a non-signatory sovereign.  Accordingly, NOAA has not breached the Management Agreement.

III.    Whether NOAA Misapplied the Tribal 4(d) Rule

The Tribes finally assert NOAA cannot have merely "processed" the Shoshone-Bannock Tribes' TRMP because the Tribal 4(d) Rule requires NOAA to determine if the TRMP "meet[s] the management responsibilities" of a tribe.  50 C.F.R. § 223.204(b)(1).  According to the Tribes, the Shoshone-Bannock Tribes have no "management responsibilities" because they have no fishing rights.  Additionally, the Tribes argue the Tribal 4(d) Rule can only permit assessment of a TRMP in a way that is "consistent with legally enforceable tribal rights," which the Tribes

Page 13 - OPINION AND ORDER ON 2008-2017 MANAGEMENT AGREEMENT

argue are absent here.  However, any dispute the Tribes have with NOAA as to the correct
implementation of the Tribal 4(d) Rule is not the proper subject of the current litigation.  NOAA
has yet to issue a final decision on the Shoshone-Bannock Tribes' harvest plan and,
consequently, any judicial review of the agency's interpretation and application of its rule must
wait.

I do comment that engaging in the consultation process on a harvest plan to determine
whether a planned fishery harvest will "not appreciably reduce the likelihood of survival and
recovery of the listed salmonids," 50 C.F.R. § 223.204(a), without first determining whether a
fishery harvest may legally occur in the first place seems to put the cart before the horse.  I also
underscore, as have the parties, that NOAA's review of the Shoshone-Bannock Tribes' TRMP
has absolutely no bearing on the existence or scope of the Shoshone-Bannock Tribes' fishing
rights.

## CONCLUSION

For the foregoing reasons, I deny the Tribes' Joint Motion for Enforcement (#2508).

IT IS SO ORDERED.

Dated this _____11th_____ day of March, 2011.


                                    ___/s/ Garr M. King_____
                                    Garr M. King
                                    United States District Judge