Kathryn Marckworth, OSB # 246840
Joëlle Catherine Klein, WSBA #62184
Yakama Nation Office of Legal Counsel
P.O. Box 150, 401 Fort Road
Toppenish, WA 98948
(509) 865-5121
kate@yakamanation-olc.org
joelle@yakamanation-olc.org

Thomas Zeilman, WSBA #28470
Law Offices of Thomas Zeilman
P.O. Box 34, 32 N. 3rd St. Suite 310
Yakima, WA 98907
(509) 575-1500
tzeilman@qwestoffice.net

*Attorneys for the Confederated Tribes and Bands of the Yakama Nation*

*\*See signature page for complete list of counsel
  submitting this document. L.R. 10-2.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Civ. No. 3:68-CV-0513-SI |
| Plaintiff, and | JOINT MOTION TO DISMISS SHOSHONE-BANNOCK TRIBES' FIRST AMENDED COMPLAINT PURSUANT TO F.R.C.P. 12(b)(1) AND 12(b)(6), OR IN THE ALTERNATIVE, MOTION FOR MORE DEFINITE STATEMENT PURSUANT TO RULE 12(e); MEMORANDUM IN SUPPORT |
| THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON; THE CONFEDERATED TRIBES AND BANDS OF THE YAKAMA NATION; THE CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION; NEZ PERCE TRIBE; and SHOSHONE-BANNOCK TRIBES, | |
| Intervenor-Plaintiffs, v. | ORAL ARGUMENT REQUESTED |
| STATE OF OREGON, Defendant, and | |
| STATE OF WASHINGTON and STATE OF IDAHO, | |
| Intervenor-Defendants. | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................... ii

LR 7-1(a) CERTIFICATION ..............................................................................................1

MOTION..............................................................................................................................1

MEMORANDUM IN SUPPORT OF MOTION.................................................................2

INTRODUCTION ...............................................................................................................2

BACKGROUND .................................................................................................................3

I.    *UNITED STATES V. OREGON* IS, AND ALWAYS HAS BEEN, FOCUSED ON PROTECTING THE STEVENS-PALMER TREATY TRIBES' RESERVED OFF RESERVATION FISHING RIGHTS.................................................................................3

    A.    *Judge Belloni's 1969 Opinion and Judgment* ...........................................3

    B.    *Judge Boldt's ruling in United States v. Washington led to the 1974 Amendment, which clarified the Stevens-Palmer Treaty Tribes' reserved share of the fishery*...........................................................................6

    C.    *Exercise of Continuing Jurisdiction to Resolve Disputes Concerning the Stevens-Palmer Treaty Tribes' Treaty Rights to Harvest up to 50% of the Harvestable Run*........................................................................9

II.    THE SHOSHONE-BANNOCK TRIBES' 1985 MOTION TO INTERVENE AND COMPLAINT ...............................................................................................10

LEGAL STANDARD .......................................................................................................13

ARGUMENT .....................................................................................................................14

I.    SBT FAILS TO ESTABLISH ARTICLE III STANDING ..................................14

II.    SBT'S FAC SHOULD BE DISMISSED PURSUANT TO RULE 12(b)(6) FOR FAILURE TO PLEAD FACTS AS REQUIRED BY RULE 8.........................19

III.    ALTERNATIVELY, THIS COURT SHOULD ORDER SBT TO PROVIDE A MORE DEFINITE STATEMENT CONCERNING ITS ALLEGATIONS UNDER RULE 12(e)...........................................................................................23

CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................................ 14, 15, 20

*Balistreri v. Pacifica Police Department*,
   901 F.2d 696 (9th Cir. 1990)................................................................................................ 22

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................................ 14, 20

*Briskin v. Shopify*,
   135 F.4th 739 (9th Cir. 2025)................................................................................................ 20, 23

*California v. Texas*,
   593 U.S. 659 (2021)................................................................................................ 18, 19

*Chandler v. State Farm Mutual Automobile Insurance Co.*,
   598 F.3d 1115 (9th Cir. 2010) ................................................................................................ 13

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983)................................................................................................ 14

*Confederated Tribes & Bands of the Yakama Nation v. Airgas USA, LLC*,
   435 F. Supp. 3d 1103 (D. Or. 2019) ................................................................................................ 15

*Countrywide Home Loans, Inc., v. Mortgage Guaranty Insurance Corp.*,
   642 F.3d 849 (9th Cir. 2011) ................................................................................................ 17

*Ferrie v. Woodford Research, LLC*,
   2020 WL 3971343 (W.D. Wash. July 14, 2020) ................................................................................................ 20

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC) Inc.*,
   528 U.S. 167 (2000)................................................................................................ 15

*Kingman Reef Atoll Investments, LLC v. United States*,
   541 F.3d 1189 (9th Cir. 2008) ................................................................................................ 13

*Knapp v. Hogan*,
   738 F.3d 1106 (9th Cir. 2013) ................................................................................................ 20

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)................................................................................................ 15

*Maya v. Centex Corp.*,
    658 F.3d 1060 (9th Cir. 2011) ................................................................. 14

*McHenry v. Renne*,
    84 F.3d 1172 (9th Cir. 1996) ................................................. 20, 21, 23, 24

*Nashville, C &. St. L.R. Co. v. Wallace*,
    288 U.S. 249 (1933) ................................................................................ 19

*Navarro v. Block*,
    250 F.3d 729 (9th Cir. 2001) ................................................................. 14

*Papasan v. Allain*,
    478 U.S. 265 (1986) ................................................................................ 14

*Poe v. Ullman*,
    367 U.S. 497 (1961) ................................................................................ 18

*Seufert Bros. Co. v. United States*,
    249 U.S. 194 (1919) .................................................................................. 4

*Simon v. Eastern Kentucky Welfare Rights Org.,*,
    426 U.S. 26 (1976) ................................................................................. 15

*Skelly Oil Co. v. Phillips Petroleum  Co.*,
    339 U.S. 667 (1950) ................................................................................ 17

*Sohappy v. Smith*,
    302 F. Supp. 899 (D. Or. 1969) ........................................................ passim

*Sohappy v. Smith*,
    529 F.2d 570 (9th Cir. 1976) ............................................................ 6, 7, 8

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ............................................................... 13

*United States v. Crookshanks*,
    441 F. Supp. 268 (D. Or. 1977) ............................................................... 9

*United States v. Oregon*,
    657 F.2d 1009 (9th Cir. 1981) .......................................................... 5, 6, 7, 9

*United States v. Oregon*,
    699 F. Supp. 1456 (D. Or. 1988) ................................................ 9, 10, 11, 12

*United States v. Oregon*,
    745 F.2d 550 (9th Cir. 1984) ................................................................... 9

JOINT MOTION TO DISMISS SHOSHONE-
BANNOCK TRIBES' FIRST AMENDED
COMPLAINT OR, ALTERNATIVELY, MOTION
TO PROVIDE MORE DEFINITE STATEMENT          iii

*United States v. State of Oregon*,
  913 F.2d 576 (9th Cir. 1990) ................................................................................21

*United States v. Taylor*,
  3 Wash. Terr. 88 (1887) ....................................................................................... 4

*United States v. Washington*,
  384 F. Supp. 312 (W.D. Wash. 1974)................................................................ 7, 8

*United States v. Winans*,
  198 U.S. 371 (1905)............................................................................................ 3, 4

*Washington Environmental Council v. Bellon*,
  732 F.3d 1131 (9th Cir. 2013) ............................................................................. 17

*Wolfe v. City of Portland*,
  566 F. Supp. 3d 1069 (D. Or. 2021)..................................................................... 13

**Statutes and Constituitional Provisions**

16 U.S.C. § 1531 *et. seq*. (Endangered Species Act) ................................................. 21

28 U.S.C. § 2201 (Declaratory Judgment Act) .................................................. 17, 18, 19

U.S. Const. art. III ...................................................................................... passim

**Treaties**

Treaty with the Walla-Walla, Cayuse, and Umatilla, 1855, art. I, 12 Stat. 945 (June 9, 1855) .......3

Treaty with the Yakamas, 1855, art. III, 12 Stat. 951 (June 9, 1855) .........................................3, 4

Treaty with the Nez Perce Indians, 1855, art. III, 12 Stat. 957 (June 11, 1855)........................3, 11

Treaty with the Tribes of Middle Oregon, 1855, art. I, 12 Stat. 963 (June 25, 1855).....................3

Fort Bridger Treaty, 15 Stat. 673 (July 3, 1868) ...............................................................10, 12, 15

**Rules**

D. Or. LR 7-1 ........................................................................................................ 1

Fed. R. Civ. P. 8(a) ............................................................................................... 13

Fed. R. Civ. P. 8(a)(2) .......................................................................................... 20

Fed. R. Civ. P. 12(b)(1) ............................................................................................ passim

Fed. R. Civ. P. 12(b)(6) ............................................................................................ passim

Fed. R. Civ. P. 12(e) ................................................................................................ passim

Fed. R. Civ. P. 12(h)(3) ................................................................................................ 15

Fed. R. Civ. P. 13 .......................................................................................................... 21

**Other Authorities**

5C WRIGHT & MILLER FED. PRAC. & PROC. Civ. § 1376 (3rd ed.) .....................................23

Endangered Species Act Section 7(a)(2) Biological Opinion and Magnuson-Stevens
    Fishery Conservation and Management Act Essential Fish Habitat Response,
    Consultation on Effects of the 2018-2027 U.S. v Oregon Management Agreement,
    NMFS Consultation Number WCR-2017-7164 ......................................................21

## LR 7-1(a) CERTIFICATION

In compliance with Local Rule 7-1, counsel for the parties to this joint motion certify that they conferred with the other parties to this case and have made a good faith effort, through a video/telephone conference on November 17, 2025, with counsel for the Shoshone-Bannock Tribes to try to resolve the disputes at issue in this Motion. The Shoshone-Bannock Tribes oppose this Motion.

## MOTION

The Confederated Tribes of the Umatilla Indian Reservation, the Confederated Tribes of the Warm Springs Reservation of Oregon, the Confederated Tribes and Bands of the Yakama Nation, and the Nez Perce Tribe (collectively, the "Stevens-Palmer Treaty Tribes") jointly move to dismiss the Shoshone-Bannock Tribes' (SBT) First Amended Complaint (FAC), Dkt. 2676, pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction for failing to establish a traceable injury for judicial standing under Article III of the U.S. Constitution and pursuant to Rule 12(b)(6) for failure to state non-conclusory claims on which relief can be granted by the Court. Should the Court decline to dismiss the FAC, the Stevens-Palmer Treaty Tribes alternatively request the Court order SBT to provide a more definite statement concerning its allegations pursuant to Rule 12(e), so that the parties are not left guessing as to what claims are being asserted, what facts support those claims, and which allegations apply to which parties. This Motion is supported by the following Legal Memorandum.

## MEMORANDUM IN SUPPORT OF MOTION

## INTRODUCTION

To properly invoke the Court's jurisdiction, SBT must have standing for each of its claims and provide the parties with adequate notice of the allegations against them. Those foundational requirements ensure the Court has subject matter jurisdiction to address SBT's alleged injuries that are traceable to actions of the existing parties and avoid making the parties guess which facts support which claims against which parties. The alleged facts must also facially support the claims being asserted. Adherence to these standards is critically important in this complex case. The numerous sovereign parties are bound by the multiple orders issued by this Court over nearly six decades, which enjoin interference with the Stevens-Palmer Treaty Tribes' reserved fishing rights in the Columbia Basin and impose obligations upon the states of Oregon and Washington. *Infra* at 4-10.

SBT's FAC fails to allege non-conclusory facts that identify its claims against specific parties and fails to trace its injuries to existing parties. The FAC also asserts vague and ambiguous allegations that make it difficult, if not impossible, to determine the parameters of SBT's claims. Because of these deficiencies, SBT lacks standing, and the Stevens-Palmer Treaty Tribes respectfully request this Court dismiss SBT's FAC under Rule 12(b)(1). *Infra* at 14-19. Dismissal is also proper under Rule 12(b)(6), as the FAC is so vague, ambiguous, and conclusory that SBT fails to state a claim upon which relief can be granted. *Infra* at 19-22. In the alternative, the Stevens-Palmer Treaty Tribes request the Court order SBT to provide a more definite statement of its claims pursuant to Rule 12(e) so that the parties can reasonably prepare a response. *Infra* at 23-25.

**BACKGROUND**

**I.      *UNITED STATES V. OREGON* IS, AND ALWAYS HAS BEEN, FOCUSED ON PROTECTING THE STEVENS-PALMER TREATY TRIBES' RESERVED OFF-RESERVATION FISHING RIGHTS**

Each of the Stevens-Palmer Treaty Tribes entered into treaties with the United States in 1855 and reserved fishing rights, "which were not much less necessary to the existence of the Indians than the atmosphere they breathed." *See United States v. Winans*, 198 U.S. 371, 381 (1905) (interpreting the Treaty with the Yakamas, 1855, 12 Stat. 951). Although each of the Stevens-Palmer Treaty Tribes have their own treaty with the United States, the specific fishing rights language is nearly identical among the four treaties:

> The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said…Indians, as also the right of taking fish at all usual and accustomed places, in common with the citizens of the Territory, and of erecting temporary buildings for curing them[.]

Treaty with the Yakamas, 1855, art. III, 12 Stat. 951 (June 9, 1855); Treaty with the Walla-Walla, Cayuse, and Umatilla, 1855, art. I, 12 Stat. 945 (June 9, 1855); Treaty with the Nez Perce Indians, 1855, art. III, 12 Stat. 957 (June 11, 1855); *see also* Treaty with the Tribes of Middle Oregon, 1855, art. I, 12 Stat. 963 (June 25, 1855) (using essentially the same language). Each dispositive decision from this Court has been tethered to this Stevens-Palmer treaty language. *See infra* at 6.

**A.      *Judge Belloni's 1969 Opinion and Judgment***

Despite the Stevens-Palmer Treaty Tribes' treaty language, the state of Oregon often obstructed the Stevens-Palmer Treaty Tribes' exercise of these reserved fishing rights. These state actions included seizure of fishing nets and property by tribal members; arrests and prosecution of tribal members for alleged violation of state fishing laws; prohibition on all net or

commercial fishing in certain areas; imposition of regulatory restrictions on types of fishing methods; and failure to recognize the federal supremacy of treaty fishing rights.[1] *E.g.*, U.S. Compl., Dkt. 1 ¶¶ 2, 6, 9-10, 13-14, 16-17 (ECF 1); *Sohappy v. Smith*, 302 F. Supp. 899, 904 (D. Or. 1969); *see also* Pre-Trial Order (Feb. 27, 1969), Attach. 1, Dkt. 89 (framing facts and exhibits, setting forth agreed-upon facts, detailing the joint contentions of the United States and the Stevens-Palmer Treaty Tribes).

By 1968, the threats to the Stevens-Palmer Treaty Tribes' fishing rights were so severe that judicial relief became necessary. Fourteen members of the Yakama Nation collectively sued state of Oregon officials for interference with treaty fishing rights. *See Sohappy*, 302 F. Supp. at 903-04. The United States, acting on its own behalf and as trustee, filed this proceeding shortly thereafter, seeking to protect the rights "of taking fish at all usual and accustomed places, in common with the citizens of the Territory."[2] Dkt. 1 ¶¶ 2-3. These two cases were consolidated, and each of the Stevens-Palmer Treaty Tribes intervened as plaintiffs in *United States v.*

---

[1] This motion and memorandum uses the historial docket number but, when available, provides the associated ECF number in parenthesis when the document is first referenced. Documents that do not yet have a designated ECF number are attached for the Court's convenience.

[2] This litigation is not the first time the United States has brought suit against entities who infringed on these 1855 treaty reserved rights to fish at all usual and accustomed places in common with the citizens of the territory. *See*, *e.g.*, *United States v. Taylor*, 3 Wash. Terr. 88, 94 (1887) ("This suit was brought by the United States [as trustee]…to restrain the appellee…from maintaining a fence" that prevented Yakama access to a tribal fishery in violation of the 1855 Treaty); *Winans,* 198 U.S. at 377 ("This suit was brought to enjoin the respondents from obstructing…[Yakama]…from exercising fishing rights and privileges on the Columbia river" in violation of the 1855 Treaty); *Seufert Bros. Co. v. United States,* 249 U.S. 194, 195 (1919) ("As trustee and guardian of the Yakima Indians, the government of the United States instituted this suit…to restrain defendant…from interfering with the fishing rights" secured in the 1855 Treaty).

*Oregon*.[3] *Sohappy*, 302 F. Supp. at 904. The United States' complaint, and each of the the Stevens-Palmer Treaty Tribes' complaints in intervention, identified discrete regulatory, statutory, and prosecutorial actions by Oregon (then the only defendant) and described how those actions infringed on the Stevens-Palmer Treaty Tribes' fishing rights. *E.g.*, Dkt. 26 ¶¶ 5-10 (Yakama Nation Intervention) (ECF No. 2-1357); Dkt. 42 ¶¶ 6-11 (Umatilla Intervention) (ECF 2-1334); Dkt. 67 ¶¶ 6-10 (Nez Perce Intervention) (ECF 2-1320).

It was against this backdrop that Judge Belloni issued his 1969 judgment and accompanying opinion, which included three key holdings that remain critical to this case. *Sohappy*, 302 F. Supp. at 904. First, the Court held the Stevens-Palmer Treaty Tribes "are entitled to a fair share of the fish produced by the Columbia River system." *Id.* at 911. Second, referring to the Stevens-Palmer Treaty Tribes' right of taking fish at all usual and accustomed places, the Court explained "that the state cannot so manage the fishery that little or no harvestable portion of the run" reaches those areas. *Id.* Third, the Court held that the state had only limited power to regulate treaty fishing:

> The state…may use its police power only to the extent necessary to prevent the exercise of that right in a manner that will imperil the continued existence of the fish resource.…To prove necessity, the state must show there is a need to limit the taking of fish and that the particular regulation sought to be imposed upon the exercise of the treaty right is necessary to the accomplishment of the needed limitation.

*Id.* at 908. This Court "enjoined Oregon, then the only defendant, from enforcing specified fishing regulations" and "established a procedure for promulgating future state regulation." *United States v. Oregon*, 657 F.2d at 1011 (describing the 1969 judgment).

---

[3] Before 1977, decisions were often issued under *Sohappy*; after the Court severed *Sohappy v. Smith*, orders and opinions have been captioned *United States v. Oregon. United States v. Oregon*, 657 F.2d 1009, 1011 n.1 (9th Cir. 1981).

Judge Belloni's 1969 opinion also acknowledged the practical difficulties of managing the parties' interests in the fisheries. *Sohappy*, 302 F. Supp. at 911. The Court embraced the United States' view that "proper anadromous fishery management in a changing environment is not susceptible of rigid pre-determination…the variables that must be weighed in each given instance make judicial review of state action, through retention of continuing jurisdiction, more appropriate than overly-detailed judicial predetermination." *Id.* Accordingly, the Court concluded that "[c]ontinuing the jurisdiction of this court in the present cases may, as a practical matter, be the only way of assuring the parties an opportunity for timely and effective judicial review of such restrictions should such review become necessary." *Id.* The Court unequivocally retained continuing jurisdiction over this case and emphasized the centrality of the 1969 Judgment (or "1969 Decree") as the basis for that jurisdiction:

> The court retains jurisdiction of the matters in suit herein for disposition of the remaining claims of the parties or to grant further or amended relief upon application of any of the parties. Any party at any time may apply to the court for a subsequent modification of any provision of this decree where the continued application of the decree has become inequitable or impracticable, but this right shall not affect the finality of the decree with respect to times prior to any such modification.

Attach. 2, 1969 Decree, Dkt. 104 ¶ 4. No party appealed the 1969 Decree. *Sohappy v. Smith*, 529 F.2d 570, 572 (9th Cir. 1976). The 1969 Decree and its 1974 amendment, *infra* at 7-8, remain binding.

### B.    *Judge Boldt's ruling in* United States v. Washington *led to the 1974 Amendment, which clarified the Stevens-Palmer Treaty Tribes' reserved share of the fishery*

In September 1970, the United States filed a companion case in the District of Washington to, *inter alia,* address Washington's infringement on some tribes' treaty reserved rights to "take fish at all usual and accustomed places in common with the citizens of the Territory," within

certain parts of Washington. *See United States v. Washington*, 384 F. Supp. 312, 327-28, 350 (W.D. Wash. 1974) (identifying the specific tribal parties and geographic scope of case). On March 22, 1974, Judge Boldt issued his opinion in *United States v. Washington*, incorporating many of the core rulings from this Court's "thoroughly researched, well reasoned and highly practicable" 1969 Decree and opinion. *Id.* at 345.

Judge Boldt explained the 1969 Decree involved a "number of law and fact issues identical or closely similar to those presented in [*United States v. Washington*]" and was "directly applicable to issues to be determined." *Id.* He also recognized that the United States and Yakama Nation, both parties to *United States v. Washington*, were bound by the 1969 Decree and were asking the Western District of Washington to interpret the same treaty language that this Court had already interpreted. *Id.* As a result, Judge Boldt adopted most of the 1969 Decree into his final order and retained continuing jurisdiction, which remains in effect. *Id.* at 345, 405. But Judge Boldt made one alteration that had significant ramifications for *United States v. Oregon*. *See id.* at 343. Instead of holding the tribes are entitled to a "fair share" of the fishery like the 1969 Decree had done, *Sohappy*, 302 F. Supp. at 911, Judge Boldt held that tribes with Stevens Treaties are entitled to the opportunity to take up to fifty-percent of the harvestable runs that are destined to reach those tribes' usual and accustomed fishing places. *Washington*, 384 F. Supp. at 343.

Less than a month after Judge Boldt's ruling, Washington moved to intervene in *United States v. Oregon*, seeking an injunction against all treaty fishing for spring Chinook by the Stevens-Palmer Treaty Tribes until the states of Oregon and Washington promulgated appropriate regulations. *Sohappy*, 529 F.2d at 572. This Court allowed Washington to intervene with the understanding that the state would be "bound by the 1969 decision and judgment." *Id.*

JOINT MOTION TO DISMISS SHOSHONE-
BANNOCK TRIBES' FIRST AMENDED
COMPLAINT OR, ALTERNATIVELY, MOTION
TO PROVIDE MORE DEFINITE STATEMENT          7

The Court ultimately denied Washington's request for an injunction and amended the 1969 Decree to apply Judge Boldt's fifty-percent calculation to the Stevens-Palmer Treaty Tribes' right to the spring Chinook salmon run:

> The Indian treaty fishermen are entitled to have the opportunity to take up to 50 per cent [sic] of the harvest of the spring Chinook Salmon run destined to reach the tribes' usual and accustomed grounds and stations. Except insofar as amended here, the 1969 judgment remains in full force and effect.

*Id.* at 572 (quoting this Court's Order amending the 1969 Decree); *see also* Attach. 3, Dkt. 181 ("1974 Amendment").

Washington and Oregon appealed the 1974 Amendment, and Washington simultaneously tried to attack the underlying 1969 Decree. *Id.* at 572-73. The Ninth Circuit rejected the attempt to appeal the 1969 Decree, holding that the judgment was "final for appeal purposes years ago, and no one can now appeal from it." *Id.* at 573 (further noting that "Washington is estopped from attacking the 1969 decree or its underpinnings because she consented to be bound by the judgment and the opinion as a price for permission to intervene"). The Ninth Circuit also affirmed the Court's 1974 Amendment over vigorous objections by Washington and Oregon, holding that the amendment "was prompted by the controversy over the 1974 spring run," and had simply further defined the 1969 Decree's finding that the Stevens-Palmer Treaty Tribes were entitled to a "fair share" of the fisheries. *Id.* The Ninth Circuit noted it was unsurprising that this Court adopted the "50-50 division of fishing opportunity," as "[m]any of the participants and issues in this litigation were also present in *United States v. Washington*[.]" *Id.*

**C.**    ***Exercise of Continuing Jurisdiction to Resolve Disputes Concerning the Stevens-Palmer Treaty Tribes' Treaty Rights to Harvest up to 50% of the Harvestable Run***

In the years following the 1974 Amendment, this Court has had to address continuing fishery disputes between the States and the Stevens-Palmer Treaty Tribes, with the parties utilizing this Court's continuing jurisdiction to enforce the 1969 Decree and its progeny against parties and non-parties alike. *See, e.g.*, *United States v. Crookshanks*, 441 F. Supp. 268, 269-70 (D. Or. 1977) (declining to dismiss criminal contempt proceedings against non-party, non-Indian fishermen who violated a temporary restraining order issued in *United States v. Oregon* and holding "this court can properly command the obedience of non-parties to orders of the court" by issuing in rem injunctions); *see also United States v. Oregon*, 657 F.2d 1009, 1015-16 (9th Cir. 1981) (upholding a preliminary injunction against the Yakama Nation).

In each instance, the Court resolved specific controversies that implicated the 1969 Decree and the Stevens-Palmer Treaty Tribes' fishing rights. As the Court continued to see disputes arise, the Court implored the parties to develop a comprehensive fishery management plan that would reduce or eliminate that need for active litigation. The parties heeded the Court's admonitions and negotiated a five-year fishery plan that the Court approved on February 28, 1977. *See United States v. Oregon*, 699 F. Supp. 1456, 1459 (D. Or. 1988) (recounting history). But in 1982, two of the Stevens-Palmer Treaty Tribes notified the other parties of their intent to withdraw from the fishery plan, and the Court ordered the parties to negotiate a new plan. *Id*.

It was at this point that the state of Idaho intervened as defendant in order to participate in the negotiations. Over objections from the Stevens-Palmer Treaty Tribes, the Ninth Circuit ultimately held Idaho was entitled to intervene. *United States v. Oregon*, 745 F.2d 550, 553 (9th Cir. 1984) (noting "Idaho has disclaimed any intent to relitigate matters which have previously

JOINT MOTION TO DISMISS SHOSHONE-
BANNOCK TRIBES' FIRST AMENDED
COMPLAINT OR, ALTERNATIVELY, MOTION
TO PROVIDE MORE DEFINITE STATEMENT          9

been litigated, to raise any claims unrelated to the [Stevens-Palmer Treaty] Tribes' treaty fishing rights, or to assert any claims against the other states"). After nearly four years of negotiations, the parties presented the Court with the Columbia River Fish Management Plan (CRFMP), which the Court approved. *Oregon*, 699 F. Supp. at 1469, *aff'd*, 913 F.2d 576 (9th Cir. 1990).

## II.    THE SHOSHONE-BANNOCK TRIBES' 1985 MOTION TO INTERVENE AND COMPLAINT

When negotiations for the CRFMP were almost concluded, SBT moved to intervene, Dkt. 1304 (ECF 2-968), and attached a proposed complaint in intervention, Dkt. 1305 (ECF 2-967). SBT's motion and complaint ("SBT Original Complaint") asserted that under the 1868 Treaty of Fort Bridger it reserved the "right to hunt on the unoccupied lands of the United States so long as game may be found thereon[.]" Dkt. 1305 ¶ 17 (quoting the Fort Bridger Treaty of July 3, 1868, 15 Stat. 673). Both the motion and SBT Original Complaint suggested that SBT's alleged fisheries were limited to certain areas within the Columbia River basin. *See* Dkt. 1304 ¶ 3 (describing its off-reservation rights to allegedly "include, inter alia, portions of the drainage of the Snake and Salmon Rivers within the State of Idaho, wherein exist spawning grounds for spring, summer, and fall chinook salmon and steelhead"); *see* Dkt. 1305 ¶¶ 13, 19, 21 (describing portions of the Snake and Salmon rivers within federal public lands as the alleged areas upon which SBT members fish).

The states of Washington and Oregon, and the Stevens-Palmer Treaty Tribes opposed SBT's intervention, but during a hearing on SBT's motion to intervene, this Court ruled from the bench that SBT's intervention would be "allowed." Tr. of Hearing on SBT Mot. to Intervene, Dkt. 1396 at 25 (July 25, 1986) (ECF 1396); *see also* Dkt. 1338 (Stevens-Palmer Treaty Tribes and Washington joint brief in opposition to SBT intervention) (ECF 2-934). The Court explicitly

JOINT MOTION TO DISMISS SHOSHONE-
BANNOCK TRIBES' FIRST AMENDED
COMPLAINT OR, ALTERNATIVELY, MOTION
TO PROVIDE MORE DEFINITE STATEMENT        10

did not, however, make "any ruling on the scope or breadth" of SBT's rights and noted SBT

"run[s] the risk of losing." Dkt. 1396 at 23. And since intervening in 1986, SBT has taken no

action to adjudicate the nature and scope of its treaty rights. Instead SBT focused on participating

in the negotiation and implementation of each of the fishery management agreements that the Court

has approved. *See* SBT Mot. to Recalendar Case, Dkt. 2651 at 4 ("[N]o action has been taken on

[SBT's] underlying complaint.").

SBT has had the opportunity to fully participate in the negotiation and implementation of

each management plan, and the plans themselves have accurately described the status of SBT in this

case. For example, under the 1988 CRFMP, as approved by the Court, SBT was a member of the

Production Advisory Committee, the Technical Advisory Committee, and the Policy Committee.

*See Oregon*, 699 F. Supp. at 1465. Although not a signatory party to this plan, the Shoshone-

Bannock Tribes "are accorded the right to participate in certain aspects of the plan," including

membership on various committees and being "deemed to be a management entity" for specific

areas within the Salmon River subbasin.[4] CRFMP at 16. Subsequent management agreements

---

[4] The full 1988 CRFMP and the Court's amendments are available at Dkt. 1490 (Proposed Plan) (ECF 2-782), Dkt. 1592 (ECF 2-678) (Amended Opinion re Plan), and Dkt.1594 (ECF 2-676) (Amended Order). Part III.C.1 of the 1988 CRFMP provided that: "The fishery management entities indicated below shall have primary responsibilities for developing tributary harvest and production plans for each of the following subbasins." Dkt. 1490 at 44. For the Salmon River subbasin it identified Idaho, Nez Perce Tribe, and SBT, with an asterisk for SBT: "The Shoshone-Bannock Tribes…shall be deemed a management entity for purposes of those portions of the Salmon River subbasin plan which concern those lands and streams outside the Nez Perce Reservation originally established by the Nez Perce Treaty of 1855 where the Shoshone-Bannock Tribes exercise treaty-secured fishing rights, and such other subbasin areas as may subsequently be agreed upon by the affected parties hereto." *Id.* The subsequent management agreements have identical provisions with respect to describing SBT's role in a portion of the Salmon River. Dkt. 2405-2 at 40 (2005-2007 Interim Management Agreement); Dkt. 2545 at 88 (2008-2017 Management Agreement); Dkt. 2607-1 at 62 (2018-2027 Management Agreement).

have contained nearly identical provisions. These management agreements have described the status of SBT's complaint in intervention, and the other parties' reservation of rights and defenses to litigate SBT's allegations.

> The parties to this plan and the Shoshone-Bannock Tribes agree that the Shoshone-Bannock Tribes' limited participation in this plan in no way represents an admission, determination, settlement, or adjudication of any legal or factual issue related to the nature and scope of the Shoshone-Bannock Tribes' off-reservation fishing rights under the Fort Bridger Treaty of July 3, 1868. 15 Stat. 673. The parties to this plan acknowledge that the Shoshone-Bannock Tribes reserve the right to litigate at any time in Case No. 68-513 any and all claims they may have against any or all of the other parties concerning the Shoshone-Bannock Tribes' fishing rights under the Fort Bridger Treaty of July 3, 1868, to the same extent and subject to the same limitations as would apply if they were not a participant hereinunder. In the event of such litigation, the signatory parties to this plan reserve the right to assert any and all defenses they may have to the claims of the Shoshone-Bannock Tribes in Case. No. 68-513.

Dkt. 1490, Section I.G (ECF 2-782); Dkt. 2405-2, Part. I.A; Dkt. 2545, Part I.A; Dkt. 2607-1, Part I.A.

As indicated by this Court and reflected in the management plan limitations, the nature and scope of any existing SBT treaty rights have never been presumed. This Court and the Ninth Circuit have both reienterated that SBT's alleged treaty rights in the Columbia Basin have never been established. *E.g.*, *United States v. Oregon*, 699 F. Supp. at 1466, *aff'd,* 913 F.2d 576 (9th Cir. 1990) ("[B]y their own statements, the Shoshone-Bannock Tribes agree that the scope of their 1868 treaty fishery rights have not yet been determined, nor should it have been."); *see also* Dkt. 2323 at 11-12 (Transcript of Proceedings, December 4, 2002) (noting "[SBT] haven't established the nature of their right" and "[t]here have been no definitive rulings on any of the issues raised in [SBT's] Complaint"); Dkt. 2589 at 14 (noting a federal agency's review of a plan by SBT for fisheries in the Grande Ronde and Imnaha River subbasins asserting treaty rights had

"absolutely no bearing on the existence or scope of the Shoshone-Bannock Tribes' fishing rights").

Now, forty years after filing its complaint, SBT is finally asking this Court to determine whether they do or don't have tribal fishing rights under a FAC that differs significantly from its 1985 original complaint, *compare* Dkt. 1305, *with* Dkt. 2676. But SBT does not point to any specific infringement on its alleged treaty right as an impetus for its renewed interest in litigating its claims. *See* SBT Mot. to Recalendar, Dkt. 2651 at 9-11.

***

The Court's rulings concerning the exercise of the treaty fishing rights by the Stevens-Palmer Treaty Tribes are the foundation of this case, and this Court continues to have an important role in adjudicating disputes as they arise in this case. SBT is free to attempt to avail itself of the federal courts, but it is still bound by rules of federal procedure and constitutional principles.

**LEGAL STANDARD**

"A plaintiff's standing under Article III of the United States Constitution is a component of subject matter jurisdiction properly challenged under Rule 12(b)(1) of the Federal Rules of Civil Procedure." *Wolfe v. City of Portland*, 566 F. Supp. 3d 1069, 1078 (D. Or. 2021) (citing *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121 (9th Cir. 2010)). When challenged by a motion to dismiss, the plaintiff bears the burden of establishing standing. *See id.* (citing *Kingman Reef Atoll Invs., LLC v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008)).

Federal rules also require plaintiffs to provide "notice of [a] claim such that the opposing party may defend himself or herself effectively." *Starr v. Baca*, 652 F.3d 1202, 1212 (9th Cir. 2011); Fed. R. Civ. P. 8(a). Complaints without "sufficient facts alleged to support a cognizable

legal theory" disadvantage opposing litigants and are subject to dismissal for failure to state a claim upon which relief can be granted. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). While the court must accept the complaint's factual allegations as true and construe those facts in the light most favorable to the non-movant, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). In applying *Twombly*, the court disregards conclusory allegations that are "not entitled to the assumption of truth," and considers whether the remaining factual allegations state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Allegations that are "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and should be dismissed. *Id*. at 678. Alternatively, a court may order a plaintiff to provide "a more definite statement of a pleading" when the pleading is "so vague or ambiguous that a party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e).

## ARGUMENT

### I.      SBT FAILS TO ESTABLISH ARTICLE III STANDING

This Court lacks subject matter jurisdiction over SBT's claims because SBT has failed to causally link its alleged injuries to any party's actions. Under Article III, federal courts only have authority to decide "an actual case or controversy" brought before them. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)). A threshold requirement for a case or controversy is standing, which requires the plaintiff to show that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the

injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Evn't Servs. (TOC) Inc.*, 528 U.S. 167, 180-81 (2000). Traceability requires "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly…trace[able] to the challenged action of the defendant, and not…th[e] result [of] the independent action of some third party not before the court.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (quoting *Simon v. E. Ky. Welfare Rts Org.*, 426 U.S. 26, 41-42 (1976)). This requirement ensures that there is a genuine nexus between a plaintiff's injury and a defendant's alleged conduct. *See id.* at 560. In the absence of standing, a court lacks subject matter jurisdiction to hear the claims and must dismiss them. *See Confederated Tribes & Bands of the Yakama Nation v. Airgas USA, LLC*, 435 F. Supp. 3d 1103, 1123 (D. Or. 2019); Fed. R. Civ. P. 12(h)(3).

SBT generally alleges injuries to its treaty reserved rights in the Treaty of Fort Bridger to "hunt on the unoccupied lands of the United States so long as game may be found thereon." Dkt. 2676 ¶ 37. SBT alleges that this right extends to fishing, that the Columbia River and its tributaries constitute unoccupied lands of the United States, and that SBT "historically fished throughout the same."[5] *Id.* ¶¶ 38-41. SBT raises concerns of "continued reduction in the number of salmon returning to Idaho," *id.* ¶ 42, "depleted anadromous fish runs," *id.* ¶ 46, "loss of life suffered by the anadromous fish," *id.* ¶ 48, and "little way to protect its priority Treaty resource from the over-harvest by downriver commercial and sport fishermen," *id.* ¶ 49. Even if read in

---

[5] SBT's assertions that the Columbia River and its tributaries constitute "unoccupied lands of the United States" are SBT's legal conclusions couched as factual assertions that need not be taken as true. *See Iqbal*, 556 U.S. at 678. In addition, the geographic scope of SBT's historical fishery alleged in the FAC is a gross expansion that is inconsistent with SBT previously filed pleadings. *See supra* at 10-11.

JOINT MOTION TO DISMISS SHOSHONE-
BANNOCK TRIBES' FIRST AMENDED
COMPLAINT OR, ALTERNATIVELY, MOTION
TO PROVIDE MORE DEFINITE STATEMENT          15

the light most favorable to SBT to assume these assertions are actual or imminent injuries that are concrete and particularized, the FAC is entirely missing the critical traceability element.

The causal connection between the alleged reductions in SBT's alleged fishery and Defendants' actions or omissions is simply not stated with any particularity. In only one instance does the FAC attempt to directly link Defendants' actions with SBT's injuries: "The loss of life suffered by the anadromous fish is the direct result of Defendants' failure to recognize the need for these fish to reach the headwaters of their home-streams." *Id.* ¶ 48. This "failure to recognize" is such a vague allegation, it is essentially meaningless. Contrast this allegation to SBT's Original Complaint, which at least pointed to an alleged failure by Oregon and Washington to "regulate the anadromous fish resource in a manner necessary to assure sufficient escapement of fish needed for spawning and to satisfy the ceremonial and subsistence needs of the Shoshone-Bannock Indians protected by Treaty." SBT Original Compl., Dkt. 1305 ¶ 32. Though bareboned, the allegation attempted to link SBT's alleged ceremonial and subsistence injuries to the states' alleged failure to regulate the fishery to allow escapement.[6] *Id.* In contrast, the FAC inexplicably removes any causal allegation and instead only offers conclusory statements about "exploitation," "failure to recognize" fish spawning needs, and "over-harvest" by unidentified parties.[7] Dkt. 2676 ¶¶ 4, 47, 48, 49.

---

[6] This is not to say SBT's Original Complaint was a paragon of clarity or that it does not suffer from the same infirmities; rather, this comparison merely shows that where the Original Complaint at least attempted to trace its injuries to defendants, the FAC is entirely deficient.

[7] Even the FAC's section header, "Actions Which Shoshone-Bannock Complain," Dkt. 2676 at 9, stands in contrast to the header in SBT's Original Complaint titled "Action *of Parties* of Which Intervenor Complains," Dkt. 1305 at 6 (emphasis added).

JOINT MOTION TO DISMISS SHOSHONE-
BANNOCK TRIBES' FIRST AMENDED
COMPLAINT OR, ALTERNATIVELY, MOTION
TO PROVIDE MORE DEFINITE STATEMENT        16

Put more pointedly, the results that the FAC outlines as injury may or may not be attributable to any actions by the Defendants or the Intervenor-Plaintiffs. SBT's injuries may, in fact, be the result of third-party actions—for example, "over-harvest by downriver commercial and sport fishermen," *id.* ¶ 49, habitat degradation, increased avian and pinniped predation, tributary flow reductions due to irrigation or municipal diversions, climate impacts, or operation of the Columbia River System dams, to name just a few. Although standing does not require a party "to be the sole source of the injury," it does require the plaintiff to causally trace the injuries to an existing party's actions. *Washington Env't Council v. Bellon*, 732 F.3d 1131, 1141-42 (9th Cir. 2013). SBT fails to do so. The FAC simply makes no attempt to paint any factually plausible picture that would illustrate how any of SBT's alleged treaty rights, even if they are as expansive as SBT alleges, are somehow being violated or restricted by any defendant or intervenor-plaintiff to this case, either now or in the future.

Some of this confusion stems from SBT's "causes of action." *See* Dkt. 2676 at 11-12. Instead of identifying legal claims, the "causes of action" appear to be requests for declaratory and injunctive relief. Dkt. 2676 ¶¶ 51-66. But the Court's authority to issue declaratory and injunctive relief does not absolve SBT of identifying underlying legal bases nor does it act as an independent basis for jurisdiction. *E.g.*, *Countrywide Home Loans, Inc., v. Mortg. Guar. Ins. Corp.*, 642 F.3d 849, 853 (9th Cir. 2011) (noting "while the [Declaratory Judgment Act] expanded the scope of the federal courts' remedial powers, it did nothing to alter the courts' jurisdiction or the 'right of entrance to federal courts'" (quoting *Skelly Oil Co. v. Phillips Petrol. Co.*, 339 U.S. 667, 671 (1950)).

SBT labels its "First Cause of Action" as "Declaration of Shoshone-Bannock Treaty Fishing Rights Throughout the Columbia Basin and its Tributaries." Dkt. 2676 at 11. The

JOINT MOTION TO DISMISS SHOSHONE-BANNOCK TRIBES' FIRST AMENDED COMPLAINT OR, ALTERNATIVELY, MOTION TO PROVIDE MORE DEFINITE STATEMENT      17

Declaratory Judgment Act authorizes this Court to "declare the rights and other legal relations of any interested party seeking such declaration," 28 U.S.C. § 2201(a), but only when there is a justiciable case or controversy. "The declaratory judgment device does not…permit litigants to invoke the power of this Court to obtain…rulings in advance of necessity." *California v. Texas*, 593 U.S. 659, 672 (2021) (quoting *Poe v. Ullman*, 367 U.S. 497, 506 (1961)). Interference with the exercise of treaty protected rights is a cognizable legal injury, *e.g.*, *Sohappy*, 302 F. Supp. 899, but by failing to trace any of its injuries to specific parties' actions, SBT has not demonstrated any necessity that would authorize this Court to issue a declaratory judgment.

The lack of necessity likewise infects SBT's second cause of action. Dkt. 2676 at 12 ("Enjoin Fishing by Downriver Users That Threatens the Preservation of Wild Runs of Anadromous Fish Spawning Within The Unoccupied Lands of the United States Subject to the Reserved Treaty Fishing Rights of the Shoshone-Bannock"). As a threshold matter, a part of SBT's second cause of action is simply an additional request for declaratory relief, despite being characterized as a request for an injunction. For example, SBT asks to be "entitled to an equitable share of any harvestable allocation[.]" *Id.* ¶ 65. But despite intervening forty years ago, SBT still has not established that it possesses treaty fishing rights that would entitle it to any specific share of the fisheries; thus, any such relief would be more akin to an advisory opinion on the declaration of their rights, not an injunction. Indeed, SBT's Prayer for Relief appears to acknowledge that SBT is actually seeking "[a]n order declaring the Shoshone-Bannock are entitled to an equitable share of any harvestable allocation[.]" Dkt. 2676 at 13. As discussed above, SBT's failure to establish Article III standing prevents it from relying on the Declaratory Judgment Act, and its request for "an equitable share" should be dismissed.

SBT also requests that it "be included in any future renegotiation of any fish management plan agreed to," *id.* ¶ 64, but SBT *is already included* in these negotiations and has been a party to management plan negotiations since 1986, *see supra* at 11-12. What SBT really seems to be asking for is an expansive declaration of its rights "adjudicating the specific scope of [SBT's] off-reservation fishing rights" that would apparently "clarify[] and secur[e] [SBT's] position as a full-party member" and "ensure [SBT] hold[s] an equal voice in protecting the shared resources." SBT Mot. to Recalendar, Dkt. 2651 at 9. "In these circumstances, injunctive relief could amount to no more than a declaration that" SBT holds treaty fishing rights within the Columbia River Basin and its tributaries. *See California*, 593 U.S. at 673 (citing *Nashville, C &. St. L.R. Co. v. Wallace*, 288 U.S. 249 (1933)). "But once again, that is the very kind of relief that cannot alone supply jurisdiction otherwise absent." *Id.*

Perhaps SBT assumes that any facts giving rise to its alleged injury and claims are so obvious that they do not need to be spelled out for the other parties. But it is simply not clear at all. The FAC does not identify any specific claim nor trace SBT's injuries to any party's action. It thus leaves the parties guessing as to which case or controversy, if any, forms the basis for SBT's requested declaratory relief and which specific actions SBT seeks to enjoin. This approach is inadequate to establish the traceability element of Article III standing or invoke the Declaratory Judgment Act. The Court thus lacks subject matter jurisdiction over both causes of action, and the FAC must be dismissed pursuant to Rule 12(b)(1).

## II.     SBT'S FAC SHOULD BE DISMISSED PURSUANT TO RULE 12(b)(6) FOR FAILURE TO PLEAD FACTS AS REQUIRED BY RULE 8

The FAC is devoid of sufficient facts to support its legal claims and should be dismissed. A complaint must contain "a short and plain statement of the claim showing that the pleader is

entitled to relief." Fed. R. Civ. P. 8(a)(2). "Violations of this Rule warrant dismissal," and "[o]ne well-known type of violation is when a pleading says *too little*." *Knapp v. Hogan*, 738 F.3d 1106, 1109 (9th Cir. 2013) (citing *Iqbal*, 556 U.S. at 678). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. And where there are multiple defendants, the plaintiff must detail "which wrongs were committed by which defendants." *McHenry v. Renne*, 84 F.3d 1172, 1179 (9th Cir. 1996). To do otherwise fails to provide fair notice to the accused party. *See Briskin v. Shopify*, 135 F.4th 739, 762 (9th Cir. 2025); *see also Ferrie v. Woodford Rsch., LLC*, Case No. 3:19-cv-05798-RBL, 2020 WL 3971343, at *8 (W.D. Wash. July 14, 2020) (("To survive a Rule 12(b)(6) motion to dismiss, a complaint cannot treat the defendants as an 'undifferentiated mass.'") (citation omitted)).

SBT's FAC lacks sufficient facts to support a claim against any of the Defendants, let alone the Stevens-Palmer Treaty Tribes. In its fifteen-page FAC, SBT has about one page dedicated to "Actions Which Shoshone Bannock Complain."[8] Dkt. 2676 ¶¶ 42-49. Of these eight paragraphs, five concern actions that *SBT* has taken: SBT's decision to "impose strict fishing regulations on its members"; "self-imposed regulations"; and "good faith efforts toward

---

[8] This section includes Paragraph 50, but that paragraph does not allege any action; it only requests an adjudication of SBT's off-reservation fishing rights. Dkt. 2676 ¶ 50.

JOINT MOTION TO DISMISS SHOSHONE-
BANNOCK TRIBES' FIRST AMENDED
COMPLAINT OR, ALTERNATIVELY, MOTION
TO PROVIDE MORE DEFINITE STATEMENT        20

conservation." *Id.* ¶¶ 42-46. Only three allegations *might* arguably be related to the Defendants'

actions (or even less clearly, the Stevens-Palmer Treaty Tribes):

> 47. Indeed, Shoshone-Bannock is apparently the only tribe to pay the price for commercial exploitation of this sacred resource by both the non-Indians and by the other tribes simply because, "Shoshone[-Bannock] treaty rights have been recognized to include the right to fish, but have not been more specifically defined." *United States v. State of Oregon*, 913 F.2d 576, 586 (9th Cir. 1990).

> 48. The loss of life suffered by the anadromous fish is the direct result of Defendants' failure to recognize the need for these fish to reach the headwaters of their home-streams.

> 49. At the present time, the Shoshone-Bannock have little way to protect its priority Treaty resource from over-harvest by downriver commercial and sport fishermen.

*Id.* ¶¶ 47-49.

None of these allegations provide sufficient notice as to "which wrongs were committed

by which defendants"—it does not even allege wrongdoing.[9] *See McHenry*, 84 F.3d at 1179. SBT

does nothing to explain how the commercial or sport harvest amounts to "exploitation" or "over-

harvest." Dkt. 2676 ¶¶ 4, 47, 49. Indeed, the Columbia River non-Indian commercial and sport

fisheries, as well as the Stevens-Palmer Treaty Tribes' ceremonial, subsistence, and commercial

fisheries are all managed on abundance-based sliding scales that are responsive to the needs of

the fish, including fish listed under the Endangered Species Act (ESA), and the United States

conducted environmental compliance under the ESA before the parties submitted the current

management agreement to this Court for entry as an order of this Court.[10] *See* Dkt. 2607-1

---

[9] Note that the FAC is so vague that it is not even clear from the allegations whether it is asserting cross-claims against other Intervenor-Plaintiff tribes under Fed. R. Civ. P. 13. *See infra* at 23-25.

[10] *See*, *e.g.*, Endangered Species Act Section 7(a)(2) Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response, Consultation on Effects of the 2018-2027 *U.S. v Oregon* Management Agreement, NMFS Consultation Number

JOINT MOTION TO DISMISS SHOSHONE-
BANNOCK TRIBES' FIRST AMENDED
COMPLAINT OR, ALTERNATIVELY, MOTION
TO PROVIDE MORE DEFINITE STATEMENT        21

(setting forth the different fisheries). SBT does nothing to explain how any of these fisheries amount to an overharvest.

Even if it had explained, SBT does not connect the alleged exploitation and over-harvest to any party. Instead SBT waves broadly across the Columbia River Basin and its tributaries, perhaps pointing to all downriver fisherpersons as the perpetrators of SBT's alleged injuries. The parties are thus left guessing as to which actions SBT seeks to hold them responsible. This broad-stroke approach is also evident in SBT's allegation that anadromous fish mortality is the "direct result of Defendants' failure to recognize the need for these to reach the headwaters of their home-streams." Dkt. 2676 ¶ 48. SBT does not explain which actions could demonstrate a "failure to recognize"; it is simply rhetoric that blames Defendants for reduced fish runs. Finally, SBT couches its factual assertion of over-harvest within an unsubstantiated legal conclusion that SBT has a "priority Treaty resource," which SBT neither defines nor explains. *Id.* ¶ 49.

These are all conclusory allegations and unwarranted inferences with no specific or detailed who/what/where factual content that would be sufficient to support a cognizable legal claim. This deficiency justifies dismissal not only for lack of standing, *supra* at 14-19, but also for failure to state a claim upon which relief can be granted. *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990) ("Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."). The Stevens-Palmer Treaty Tribes thus respectfully requests the Court dismiss SBT's FAC pursuant to Rule 12(b)(6).

---

WCR-2017-7164. Accessible at: https://www.fisheries.noaa.gov/s3//dam-migration/s7-_usvoregon_2018-2027_mgmagmnt__final_signed.pdf.

### III.    ALTERNATIVELY, THIS COURT SHOULD ORDER SBT TO PROVIDE A MORE DEFINITE STATEMENT CONCERNING ITS ALLEGATIONS UNDER RULE 12(e)

The Stevens-Palmer Treaty Tribes alternatively request that the Court order SBT to provide a more definite statement concerning its allegations. Under Rule 12(e), a more definite statement is proper when a pleading "is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). It is designed to "permit litigants to procure information needed to frame a responsive pleading[.]" 5C WRIGHT & MILLER FED. PRAC. & PROC. Civ. § 1376 (3rd ed.).

A complaint that does not "clearly and concisely explain[] which allegations are relevant to which defendants" leaves parties "literally guessing as to what facts support the legal claims being asserted," making it "excessively difficult" to prepare a responsive pleading. *See McHenry*, 84 F.3d at 1175, 1177. This difficulty is compounded "where there are multiple defendants and claims, and the complaint fails to differentiate among them." *See Briskin*, 135 F.4th at 672 (noting these situations may fail to provide defendants with requisite fair notice) (citing *McHenry*, 84 F.3d at 1180). In these instances, a more definite statement clarifies the complaint, thereby giving the appropriate parties a fair opportunity to respond and resulting in a more orderly, focused adjudication of the claims. *See McHenry*, 84 F.3d at 1179-80 (explaining "confusing complaints…impose unfair burdens on litigants and judges[,]" such as unnecessary "discovery disputes and lengthy trials").

Here, the FAC is so vague or ambiguous, the Stevens-Palmer Treaty Tribes are left guessing as to whether SBT is asserting crossclaims against one or all of them. Although the FAC identifies the states of Oregon, Washington, and Idaho as the only defendants, Dkt. 2676 ¶ 15, the FAC's references to "the other tribes" and "downriver users" suggest that SBT may be

JOINT MOTION TO DISMISS SHOSHONE-
BANNOCK TRIBES' FIRST AMENDED
COMPLAINT OR, ALTERNATIVELY, MOTION
TO PROVIDE MORE DEFINITE STATEMENT        23

seeking to hold the Stevens-Palmer Treaty Tribes liable for its alleged injuries, *see id.* ¶¶ 4, 47, 66. The FAC describes each of the Stevens-Palmer Treaty Tribes (all of which are downriver of SBT) as holding a "shared responsibility for the management of the anadromous fish resources" within the Columbia River Basin. *Id.* ¶¶ 10-13, 15. The FAC asserts SBT's alleged treaty interests are harmed by the "external exploitation and *mismanagement* of downriver users." *Id.* ¶ 4 (emphasis added); *id.* ¶ 47 ("[SBT] is apparently the only tribe to pay the price for commercial exploitation…by the other tribes"); *id.* ¶ 49 ("over-harvest by downriver commercial and sport fishermen"). Further, the FAC seeks to enjoin "*any activity* by *downriver users* that threatens the preservation of wild anadromous fish runs and spawning locations." *Id.* ¶ 66 (emphasis added); *see also id.* at 13 ¶ E. These statements leave the Stevens-Palmers Treaty Tribes "literally guessing as to what facts support the legal claims being asserted against" which parties. *McHenry*, 84 F.3d at 1177. Without "knowing what claims are made against whom," *id.*, the Stevens-Palmer Treaty Tribes are not only unable to reasonably prepare a response but also unable to ascertain whether a response is required.

While the Stevens-Palmers Treaty Tribes respectfully request that this Court dismiss the FAC, should it decline to do so, the Stevens-Palmer Treaty Tribes respectfully request this Court order SBT to provide a more definite statement as to whether it is asserting crossclaims against them, and, if so, to provide a more definite statement identifying which actions by the Stevens-Palmer Treaty Tribes constitute "mismanagement," cause alleged "overharvest," and "threaten[] the preservation of wild anadromous fish runs." Dkt. 2676 ¶¶ 4, 49, 66.

## CONCLUSION

For the reasons set forth above, the Court should dismiss SBT's claims under Rules 12(b)(1) and 12(b)(6) for failure to meet the traceability element of Article III standing and failure to state a claim upon which relief can be granted. Alternatively, the Court should order SBT to provide a more definite statement concerning its allegations under Rule 12(e).

Respectfully submitted this 19th day of November, 2025.

s/Kathryn Marckworth
s/Joëlle Catherine Klein
Kathryn Marckworth, OSB # 246840
Joëlle Catherine Klein, WSBA #62184
Yakama Nation Office of Legal Counsel
P.O. Box 150, 401 Fort Road
Toppenish, WA 98948
(509) 865-5121
kate@yakamanation-olc.org
joelle@yakamanation-olc.org

s/Thomas Zeilman
Thomas Zeilman, WSBA #28470
Law Offices of Thomas Zeilman
32 N. 3rd St., Suite 310, P.O. Box 34
Yakima, WA 98907
(509) 575-1500
tzeilman@qwestoffice.net

*Attorneys for the Confederated Tribes and Bands of the Yakama Nation*

s/Garrett L. Brown
s/Joseph R. Pitt
Garrett L. Brown, OSB # 220554
Joseph R. Pitt, OSB #081134
Confederated Tribes of the Umatilla Indian Reservation
Office of Legal Counsel
46411 Timíne Way
Pendleton, OR 97801
(541) 429-7400
garrettbrown@ctuir.org
joepitt@ctuir.org

*Attorneys for Confederated Tribes of the Umatilla Indian Reservation*

s/Brent H. Hall
Brent H. Hall, OSB #992762
Hall Law P.L.L.C.
P.O. Box 945
Walla Walla, WA 99362
(541) 215-0404

JOINT MOTION TO DISMISS SHOSHONE-
BANNOCK TRIBES' FIRST AMENDED
COMPLAINT OR, ALTERNATIVELY, MOTION
TO PROVIDE MORE DEFINITE STATEMENT          26

Brent@bhhall.com

*Attorney for the Confederated Tribes of the Warm Springs Reservation*

s/Jane Steadman
s/Laura Boyer
Jane Steadman, OSB #101540
Laura Boyer, CSB #56764*
Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 640
Seattle, WA 98104
(206) 344-8100
jsteadman@kanjikatzen.com
lboyer@kanjikatzen.com

*Pro hac vice*

s/David James Cummings
s/Geoffrey Whiting
David James Cummings, OSB #92269
Geoffrey Whiting, OSB #954544
Nez Perce Tribe
Office of Legal Counsel
(208) 843-7355
djc@nezperce.org
gwhiting@frontier.com

*Attorneys for Nez Perce Tribe*

JOINT MOTION TO DISMISS SHOSHONE-
BANNOCK TRIBES' FIRST AMENDED
COMPLAINT OR, ALTERNATIVELY, MOTION
TO PROVIDE MORE DEFINITE STATEMENT       27

**CERTIFICATE OF SERVICE**

I, Joëlle Klein, hereby certify that on November 19, 2025, I electronically filed the foregoing with the Clerk of the Court and upon all parties in this matter whose names appear on the official service list as registered in the Court's CM/ECF filing system, using the CM/ECF system.

DATED this 19th day of November, 2025.

s/*Joëlle Catherine Klein*
Joëlle Catherine Klein, WSBA #62184
Yakama Nation Office of Legal Counsel
P.O. Box 150, 401 Fort Road
Toppenish, WA 98948
(509) 865-5121
joelle@yakamanation-olc.org