# APPENDIX

to

Stevens-Palmer Treaty Tribes' Joint Motion to Dismiss
Shoshone-Bannock Tribes' First Amended Complaint

| **Historical Docket Entry** | **Attachment** |
| --- | --- |
| Dkt. 89, Pre-Trial Order | Attachment 1 |
| Dkt. 104, 1969 Decree/Judgment | Attachment 2 |
| Dkt. 181, 1974 Amendment | Attachment 3 |

# ATTACHMENT 1

# **Dkt. 89, Pre-Trial Order**

(February 24, 1969)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,
Plaintiff,
vs.
STATE OF OREGON,
Defendant,
vs.
THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON; CONFEDERATED TRIBES & BANDS OF THE YAKIMA INDIAN NATION; CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION; and NEZ PERCE TRIBE OF IDAHO,
Intervenors,

Civil No. 68-513

PRETRIAL ORDER

RICHARD SOHAPPY; ALECK SOHAPPY; DAVID SOHAPPY; MYRA SOHAPPY; CLARA S. SOHAPPY; JAMES ALEXANDER; JAMES ALEXANDER, JR.; LEO ALEXANDER; CLIFFORD ALEXANDER; HENRY J. ALEXANDER; ANDREW JACKSON; ROY WATLAMET; SHIRLEY McCONVILLE and CLARENCE TAHKEAL,
Plaintiffs,
vs.
McKEE A. SMITH, EDWARD G. HUFFSCHMIDT, J.I. EOFF, Commissioners, Oregon Fish Commission; ROBERT W. SCHONING, Director, Oregon Fish Commission; their agents, servants employees and those persons in active concert or participation with them; JOHN W. McKEAN, Director, Oregon Game Commission; his agents, servants, employees and those persons in active concert or participation with him,
Defendants.

Civil No. 68-409

PRETRIAL ORDER

The attorneys for the parties are as follows:

Attorneys for United States of America:

Sidney I. Lezak
United States Attorney
Michael L. Morehouse
Assistant United States Attorney
District of Oregon
506 United States Courthouse
Box 71
Portland, Oregon 97207
Telephone: 226-3361 Ext. 1531

George D. Dysart
Assistant Regional Solicitor
United States Department of Interior
P. O. Box 3621
Portland, Oregon 97208
Telephone: 234-3361 Ext. 502

Attorney for Yakima Indian Nation:

James B. Hovis
P. O. Box 433
Yakima, Washington 98902
Telephone: GL 3-3165

Attorneys for Warm Springs Tribe:

Owen M. Panner
David F. Berger
1026 Bond Street
Bend, Oregon 97701
Telephone: 382-3011

Attorneys for Umatilla Tribe:

Mark C. McClanahan
Dean D. DeChaine
King, Miller, Anderson, Nash & Yerke
1200 American Bank Building
Portland, Oregon 97205
Telephone: 226-2431

Attorneys for Nez Perce Tribe of Idaho:

Arthur Lazarus, Jr.
1700 K Street N. W.
Washington, D. C. 20006
Telephone: 296-3201

Robert C. Strom
Box 155
Craigmont, Idaho 83523
Telephone: WA 4-5671

John T. Lewis
Box 306
The Dalles, Oregon 97058
Telephone: 296-5474

Attorneys for Plaintiffs in No. 68-409

Robert A. Bennett
Willner, Bennett & Leonard
900 Corbett Building
Portland, Oregon 97204
Telephone: 228-2117

Jack Greenberg
Melvyn H. Zarr
National Office for the Rights of the Indigent
10 Columbus Circle
New York, New York 10019
Telephone: 586-8397

David R. Hood
MacDonald, Hoague & Bayless
1500 Hoge Building
Seattle, Washington 98104
Telephone: 622-1604

Donald J. Horowitz
Farris, Bangs & Horowitz
1605 IBM Building
Seattle, Washington 98101
Telephone: 624-8515

Ralph W. Johnson
School of Law
University of Washington
Seattle, Washington 98105
Telephone: 543-4938

Attorneys for Defendants in both cases:

Robert Y. Thornton
Attorney General
George S. Woodworth
Henry Kane
Assistant Attorneys General
469 State Office Building
Portland, Oregon 97201
Telephone: 226-2161 Ext. 359

Roy C. Atchison
Assistant Attorney General
1634 S. W. Alder Street
Portland, Oregon 97208
Telephone: 222-9611

As the result of pretrial conferences heretofore held at which each of the parties listed in the titles to these consolidated cases was represented by his or its respective counsel, the following issues of fact were framed and exhibits identified.

## STATEMENT OF JURISDICTION
## NATURE OF PROCEEDINGS

These proceedings have been consolidated by the court for trial. No. 68-513 is hereinafter sometimes called "United States vs. Oregon." No. 68-409 is hereinafter sometimes called "Sohappy vs. Smith." Intervenors are hereinafter sometimes referred to as follows: The Confederated Tribes of the Warm Springs Reservation of Oregon is called "Warm Springs Tribe"; Confederated Tribes & Bands of the Yakima Indian Nation is called "Yakima Tribe"; Confederated Tribes of the Umatilla Indian Reservation is called "Umatilla Tribe"; and Nez Perce Tribe of Idaho is called "Nez Perce Tribe."

United States vs. Oregon is an action for declaratory judgment that certain of the intervenor tribes own and may authorize their members to exercise certain treaty rights to fish for commercial and other purposes at their usual and accustomed places on the Columbia River and its tributaries, that the exercise of such treaty rights is subject to regulation by the State of Oregon only under certain conditions and after establishment of certain facts, and that certain attempted regulations thereof by the State of Oregon violate said treaty rights and are, therefore, void. Sohappy vs. Smith is an action for a declaratory judgment by certain members of the Yakima Tribe against the members of the Fish Commission of the State of Oregon, hereinafter called the "Fish Commission," and the Directors of the Fish Commission and Oregon State Game Commission, hereinafter called the "Game Commission," to establish the standards governing defendants' future regulation of said plaintiffs' fishing at their usual and accustomed fishing places on the Columbia River and to declare certain attempted regulations as violations of their treaty rights and, therefore, void. In both actions, the

plaintiffs also seek injunctions pendente lite and permanently against the alleged improper attempts at regulation, any additional relief to which they may be entitled, including cost award, and they ask the court to retain jurisdiction of the actions.

In United States vs. Oregon, jurisdiction is invoked pursuant to 28 USC Section 1345 by reason of the fact that the United States is plaintiff. Jurisdiction in both cases is also invoked pursuant to the provisions of 28 USC Section 1331(a), relating to federal questions, and declaratory judgments are sought pursuant to 28 USC Section 2201. The matter in controversy exceeds the value of $10,000, exclusive of interest and costs.

AGREED FACTS

The following facts have been agreed upon by the parties and require no proof:

Identification of Tribes

1. The Yakima Tribe is a party to the Treaty of June 9, 1855, ratified March 8, 1859, and proclaimed April 18, 1859, 12 Stat 951. It is a recognized tribe or community of Indians composed of the tribes and bands consolidated into the Yakima Nation by that treaty. It maintains a tribal government and the ownership of tribal property. Its membership is determined in accordance with the provisions of the Act of August 9, 1946 (60 Stat 968, 25 USC Section 601 to 607). It presently has approximately 5,609 enrolled members. Approximately 4,065 members live on the Yakima Indian Reservation and approximately 1,544 live elsewhere.

2. The Warm Springs Tribe is a party to the Treaty of June 25, 1855, ratified March 8, 1859, proclaimed April 18, 1859, 12 Stat 963. It is a recognized tribe or community of Indians chartered by the Secretary of the Interior under Section 16 of the Indian Reorganization Act of June 18, 1934 (48 Stat 987, 25 USC

Section 476) and has a constitution and bylaws adopted pursuant to said Act and approved by the Secretary of the Interior, and includes the Confederated Tribes and Bands of Middle Oregon, confederated by that treaty. Its membership is determined by its constitution and bylaws. It presently has approximately 1,809 enrolled members, of whom approximately 1,400 live on or adjacent to the Warm Springs Indian Reservation.

3. The Umatilla Tribe is a party to the Treaty of June 9, 1855, ratified March 8, 1859, proclaimed April 11, 1859, 12 Stat 945. It is a recognized tribe or community of Indians composed of the Walla Walla, Cayuse and Umatilla tribes, confederated by that treaty. It is organized under a constitution and bylaws approved by the Secretary of the Interior and maintains a tribal government and the ownership of tribal property. Its membership is determined by its constitution and bylaws. It presently has approximately 1,270 enrolled members, of whom approximately 678 live on or adjacent to the Umatilla Indian Reservation.

4. The Nez Perce Tribe is a party to the Treaty of June 11, 1855, ratified March 8, 1859, proclaimed April 29, 1859, 12 Stat 957. It is a recognized tribe of Indians and has a constitution and bylaws approved by the Secretary of the Interior. Its membership is determined by its constitution. It presently has approximately 2,364 members, of whom approximately 50 percent live on the present Nez Perce Indian Reservation.

5. The United States brings United States v. Oregon on its own behalf and on behalf of the Yakima Tribe, Umatilla Tribe and Nez Perce Tribe. Said tribes and the Warm Springs Tribe intervene therein in their tribal capacities asserting they are the owners and possessors of the fishing rights, privileges and immunities conferred by the above-described treaties and the representative of their members who, in accordance with tribal law and custom,

have always exercised and do exercise such fishing rights, privileges and immunities.

Parties in Sohappy v. Smith

6. Plaintiffs Richard Sohappy, Aleck Sohappy, David Sohappy, Myra Sohappy, Clara S. Sohappy, James Alexander, Leo Alexander, Clifford Alexander, Henry J. Alexander, Andrew Jackson, Roy Watlamet, Shirley McConville and Clarence Tahkeal are enrolled members of the Yakima Tribe who assert for themselves as individuals fishing rights under the above-mentioned Yakima Treaty with respect to usual and accustomed fishing places on the Columbia River.

7. Defendants McKee A. Smith, Edward G. Huffschmidt and Joseph I. Eoff are the duly appointed, qualified and acting members of the Fish Commission which is an agency of the State of Oregon with authority to carry out the purpose and intent of the laws of Oregon pertaining to commercial fishing and the propogation, distribution, protection and promotion of food fish. Defendant Robert W. Schoning is the duly appointed, qualified and acting Director of the Fish Commission.

8. At the time of filing these actions, P. W. Schneider was the duly appointed, qualified and acting Director of the Game Commission. Defendant John W. McKean is presently, and since February 1, 1969, has been, the duly appointed, qualified and acting Director of said Commission. Said Commission is an agency of the State of Oregon with authority to carry out the purpose and intent of the laws of Oregon pertaining to sports fishing and the propogation, distribution, protection and promotion of game fish.

Treaty Fishing Rights

9. The use of the phrase "tribes and its members" herein shall not be construed determinative of the question as to whether or not treaty fishings rights are tribal or individual,

or both. In June, 1855, the respective intervenor tribes and their members occupied and exercised control over large areas of land in central and eastern Washington and Oregon and in Idaho. They used such lands in the manner of their culture, which was primarily a hunting, trapping, fishing and gathering culture. They derived an essential part of their livelihood from fishing for salmon and steelhead for personal consumption and for trade, sale and barter thereof.

10. Each of the treaties above described contained a provision securing to the Indians certain off-reservation fishing rights. The respective treaty provisions are as follows:

Umatilla Treaty (Article 1)

> "....the exclusive right of taking fish in the streams running through and bordering said reservation is hereby secured to said Indians, and at all other usual and accustomed stations in common with citizens of the United States, and of erecting suitable buildings for curing the same; the privilege of hunting, gathering roots and berries and pasturing their stock on unclaimed lands in common with citizens, is also secured to them."

Yakima Treaty (Article 3)

> "The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with the citizens of the Territory, and of erecting temporary buildings for curing them; together with the privileges of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land."

Nez Perce Treaty (Article 3)

> "The exclusive right of taking fish in all the streams where running through or bordering said reservation is further secured to said Indians; as also the right of taking fish at all usual and accustomed places in common with citizens of the Territory; and of erecting temporary buildings for curing, together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land."

Warm Springs Treaty (Article 1)

> "...the exclusive right of taking fish in the streams running through and bordering said reservation is hereby secured to said Indians; and at all other usual and accustomed stations, in common with citizens of the United States, and of erecting suitable houses for curing the same; also the privilege of hunting, gathering roots and berries, and pasturing their stock on unclaimed lands, in common with citizens, is secured to them."

Each of the intervenor tribes and their members had usual and accustomed fishing places in the Columbia River Basin in waters now under Oregon's jurisdiction, including areas upstream (east) from the confluence of the Deschutes River in Oregon and the Columbia River.

11. Subsequent to the execution of the treaties and in reliance thereon, the members of said four tribes have continued to fish for subsistence and commercial purposes at their usual and accustomed fishing places. Such fishing provided and still provides an important part of their subsistence and livelihood. Both prior to and subsequent to the treaties, the Indians used a variety of means to take fish, including various types of nets, weirs, spears and gaff hooks. The construction of Bonneville Dam in 1938 at River Mile 146.1 raised the Columbia River mean level approximately 59 feet. The Dalles Dam, constructed in 1957 at River Mile 191.5 raised the mean river level approximately 86 feet. John Day Dam, constructed in 1968 at River Mile 215.6 raised the mean river level approximately 105 feet. McNary Dam, constructed in 1953 at River Mile 292 raised the mean river level approximately 75 feet. In each case, such raising refers to the head water immediately behind the dam; from that point the extent by which the level is raised diminishes gradually to the end of the pool. The pool created behind each dam extends to, or practically to the base of the next higher dam. One or more of the intervenor tribes and their members had usual and accustomed fishing places in and along the original bed and shores of the river above and below Miller Island. They claim, in addition to certain locations described in Exhibit A20 (a) to (k) provided for them as "in lieu sites" pursuant

to the act of March 2, 1945, as amended (59 Stat 22, 69 Stat 85) fishing places in and along the present river boundaries. While the extent of present usual and accustomed treaty fishing places is in dispute among the parties, it is agreed that there are some usual and accustomed treaty fishing places at which members of intervenor tribes and plaintiffs in Sohappy vs. Smith have continued to fish, both above and below the mouth of the Deschutes River.

<u>Tribal Regulation</u>

12. From time to time each of the intervenor tribes, through their respective governing bodies, have purported to enact regulations governing the exercise by their respective members of the fishing rights secured by their treaties above Bonneville Dam. Said regulations apply to the times, places and manner of fishing. The current regulations for each tribe are included in the Pretrial Order Exhibits.

<u>State Regulation</u>

13. The Game Commission and the Fish Commission are charged by Oregon statutes with management of the fish resources of the State of Oregon. ORS 506.036 provides that the Fish Commission has exclusive jurisdiction over all fish within the waters of the state, except as provided in ORS 506.040. The latter provides that the Fish Commission has no jurisdiction over game fish, as defined in ORS 496.010. The Game Commission, by virtue of ORS 496.160, has jurisdiction over game fish in all the waters of the state. Under Oregon statutes, salmon and steelhead are game fish only when taken by anglers and are food fish otherwise.

14. By the Act of April 8, 1918 (40 Stat 515), Congress gave its consent to the Oregon-Washington Columbia River Compact which reads in full as follows:

"All laws and regulations now existing, or which may be necessary for regulating, protecting or preserving fish in the waters of the Columbia River, over which the States of Oregon and Washington have concurrent jurisdiction, or any other waters within either of said states, which would affect the concurrent jurisdiction, shall be made, changed, altered and amended in whole or in part, only with the mutual consent and approbation of both states." (ORS 507.010)

Pursuant to said Compact and the applicable state enabling legislation, the Fish Commission and the Director of the Washington Department of Fisheries periodically hold joint public hearings for the purpose of considering joint or substantially identical regulations to govern commercial fishing on the portions of the Columbia River and its tributaries which are under the concurrent jurisdiction of the two states. After approval of a resolution recommending the particular regulation by the affirmative vote of each of the two agencies (as the representatives of their respective states) each agency, in accordance with its own state laws, separately promulgates its own regulation to carry out the agreed upon recommendation. Regulations governing sport fishing on the portions of the Columbia River and its tributaries which are under the concurrent jurisdiction of the two states are promulgated separately by each state acting through its legislature, electorate, or appropriate regulatory agency.

15. On January 28, 1969, the Fish Commission announced establishment of a 16-day commercial fishing season in the lower Columbia River for spring Chinook extending from noon, February 19, to noon, March 7, 1969, with no mesh restrictions other than those normally in effect. This action was taken unilaterally by the Fish Commission without approval or concurrence by the State of Washington after the Commission and the Washington Department of Fisheries were unable to agree on terms of a winter season.

16. ORS 506.045 provides as follows:

> "There are excluded from the operation of ORS 506.136 to 506.156, 507.030, 508.025, 508.285, subsection (1) of 509.025, ORS 509.206 and 509.216, any Warm Springs, Umatilla, Yakima, Wasco, Tenino, Wyum and other Columbia River Indians affiliated with these tribes and entitled to enjoy fishing rights, who have not severed their tribal relations, in so far as it would conflict with any rights or privileges granted to such Indians under the terms of the treaties made by the United States with the Warm Springs Indians on June 25, 1855, and with the Umatilla and Yakima Indians on June 9, 1855."

17. From time to time various officers, agents or agencies of the State of Oregon have informally pursued policies of nonenforcement of certain state laws or regulations against treaty Indians, including those pertaining to seasons and areas of commercial fishing and the sale thereof. Treaty Indians were not required to purchase licenses to take or dispose of fish. In addition, as an example of the above-described informal policies, treaty Indians were allowed to fish for personal or Indian use and purposes during periods closed to commercial fishing and by means other than angling without prosecution or threat thereof.

18. Prior to 1957, the laws and regulations of the State of Oregon applicable to all persons permitted commercial fishing on the Columbia River during prescribed open seasons generally from its mouth to its confluence with the Deschutes River, with certain limited exceptions in the vicinity of dams and the mouths of certain tributary streams. The mouth of the Deschutes River is located at approximately Columbia River Mile 204.1 as measured from the mouth of the Columbia. In 1957, following the filling of The Dalles Dam reservoir and the inundation of Celilo Falls, the most important treaty Indian fishing area, the Fish Commission and the Washington Department of Fisheries jointly agreed upon and separately promulgated regulations purporting to close the Columbia River to all commercial fishing above a deadline located five miles below Bonneville Dam at approximately river mile 141.1. By regulation each

of said agencies continued to provide for commercial fishing seasons of salmon and steelhead below said deadline. In addition, through the regulatory control which they have for fish landed in their respective states, said agencies continued to authorize by regulation the taking of substantial numbers of salmon for commercial purposes off-shore in the Pacific Ocean (ORS 506.146(4), (5) and (6)). Such pattern of regulation has continued to the present time, except for the changes in 1968 as described below.

19. By successive statutory enactment of the State of Oregon, dating back to 1901 (currently ORS 511.106(1)), the area under the jurisdiction of the State of Oregon east of the confluence of the Columbia and Deschutes Rivers has been completely closed to commercial fishing. Under the current statutes, including ORS 506.006(4), this closure applies to any fishing by any means other than angling as defined in ORS 506.006(1). It is the defendants' contention that these statutes are equally applicable to treaty Indians and other persons except insofar as their applicability to members of the Umatilla Tribe is prohibited by the judgments of this court in the case of Confederated Tribes of the Umatilla Indian Reservation, et al, vs. Maison, et al, Civil No. 77-59.

20. In 1961, an informal memorandum of agreement was entered into between the Fish Commission, the Washington Department of Fisheries, the Warm Springs Tribe and the Umatilla Tribe. Said memorandum of agreement and interpretive letters are included in Exhibit A23 (a) to (f). Generally, it provided for commercial fishing by dip nets above Bonneville Dam to the mouth of the Deschutes River and for use of such gear for subsistence fishing above that point. The Yakima Tribe and Nez Perce Tribe did not adhere to or enter into said agreement. Said agreement was not officially approved by any official of the United States of America. No action was taken by any party thereto to cancel or withdraw from said memorandum of agreement until July 10, 1965, when the

Washington Department of Fisheries, by letter given pursuant to the preamble of said memorandum agreement, notified the other parties thereto that it was withdrawing from the agreement. (Exhibit A23(f).)

21. Following the decision of the Supreme Court of the United States in the case of Puyallup Tribe v. Department of Game, et al (May 27, 1968) 391 US 392, and as a direct result thereof, the Fish Commission requested recommendations from its biology staff on a commercial fishery season for sockeye salmon which, without endangering the needed escapement of sockeye salmon above all commercial fishing, would provide for a commercial fishery season for sockeye salmon on the Columbia River above Bonneville Dam. No recommendations were made for any commercial fishery season above the mouth of the Deschutes River. One of the reasons for the above limitation on such recommendations was ORS 511.106(1). Since the original enactment of the statutory predecessor of ORS 511.106(1), no consideration has been given by members or employees of the Fish Commission to establishing a commercial salmon and steelhead fishery above the mouth of the Deschutes River.

22. On June 20, 1968, the Fish Commission and Washington Department of Fisheries held an emergency public hearing and meeting for the stated purpose of acting on said recommendations and establishing a commercial fishery season for sockeye salmon above Bonneville Dam in addition to the previously adopted season for below Bonneville Dam. Citing a June 18, 1968, opinion issued jointly by the Attorneys General of Oregon, Washington and Idaho (Exhibit A28) construing the decision of the Supreme Court in the Puyallup case, the acting chairman of the joint meeting, the Director of the Washington Department of Fisheries, announced that, upon legal advice, any state authorization of fishing above Bonneville Dam must be applicable equally to all persons, Indian and non-Indian, and that "all state laws must be adhered to." This policy still exists.

23. Following the hearing of June 20, 1968, said two state agencies agreed upon, and thereafter on June 21, 1968, separately issued, regulations adding a summer sockeye season above Bonneville Dam consisting of a six-day season for commercial fishing between Bridge of the Gods and the lower end of Miller Island (at the mouth of the Deschutes River) with gear limitations designed to confine the fishing essentially to the taking of sockeye salmon. The Oregon regulation was promulgated as Fish Commission Order FC-180, consisting of enactments of Section 625-10-835 through 625-10-840, Oregon Administrative Rules. On July 25, 1968, following a further hearing called jointly by the Oregon Fish Commission and the Washington Department of Fisheries to consider regulations for a fall Columbia River fishing season both above and below Bonneville Dam the Fish Commission promulgated orders FC-181 and FC-182, amending Sections 625-10-760, 625-10-775 and 625-10-840 and enacting Section 625-10-850, Oregon Administrative Rules. Again the upper limit of permitted commercial fishing was the lower end of Miller Island. The commercial fishing permitted by FC-180, 181 and 182 was not restricted to any particular locations or usual and accustomed fishing places and was open generally to all persons, Indian and non-Indian alike. Section 625-10-750 OAR, previously promulgated by the Fish Commission states that it is unlawful to take food fish from the Columbia River, its sloughs or tributaries except as authorized by statute or commission regulation.

24. In adopting and enforcing ORS 511.106(1), OAR 625-10-750, FC-180, FC-181 and FC-182, and generally in carrying out Oregon's regulatory scheme of the fish resources of the Columbia River and its tributaries, and in enforcing the same, defendants:

(a) Refuse to deal with the fishing by the beneficiaries of the above-described treaties as a separate subject when formulating regulations to govern the taking of fish.

(b) Deny that such treaty rights invest the beneficiaries thereof with any privileges and immunities other than those which defendants choose to accord to citizens generally.

(c) Contend and assert that they have no obligation or authority to recognize or allow any manner of exercise of the right or its exercise during any time, at any place or for any purpose, which defendants do not also allow to other persons.

(d) Refuse to attempt to so regulate the fishing in the Columbia River and its tributaries as to accord the beneficiaries of such treaty rights an opportunity to catch, at their usual and accustomed places, and by reasonable means feasible to them, a fair and equitable portion of the fish which are available for harvesting from a particular run consistent with adequate escapement for spawning and reproduction.

In adopting their regulations and enforcing the same, defendants have proceeded and threaten to continue to proceed on the foregoing premises.

25. Defendants and various of their officers and agents, claiming to act in their official capacities on behalf of the State of Oregon, have threatened to seize nets and other properties of members of certain of the intervenor tribes, and have threatened to cause said members to be arrested and prosecuted for violating any state laws and regulations pertaining to fishing for, taking of, or possession of fish if in violation of statutes and regulations adopted pursuant to the foregoing premises.

26. The tribes and United States of America are unable to be a party to criminal cases brought for the violation of said statutes and regulations and are without an adequate remedy at law or any remedy at law whatsoever to assert and enforce the fishing

rights reserved pursuant to said treaties. The individual members of the tribes are without an adequate remedy at law to enforce their rights to fish in accordance with tribal law or custom because: (a) the treaty rights that are asserted are unique and the damages which have been or will be sustained are not susceptible of definite monetary determination; and (b) in the case of criminal prosecutions said Indians have no remedy at all except at the risk of suffering fines, imprisonment and confiscation of property involving a multiplicity of legal proceedings.

27. An actual controversy exists between plaintiffs and each of them and intervenors on the one hand and defendants on the other as to the nature and extent of the treaty fishing rights of the tribes and their members and the attempted regulation thereof by defendants.

Conservation Matters

28. In considering the problem of salmon and steelhead conservation in the Columbia River and its tributaries, it is necessary to consider the entire Columbia River system. The off-shore fishery in the Pacific Ocean has some effect on the numbers of fish that enter the river. The salmon and steelhead that enter the Columbia River are anadromous fish and spend much of their adult lives in the Pacific Ocean. Therefore, they must pass as fingerlings down the Columbia River to the sea; and as adults they must pass up the Columbia River into the particular tributary or area where they spawn.

29. Since 1855 there has been a decline in the salmon and steelhead runs of the Columbia River system destined to spawn above the location of Bonneville Dam. Such decline has been caused principally by alterations in the natural environment of the Columbia River and its tributaries by construction of dams, appropriation of water for irrigation, unscreened irrigation ditches, pollution and

the like. Other factors include catches of fish by commercial and sports fishermen. Commencing in 1933 the Federal Government has constructed a number of major dams on the Columbia and Snake Rivers. A private dam, Rock Island, had been constructed prior to that time and several nonfederal dams have been constructed since 1950. At the present time the following dams are in existence or under construction on the Columbia River at the river mile indicated:

| | |
|---|---|
| Bonneville Dam | 146.1 |
| The Dalles Dam | 191.5 |
| (Mouth of Deschutes River | 204.1) |
| John Day Dam | 215.6 |
| McNary Dam | 292.0 |
| (Mouth of Snake River | 324.3) |
| Priest Rapids Dam | 397.1 |
| Wanapum Dam | 415.0 |
| Rock Island Dam | 453.4 |
| Rocky Reach Dam | 474.5 |
| Wells Dam | 516.6 |
| Chief Joseph Dam | 545.1 |
| Grand Coulee Dam | 596.6 |

On the lower and middle Snake River there are:

| | (Miles from mouth of Snake River) |
|---|---|
| Ice Harbor Dam | 9.7 |
| Lower Monumental Dam | 41.6 |
| Little Goose Dam | 70.3 |
| Lower Granite Dam | 107.5 |
| Hells Canyon Dam | 247.0 |
| Oxbow Dam | 273.0 |
| Brownlee Dam | 285.0 |

All dams downstream from (but not including) Chief Joseph Dam and Hells Canyon Dam have facilities for the upstream fish ladder passage of anadromous fish, which work with varying success.

30. Since 1963, in establishing the times and manner of commercial fishing to be permitted under regulations issued by it with respect to the Columbia River, the Fish Commission has set an "escapement goal" for most runs of fish which goal is defined as the estimated numbers of fish which must escape above all commercial fishing in order that, considering all factors which influence the matter above that point, the greatest aggregate numbers of fish from such fish run will be produced and return down the Columbia to the Pacific Ocean. Thus, in establishing the escapement goal for a particular run the Fish Commission and its biological staff consider the losses which will occur above the escapement goal point from all causes, including natural causes, losses at dams and the sports catch on the upstream and tributaries in Oregon, Washington and Idaho. All the estimated numbers of fish in a given run in excess of the escapement goal are regarded by the Fish Commission as harvestable.

31. In the past 32 years, in general, the troll catch in the Pacific Ocean (which includes Columbia River salmon) has been stable. For the past 20 years, in general, the sports catch of Columbia River salmon and steelhead has increased. Under present regulations of the Game Commission, the entire length of the Columbia and the Snake rivers subject to Oregon's jurisdiction and many of the tributary streams thereto subject to such jurisdiction are open to angling for salmon and steelhead throughout the year except during such emergency closures as have been invoked in specific years to protect specific fish runs that were deemed to be in particularly serious condition as regards achieving adequate spawning escapement for perpetuation of the resource. In some tributaries, various open seasons are established.

32. Exhibit A32 is a joint statement prepared by fish biologists of the Fish Commission and of the United States Department of the Interior pertaining to certain conservation data and considerations with respect to the Columbia River salmon and steelhead runs. Said statement may be regarded as testimony and defendants will submit the Fish Commission authors and the United States will submit the Department of the Interior authors for cross examination.

JOINT CONTENTIONS OF ALL PLAINTIFFS AND INTERVENORS

1. Before the State of Oregon is entitled to regulate the taking and disposition of fish by Indians at usual and accustomed fishing places pursuant to treaties between the respective tribes and the United States:

(a) It must establish preliminary to regulation that the specific proposed regulation is both reasonable and necessary for the conservation of the fish resource. In order to be necessary, such regulations must be the least restrictive which can be imposed consistent with assuring the necessary escapement of fish for conservation purposes; the burden of establishing such facts is on the state.

(b). Its regulatory agencies must deal with the matter of the Indians' treaty fishing rights as a subject separate and distinct from that of fishing by others. As one method of accomplishing conservation objectives it may lawfully restrict or prohibit non-Indians' fishing at the Indians' usual and accustomed fishing places without imposing similar restrictions on treaty Indians.

(c) It must so regulate the taking of fish that the treaty tribes and their members will be accorded an opportunity to take, at their usual and accustomed fishing places, by reasonable means feasible to them, a fair and equitable share of all fish which it permits to be taken from any given run.

2. ORS 511.106(1), 506.006(4), and FC-180, FC-181 and FC-182 (Oregon Administrative Rules, Sections 10-750, 10-760, 10-775, 10-835, 10-840 and 10-850, Title 625) may not, consistently with the Supremacy Clause of the United States Constitution, be

applied so as to prevent members of the tribes entitled to exercise off-reservation fishing rights from taking fish for subsistence and commercial purposes at their usual and accustomed fishing places on the Columbia River or its tributaries east of its confluence with the Deschutes River, because such application of said statutes and regulations is not reasonable and necessary for conservation and constitutes an arbitrary and unreasonable total prohibition against the exercise of such treaty rights. In addition, such application of said regulations violates ORS 506.045.

3. It is possible by regulation to effect an allocation of the harvestable fish in a given run between (1) the Indian treaty commercial fisheries, (2) the Indian treaty subsistence fishery, (3) a general population sports fishery and (4) the below Bonneville general population commercial fishery. As a result of geographic, gear, economic and other factors, the establishment of regulations governing the seasons and gear for commercial fishing frequently effect such allocation.

4. The practical results of defendant's refusal to deal with the matter of Indians' treaty fishing as a separate and distinct matter and to have as an objective of regulations that the treaty Indians shall have an opportunity to catch, at their usual and accustomed fishing places, by reasonable means feasible to them, a fair and equitable portion of the total number of fish available for harvesting from a particular run include the following:

(a) In many instances such refusal allows all or substantially all the harvestable fish from a given run to be taken by those with no treaty rights before such runs ever reach the usual and accustomed fishing places to which the treaties apply. Thereby defendants allocate for the benefit of those with no treaty rights an unreasonable share of a valuable resource and solely by their regulatory scheme place themselves in a position

enabling them to assert and present evidence that by the time such runs reach such usual and accustomed fishing places it has become necessary for conservation to prevent or unreasonably restrict further harvesting of the fish in commercial quantities.

(b) As between the tribes entitled to exercise off-reservation treaty rights, and through a similar process, defendants discriminate between the differing usual and accustomed fishing places and, by that fact, between the members of the different tribes.

5. Defendants have not undertaken, or caused to be undertaken, any studies, research or experimentation of the extent to which it is necessary for defendants to restrict the exercise of fishing rights secured to Indian tribes by treaties of the United States; or, if they have, they have not introduced the results thereof in any hearing or public proceeding at which state fishing laws or regulations were considered and enacted.

6. In devising, adopting and promulgating the regulations by which they authorize the taking of fish for commercial or sports purposes by persons subject to their jurisdiction, and in establishing and carrying out fishery management policies and programs and determining conservation objectives, defendants have not given recognition to, or proper allowance for, rights secured to the tribes entitled to exercise off-reservation fishing rights by treaties of the United States.

7. As a result of said wrongful acts of defendants the tribes and their members are being unlawfully deprived of their treaty rights, privileges and immunities and have suffered and will continue to suffer irreparable damage.

8. Plaintiffs and intervenors are entitled to a judgment of this court declaring that the tribes and the members entitled

to exercise off-reservation treaty rights have a right derived from treaties of the United States to take fish at their usual and accustomed fishing places on the Columbia River and its tributaries wherever located which right is distinct from any right or privilege of other individuals to take fish derived from common law or state authority and the exercise of which is subject to state control only through statutes or regulations which have met the tests described in Contention No. 1 above; declaring that ORS 511.106(1) and 506.006(4) and FC-180, FC-181 and FC-182 (Oregon Administrative Rules 625-10-750, 10-760, 10-775, 10-835, 10-840 and 10-850) cannot be applied so as to preclude the exercise of treaty fishing rights easterly and upstream from the upper limits from the Bonneville-Celilo fishing area (lower end of Miller Island); and declaring that said listed regulations are in violation of ORS 506.045.

9. The United States, the intervenor tribes and their members are entitled to an injunction enjoining defendants, their officers, agents and employees, from enforcing the provisions of ORS 511.106(1) and 506.006(4) and Oregon Administrative Rules 625-10-750, 10-760, 10-775, 10-835, 10-840 and 10-850 in such manner as to prevent or restrict members of the treaty tribes from taking fish at their treaty usual and accustomed fishing places on the Columbia River or its tributaries pursuant to the treaties between those tribes and the United States.

10. The United States, the intervenor tribes and their members are entitled to an injunction enjoining defendants, their officers and employees, from enforcing the provisions of state laws or regulations in such manner as to prevent or restrict members of the treaty tribes from taking fish at their treaty usual and accustomed fishing places on the Columbia River and its tributaries pursuant to the treaties between those tribes and the United States without

(a) Previously having established that the imposition of state regulations is necessary for the conservation of fish, and

(b) Implementing a regulatory scheme which does not violate the standards adjudicated in accordance with Contention No. 1, above.

11. The court should grant such further and additional relief to plaintiffs and intervenors as they may be entitled to, award plaintiffs and intervenors the costs of this action and retain jurisdiction for the purpose of enforcing the judgment of this court.

12. Plaintiffs and intervenors deny each of defendants' contentions except that

(a) With respect to defendants' contentions No. 1 through 7, said parties admit that as regards state regulation, the only sense in which the treaties secure to the treaty Indians any different, superior or exclusive rights to fish at their usual and accustomed fishing places outside their reservations than are possessed by the general population is that the treaties require any restrictions sought to be imposed by the states on such treaty Indians to meet the "necessary for conservation" test and other standards described in their Joint Contention No. 1 above whereas the states are free to and have adopted less stringent standards for imposing restrictions on the general population.

(b) The intervenor tribes and the plaintiffs in Sohappy vs. Smith have not made contentions in relation to defendants' contentions No. 8 through 19 pending amendments to this pretrial order made pursuant to its terms.

SEPARATE CONTENTIONS OF PLAINTIFF UNITED STATES

1. The court lacks jurisdiction to consider as a claim or counterclaim in this action Defendants' Contentions No. 15 and 19, and neither the United States nor the intervenor tribes have consented to be sued on said claims.

DEFENDANTS' CONTENTIONS

1. By virtue of the treaties entered into between the United States and the intervenor tribes, the fishing rights reserved to said tribes were those of fishing at usual and accustomed fishing places in common with citizens of the then territories of Oregon and Washington, on a non-exclusive basis, and subject to regulation by the State of Oregon for conservation purposes.

2. The treaties entered into between the United States and the intervenor tribes did not guarantee or grant to the treaty tribes a special Indian right of fishing not made applicable to other citizens, other than right of access over private lands and exemption from payment of license fees.

3. The treaties entered into between the United States and the intervenor tribes did not grant or reserve to the treaty tribes a right to fish at usual and accustomed fishing places by means not available to or permitted to other citizens.

4. The treaties entered into between the United States and the intervenor tribes did not reserve to the treaty tribes a "fair" or any share of any run of fish in the waters of the Columbia River and its tributaries outside the boundaries of a tribal reservation.

5. The State of Oregon is not required to consider fishing by members of tribes as a separate subject when formulating regulations to govern the taking of fish in the Columbia River and its tributaries.

6. Indians claiming treaty fishing rights do not have an exclusive right to fish at their usual and accustomed fishing places outside the reservations to the exclusion of non-Indians.

7. The State of Oregon would violate the Fourteenth Amendment to the United States Constitution and Section 20 of the Bill of Rights of the Constitution of Oregon by granting Indians claiming

treaty fishing rights, rights to fish not granted to non-Indians.

8. The treaty fishing rights claimed by and for the intervenor tribes are communal tribal rights and are not rights which may be asserted in behalf of individual members of said tribes.

9. The usual and accustomed fishing places referred to in said treaties are specific sites, as distinct from broad stretches of the Columbia River and its tributaries, no longer exist for the reason that said fishing places were inundated and destroyed by the backwaters created by Bonneville Dam, The Dalles Dam, John Day Dam, the now inundated Cascade Locks and The Dalles-Celilo Canal on the Oregon side of the Columbia River, are at present under as much as 80 feet of water, and are covered in part by broad stretches of earth and rock fill now composing the roadbed of relocated railroads and highways on the Oregon and Washington sides of the Columbia River, all of which has destroyed and rendered unuseable such usual and accustomed fishing places for fishing purposes.

10. The backwaters created by Bonneville Dam, The Dalles Dam, John Day Dam and McNary Dam have raised the Columbia River above the levels existing at the time said treaties were entered into, therefore the fishing places claimed by the plaintiff and the plaintiffs in intervention to be the said usual and accustomed fishing places on the Columbia River and its tributaries are not the fishing places referred to in said treaties.

11. Treaty tribes claiming Indian treaty fishing rights on the Columbia River accepted compensation totaling some $27 million from the federal government for inundation and destruction of the usual and accustomed fishing places that were the subject of said treaties, and the plaintiff and the plaintiffs in intervention are estopped to claim a treaty right to fish at usual and accustomed fishing places by reason thereof.

12. The Yakima Indians and other Indian tribes claiming Indian treaty fishing rights on the Columbia River accepted compensation in the form of in lieu sites from the federal government for inundation and destruction of usual and accustomed fishing places by backwaters of the Bonneville Dam (Act of March 2, 1945, 59 Stat 22, as amended by the Act of June 8, 1955 (69 Stat 85)); therefore said in lieu sites are not the usual and accustomed fishing places that were the subject of said treaties.

13. The State of Oregon denies that the Nez Perce Tribe had usual and accustomed fishing places on the Columbia River and on tributaries thereof, including the area upstream (east) from the confluence of the Deschutes River in Oregon and the Columbia River, outside of the lands ceded by the Nez Perce Tribe to the United States.

14. Subject to the provisions of the Oregon-Washington Columbia River Fish Compact ratified by Congress, 40 Stat 515, the State of Oregon has the exclusive power to regulate fishing by Indians claiming treaty fishing rights and persons not claiming Indian treaty fishing rights, on waters within the boundaries of the State of Oregon which are outside the reservation of the respective tribes.

15. The Yakima Tribe, the Warm Springs Tribe, the Umatilla Tribe, and the Nez Perce Tribe do not have any authority to regulate off-reservation fishing by members of their respective tribes purporting to fish pursuant to said treaties, or to punish any of their members for violation of any rules or regulations purporting to regulate said off-reservation fishing rights.

16. The State of Washington is an indispensable party to this action pursuant to the Oregon-Washington Columbia River Fish Compact ratified by Congress, 40 Stat 515.

17. The fishing regulations promulgated by the Fish Commission and the Game Commission are based upon the best available biological, statistical and historical information.

18. The regulations challenged by the plaintiff and plaintiffs in intervention, Administrative Orders FC-181 and FC-182, are necessary for the protection and preservation of the runs of salmon in the Columbia River and its tributaries during the time periods involved.

19. Plaintiff United States of America has no authority to promulgate regulations, 25 CFR, Part 256, purporting to authorize regulation of off-reservation fishing by tribes claiming treaty fishing rights.

20. Defendants deny each of the "Joint Contentions of all Plaintiffs and Intervenors," and the separate contentions of the plaintiff United States.

EXHIBITS

Exhibits shall be classified as follows:

Group A - Pretrial Order Exhibits. Such exhibits are those listed as such in this pretrial order and lodged therewith. With the approval of the court, they are received in evidence without further order by the court but the parties reserve the right to contradict the same by other evidence.

Group B - Joint exhibits of all plaintiffs and intervenors.

Group C - Separate exhibits of plaintiff United States of America.

Group D - Separate exhibits of Warm Springs Tribe.

Group E - Separate exhibits of Yakima Tribe.

Group F - Separate exhibits of Umatilla Tribe.

Group G - Separate exhibits of Nez Perce Tribe.

Group H - Separate exhibits of plaintiffs in the Sohappy vs. Smith case.

Group I - Defendants' exhibits.

As to exhibits in Groups B through I, the parties agree with the approval of the court that not more than two weeks prior to the trial at which the same are offered such exhibits will be listed for identification, disclosed and marked, and inspection shall be allowed. Any objections to such exhibits shall be made at that time with separate objections being made to the identification and authenticity thereof. In the absence thereof the same may be received in evidence. Any objections not made at such time shall be deemed waived.

EXHIBIT GROUP A - PRETRIAL ORDER EXHIBITS

| | |
|---|---|
| A.1 | Letter from Governor Stevens to Indian Commissioner Manypenny. December 30, 1854, transmitting his first Treaty (Medicine Creek). |
| A.2(a) | Records of official proceedings, Indian Treaty Council, Walla Walla Valley, June 9-11, 1855 (with Yakima, Umatilla, Nez Perce Tribes). |
| A.2(b) | Letter of June 12, 1855, from Governor Stevens and Superintendent Palmer to Indian Commissioner Manypenny transmitting Nez Perce and Umatilla Treaties. |
| A.3 | Treaty with the Yakimas, June 9, 1855 (12 Stat 951). |
| A.4 | Treaty with the Walla Walla, Cayuse and Umatilla Tribes, June 9, 1855 (12 Stat 945). |
| A.5 | Treaty with the Nez Perce Tribe, June 11, 1855 (12 Stat 957). |
| A.6 | Report of the official proceedings of the Treaty Council with the Middle Oregon Tribes, June 22 to 25, 1855 (Warm Springs Tribe). |
| A.7(a) | Treaty with the Confederated Tribes and Bands of Middle Oregon, June 25, 1855 (longhand copy). |
| A.7(b) | Treaty with the Confederated Tribes and Bands of Middle Oregon, June 25, 1855 (printed copy) (12 Stat 963). |
| A.8 | Yakima Enrollment Act of August 9, 1946 (60 Stat 968). |
| A.9(a) | Constitution and bylaws, Confederated Tribes of the Warm Springs Reservation of Oregon. |
| A.9(b) | Amendment VIII amending section 2(a) of Article III of Warm Springs Constitution, with Departmental approval letters. |
| A.10 | Constitution and bylaws of the Confederated Tribes of the Umatilla Reservation. |
| A.11 | Revised Constitution and bylaws of the Nez Perce Tribe with Commissioner of Indian Affairs approval memorandum. |
| A.12 | Map, areas ceded under certain Pacific Northwest Indian treaties (also shows reservations). |
| A.13 | Excerpts from various historical accounts re early Indian fishing in Columbia basin. |
| A.14(a) | Report of Bureau of Indian Affairs Special Indian Agent George W. Gordon, January 12, 1889, with attached map. |
| A.14(b) | Overlay map showing fishing sites listed by Gordon, Columbia River area. |
| A.14(c) | None. |
| A.15 | "History and development of the fisheries of the Columbia River" by J. A. Craig and R. L. Hacker, U. S. Bureau of Fisheries Bulletin No. 32, 1940. |

| | |
|---|---|
| A.16 | "The Indian dip net fishery at Celilo Falls on the Columbia River" by R. W. Schoning, T. R. Merrill, Jr., and D. R. Johnson, Oregon Fish Commission Contribution No. 17, November 1951. |
| A.17 | Summary report on the Indian fishery at Celilo Falls and vicinity, Columbia River, 1947-1954, by U. S. Fish and Wildlife Service. |
| A.18(a) | Map, mid-Columbia Basin area. |
| A.18(b) | Overlay to map 18(a), state and tribal open commercial fishing areas. |
| A.18(c) | Area 1 inset to 18(a), state and tribal closed fishing areas. |
| A.18(d) | Area 2 inset to 18(a), state and tribal closed fishing areas. |
| A.18(e) | Area 3 inset to 18(a), state and tribal closed fishing areas. |
| A.18(f) | Area 4 inset to 18(a), state and tribal closed fishing areas. |
| A.18(g) | Area 5 inset to 18(a), state and tribal closed fishing areas. |
| A.18(h) | Area 6 inset to 18(a), state and tribal closed fishing areas. |
| A.18(i) | Area 7 inset to 18(a), state and tribal closed fishing areas. |
| A.18(j) | Area 8 inset to 18(a), state and tribal closed fishing areas. |
| A.18(k) | Area 9 inset to 18(a), state and tribal closed fishing areas. |
| A.19 | Excerpts from Act of March 2, 1945 (59 Stat 22) re in-lieu sites, Bonneville reservoir. |
| A.20(a) | Site description, Big White Salmon in-lieu site. |
| A.20(b) | Map for Big White Salmon in-lieu site. |
| A.20(c) | Site description, Wind River in-lieu site. |
| A.20(d) | Map for Wind River in-lieu site. |
| A.20(e) | Site description, Little White Salmon in-lieu site. |
| A.20(f) | Map for Little White Salmon in-lieu site. |
| A.20(g) | Site description, Lone Pine in-lieu site. |
| A.20(h) | Map for Lone Pine in-lieu site. |
| A.20(i) | Site description, Cascade Locks in-lieu site. |
| A.20(j) | Map for Cascade Locks in-lieu site. |
| A.20(k) | Map of Columbia River segment showing location of in-lieu sites. |
| A.21 | Act of June 30, 1954, re payment for Celilo inundation (68 Stat 330). |
| A.22(a) | Celilo inundation agreement with Yakima Tribe. |
| A.22(b) | Celilo inundation agreement with Umatilla Tribe. |

| | |
|---|---|
| A.22(c) | Celilo inundation agreement with Warm Springs Tribe. |
| A.22(d) | Celilo inundation agreement with Nez Perce Tribe. |
| A.22(e) | Corps of Engineers letter of March 26, 1957, regarding effect of The Dalles Dam on Indian fishing rights. |
| A.23(a) to A.23(f) | 1961 agreement among Fish Commission of Oregon, Washington Department of Fisheries, Umatilla Tribe and Warm Springs Tribe and Washington's withdrawal therefrom. |
| A.24 | Letter from Oregon State Game Commission to Nez Perce tribal attorney, June 20, 1961, re ORS 497.170. |
| A.25 | Interior Department Solicitor's Opinion re off-reservation Indian fishing rights of May 16, 1962, 69 I. D. 68. |
| A.26(a) to A.26(d) | Conservation regulations of Yakima (a), Umatilla (b), Warm Springs (c), and Nez Perce (d), Tribes with BIA letters of approval. |
| A.27 | Summary report "Indian fishery on Columbia River - 1964," E. M. Maltzeff, U. S. Bureau of Commercial Fisheries. |
| A.28 | Opinion of June 18, 1968, of Attorneys General of Oregon, Washington and Idaho re <u>Puyallup</u> decision. |
| A.29(a) | Regulations, Fish Commission of Oregon, excerpt from Chapter 10-625. |
| A.29(b) | Regulations, Fish Commission of Oregon, FC 180. |
| A.29(c) | Regulations, Fish Commission of Oregon, FC 181. |
| A.29(d) | Regulations, Fish Commission of Oregon, FC 182. |
| A.29(e) | Regulations, Fish Commission of Oregon, FC 187. |
| A.30 | Synopsis of Oregon Angling Regulations, 1969, Oregon State Game Commission. |
| A.31 | "Commercial fisheries of the Columbia River and adjacent ocean waters" by A. T. Pruter, U. S. Bureau of Commercial Fisheries (1968). |
| A.32 | "The Columbia River Fishery," a joint statement by biologists for Fish Commission of Oregon and U. S. Bureau of Commercial Fisheries February 20, 1969. |
| A.33(a) | 1967 Corps of Engineers Fish Passage Report, Columbia and Snake Rivers. |
| A.33(b) | Table from forthcoming 1968 Corps of Engineers Fish Passage Report. |
| A.34(a) | 1968 status report of the Columbia River commercial fisheries, Fish Commission of Oregon and Washington Department of Fisheries. |

A.34(b) Excerpts from 1967 status report as above (Spring Season).

A.35 "Regulation of commercial fishing gear and seasons on the Columbia River from 1859 - 1963" by Henry O. Wendler, from Washington Department of Fisheries Fisheries Research Papers, December, 1966.

A.36 "The effects on salmon populations of the partial elimination of fixed gear on the Columbia River in 1935" by D. R. Johnson, W. M. Chapman and R. W. Schoning from Oregon Fish Commission Contribution No. 11.

A.37 "Spawning areas and abundance of chinook salmon in the Columbia River basin, past and present" by Leonard A. Fulton, U. S. Fish and Wildlife Service, with maps. Special Scientific Report, Fisheries No. 571, 1968.

A.38 "Timing of Willamette River spring chinook salmon through the lower Columbia River," James A. Galbreath, Fish Commission of Oregon Research Briefs, June 1965.

A.39 "Trends in production rates for upper Columbia River runs of salmon and steelhead and possible effects of changes in turbidity" by C. O. Junge and A. L. Oakley, Fish Commission of Oregon Research Briefs, April 1966.

A.40 "Timing of tributary races of chinook salmon through the lower Columbia River based on analysis of tide recoveries," J. L. Galbreath, Fish Commission of Oregon Research Briefs, April 1966.

A.41 Oregon Game Commission Catch Statistics for Salmon and Steelhead.

A.42 Excerpts from Annual Report by Indian Agent R. R. Thompson, dated August 14, 1855.

A.43 Table of estimated distribution of maximum runs of salmon and steelhead trout to the Snake River System in percent and number. Prepared by Fish and Wildlife Task Force on Federal Power Commission hearing on High Mountain Sheep Dam.

A.44 Designated portions of deposition of Edward G. Huffschmidt taken December 19, 1968:

| From | | To | |
|---|---|---|---|
| Page | Line | Page | Line |
| 4 | 1 | 4 | 25 |
| 15 | 11 | 23 | 12 |

A.45 Designated portions of deposition of Robert W. Schoning taken December 19, 1968, and January 2, 1969:

| | From | | To | |
|---|---|---|---|---|
| | Page | Line | Page | Line |
| Vol I | 4 | 1 | 6 | 22 |
| | 19 | 14 | 26 | 18 |
| | 30 | 4 | 38 | 15 |
| | 50 | 5 | 55 | 1 |

| A.45 cont. | From Page | From Line | To Page | To Line |
|---|---|---|---|---|
| Vol II | 5 | 15 | 9 | 23 |
| | 11 | 9 | 12 | 20 |
| | 14 | 9 | 15 | 1 |
| | 34 | 2 | 37 | 20 |
| Vol III | 31 | 9 | 43 | 5 |
| | 44 | 11 | 67 | 1 |
| | 90 | 3 | 98 | 15 |
| | 102 | 1 | 108 | 7 |
| | 112 | 14 | 113 | 23 |
| | 116 | 14 | 119 | 16 |
| | 121 | 21 | 124 | 19 |
| | 131 | 14 | 133 | 18 |

A.46 Designated portions of deposition of Arthur L. Oakley taken January 3, 1969:

| From Page | From Line | To Page | To Line |
|---|---|---|---|
| 5 | 9 | 6 | 5 |
| 15 | 16 | 16 | 9 |
| 17 | 24 | 19 | 4 |
| 23 | 15 | 27 | 22 |
| 30 | 17 | 32 | 13 |
| 43 | 1 | 44 | 24 |
| 45 | 12 | 47 | 3 |
| 48 | 11 | 48 | 24 |
| 49 | 20 | 50 | 12 |
| 51 | 14 | 84 | 18 |
| 90 | 6 | 122 | 1 |
| 125 | 15 | 131 | 6 |
| 132 | 11 | 139 | 22 |
| 144 | 15 | 147 | 21 |

DISCOVERY

The entry of this Pretrial Order shall not preclude further discovery proceedings.

ACTION BY THE COURT

The court has ruled:

1. The motions of the four intervenor tribes to intervene in United States vs. Oregon were granted with the consent of the defendant. Thereafter on motion of the defendant the court struck from the complaint the allegation that the action was brought also on behalf of "all other tribes similarly situated."

2. In both actions the court ruled that the case was not required to be heard by a three-judge court pursuant to 28 USC, Section 2281.

3. In both actions the court held that the State of Washington is not an indispensable party and that the action should proceed among the parties before it. (See Defendants' Contention No. 16.)

4. In Sohappy vs. Smith the court held that the plaintiffs therein had standing to sue as individuals and therefore denied the defendants' motion to dismiss based on alleged lack of standing.

5. In Sohappy vs. Smith the court ruled that it was not deprived of jurisdiction by the Eleventh Amendment to the Constitution of the United States.

6. In United States vs. Oregon the court has under advisement the plaintiff's motion to dismiss for lack of jurisdiction and consent to suit the defendants' counterclaim against the United States challenging the authority of the United States to issue the regulations in 25 CFR Part 256, and of the tribes to adopt regulations governing off-reservation fishing of their members. (See Defendants' Contentions No. 15 and 19.)

TRIAL

1. No demand for jury trial has been made.

2. There are segregated for separate hearing and determination the issues of whether, on the basis solely of the agreed facts and the pretrial order exhibits, category A, and any evidence presented in contradiction of said pretrial order exhibits, the plaintiffs and intervenors are entitled to prevail on their joint contentions Nos. 1 and 2, or defendants are entitled to prevail on their contentions 1 through 7. Following said determination the remaining issues shall be tried, as appear necessary, and as ordered by the court.

NOW, THEREFORE, the parties, through their attorneys, having at pretrial conference before the judge agreed to the foregoing, it is hereby

ORDERED that the foregoing pretrial order shall not be amended, except by consent by all parties or by order of the court. Additional contentions can be added by plaintiffs in Sohappy vs. Smith, and by any of the intervenor tribes following disposition of the segregated issues, insofar as such contentions relate to matters left unresolved at that time, and exhibits pertaining to such unresolved matters may be added by all parties as provided in the "Exhibits" section of this order.

DATED, at Portland, Oregon, this 24th day of February, 1969.

s/Robert C. Belloni
United States Judge

# ATTACHMENT 2

# **Dkt. 104, 1969 Decree / Judgment**

(October 10, 1969)

U. S. DISTRICT COURT
DISTRICT OF OREGON
FILED
OCT 1 0 1969
MILDRED SPARGO, Clerk
By DE Roberts Deputy

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| RICHARD SOHAPPY; ALECK SOHAPPY, DAVID SOHAPPY, MYRA SOHAPPY, CLARA S. SOHAPPY, JAMES ALEXANDER, JAMES ALEXANDER, JR., LEO ALEXANDER, CLIFFORD ALEXANDER, HENRY J. ALEXANDER, ANDREW JACKSON, ROY WATLAMET, SHIRLEY McCONVILLE and CLARENCE TAHKEAL,<br><br>Plaintiffs<br><br>vs<br><br>McKEE A. SMITH, EDWARD G. HUFFSCHMIDT, J.I. EOFF, Commissioners, Oregon Fish Commission, ROBERT W. SCHONING, Director, Oregon Fish Commission, their agents, servants, employees and those persons in active concert or participation with them JOHN W. McKEAN, Director, Oregon Game Commission, his agents, servants, employees and those persons in active concert or participation with him,<br><br>Defendants | CIVIL NO. 68-409 |
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>vs.<br><br>STATE OF OREGON,<br><br>Defendant<br><br>vs.<br><br>THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON, CONFEDERATED TRIBES & BANDS OF THE YAKIMA INDIAN NATION, CONFEDERATED TRIBES OF THE UMATILLA INDIAN | CIVIL NO. 68-513 |

RESERVATION, AND NEZ PERCE )
TRIBE OF IDAHO, )
Intervenors ) JUDGMENT

The court having filed its opinion dated July 8, 1969, as Findings of Fact and Conclusions of Law in these proceedings,

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1. Before the State of Oregon may regulate the taking and disposition of fish by members of the Intervenor Tribes herein at usual and accustomed fishing places pursuant to treaties between the respective tribes and the United States:

(a).It must establish by hearings preliminary to regulation that the specific proposed regulation is both reasonable and necessary for the conservation of the fish resource. In order to be necessary, such regulations must be the least restrictive which can be imposed consistent with assuring the necessary escapement of fish for conservation purposes; the burden of establishing such facts is on the state.

(b) Its regulatory agencies must deal with the matter of the Indians' treaty fishing as a subject separate and distinct from that of fishing by others. As one method of accomplishing conservation objectives it may lawfully restrict or prohibit non-Indians fishing at the Indians' usual and accustomed fishing places without imposing similar restrictions on treaty Indians.

(c) It must so regulate the taking of fish that, except for unforeseeable circumstances beyond its control, the treaty tribes and their members will be accorded

an opportunity to attempt to take, at their usual and accustomed fishing places, by reasonable means feasible to them, a fair and equitable share of all fish which it permits to be taken from any given run.

2. ORS 511.106(1) may not be applied or relied upon by the State of Oregon or its agents, officers or employees to restrict fishing by members of the Intervenor tribes at their usual and accustomed places pursuant to their tribe's treaties with the United States.

3. The State of Oregon, to the extent that it can establish that such regulations are reasonable and necessary for conservation of the fish resources and do not discriminate against the Indians, and in accordance with the other provisions of this decree, may regulate the treaty Indian off-reservation fisheries; provided, that this judgment does not modify or affect in any way the judgment or orders of this court in the case of <u>Confederated Tribes of the Umatilla Indian Reservation, et al v. Maison, et al</u>, Civil No. 77-59, or any proceedings therein. In promulgating these regulations the protection of the treaty right to take fish at the usual and accustomed places must be an object of the state's regulatory policy and any restriction on the exercise of the treaty right must be expressed with such particularity that a member of the intervenor tribes can know in advance of their actions precisely the extent of the restrictions which the state has found to be necessary for conservation. In promulgating regulations, the State of Oregon must give the Intervenors and designated representatives of their members whose name and address are on file with the State of Oregon Fish Commission appropriate notice of the hearing and of the proposed restrictions to be considered and accord them an opportunity to be heard and participate meaningfully in

the rulemaking process.

4. This judgment constitutes a final judgment under Fed. R. Civ. P. 54(b) on the segregated claims above set forth, there being no just reason for delay. The court retains jurisdiction of the matters in suit herein for disposition of the remaining claims of the parties or to grant further or amended relief upon application of any of the parties. Any party at any time may apply to the court for a subsequent modification of any provision of this decree where the continued application of the decree has become inequitable or impracticable, but this right shall not affect the finality of the decree with respect to times prior to any such modification.

5. Each party shall bear its own costs.

DATED THIS 16 day of October, 1969.

United States District Judge

# ATTACHMENT 3

# **Dkt. 181, 1974 Amendment**

(May 10, 1974)

U. S. DISTRICT COURT
DISTRICT OF OREGON
FILED
ENTERED
MAY 10 1974
ROBERT M. CHRIST, Clerk
By [signature] DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| RICHARD SOHAPPY, et al,<br><br>Plaintiffs,<br><br>vs.<br><br>McKEE A. SMITH, EDWARD G. HUFFSCHMIDT, J.I. EOFF, Commissioners, Oregon Fish Commission; ROBERT W. SCHONING, Director, Oregon Fish Commission, their agents, servants, employees and those persons in active concert or participation with them; JOHN W. McKEAN, Director, Oregon Game Commission, his agents, servants employees and those persons in active concert or participation with him.<br><br>Defendants. | CIVIL NO. 68-409<br><br>ORDER AMENDING JUDGMENT OF OCTOBER 10, 1969 |
| UNITED STATES OF AMERICA,<br><br>Plaintiffs,<br><br>vs.<br><br>STATE OF OREGON,<br><br>Defendant,<br><br>and<br><br>THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON: CONFEDERATED TRIBES & BANDS OF THE YAKIMA INDIAN NATION: CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION: and NEZ PERCE TRIBE OF IDAHO,<br><br>Intervenors. | CIVIL NO. 68-513 |



FPI-Sandstone
6-2-70-75M-5343

The Indian treaty fishermen are entitled to have the opportunity to take up to 50 per cent of the harvest of the spring Chinook Salmon run destined to reach the tribes' usual and accustomed grounds and stations. Except insofar as amended here, the 1969 judgment remains in full force and effect.

IT IS SO ORDERED.

Dated this 10 day of May, 1974.

United States District Judge



FPI-Sandstone
6-2-70-75M-5643